1   MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
2   RANDI D. BANDMAN (145212)
    SYLVIA WAHBA (197612)
3   100 Pine Street, 26th Floor
    San Francisco, CA 94111
4   Telephone: 415/288-4545
    Facsimile: 415/288-4534
5            - and -
    PAUL D. YOUNG (*pro hac vice application pending*)
6   BRIAN C. KERR (*pro hac vice application pending*)
    One Pennsylvania Plaza
7   New York, NY  10119-0165
    Telephone:  212/594-5300
8   Facsimile: 212/868-1229

9   SCHIFFRIN & BARROWAY, LLP
    JACOB A. GOLDBERG
10  Three Bala Plaza East, Suite 400
    Bala Cynwyd, PA 19004
11  Telephone: 610/667-7706

12  STULL, STULL & BRODY
    MICHAEL BRAUN
13  10940 Wilshire Boulevard, Suite 2350
    Los Angeles, CA 90024
14  Telephone: 310/209-2468

15  *Co-Lead Counsel for Plaintiffs*

16              UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18  ----------------------------------------------------------- x   No. C-03-2102-PJH
                                                              :
19  In re FLEXTRONICS INTERNATIONAL LTD.                      :   CLASS ACTION
    SECURITIES LITIGATION                                     x
20  ----------------------------------------------------------- :   CONSOLIDATED CLASS ACTION
                                                              :   COMPLAINT PURSUANT TO THE
21                                                            x   SECURITIES EXCHANGE ACT OF
    This Document Relates To:  ALL ACTIONS                        1933
22  -----------------------------------------------------------
                                                                  DEMAND FOR JURY TRIAL
23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................... 1

JURISDICTION AND VENUE ................................................ 1

PARTIES

    A.    PLAINTIFFS ........................................................ 2

    B.    FLEXTRONICS DEFENDANTS ........................................... 2

    C.    UNDERWRITER DEFENDANTS .......................................... 3

DEFENDANTS' WRONGFUL COURSE OF CONDUCT ............................ 6

    A.    FLEXTRONICS RECORDED IN ITS FINANCIAL STATEMENTS SUBSTANTIAL AMOUNTS OF USELESS INVENTORY AND PROPERTY AND EQUIPMENT IN ORDER TO CONTINUE TO APPEAR TO BE PROFITABLE ......................................... 7

    B.    DEFENDANTS FAILED TO DISCLOSE THAT THE SEVERE DOWNTURN IN THE INTERNET AND TECHNOLOGY MARKETS CAUSED FLEXTRONICS TO HAVE A SIGNIFICANT AMOUNT OF EXCESS INVENTORY THAT NEEDED TO BE WRITTEN OFF ....................................................... 8

    C.    DEFENDANTS ALSO FAILED TO DISCLOSE THAT FLEXTRONICS HAD A SIGNIFICANT AMOUNT OF EXCESS CAPACITY THAT NEEDED TO BE WRITTEN DOWN ....... 10

    D.    DEFENDANTS FALSELY REPRESENTED FLEXTRONICS' BUSINESS AND PROSPECTS WHILE ORDERING THE COMPANY'S PLANT CONTROLLERS TO DESTROY INTERNAL COPIES OF FORECASTS, WHICH CONTAINED MATERIAL ADVERSE INFORMATION ................................................ 11

    E.    DEFENDANTS IMPROPERLY RELEASED RESERVES TO MEET PREDETERMINED EARNINGS TARGETS AND TO AVOID DISCLOSURE OF FLEXTRONICS' INABILITY TO THRIVE DURING THE SEVERE DOWNTURN IN THE TECHNOLOGY MARKET ..... 12

DEFENDANTS' MATERIALLY FALSE AND MISLEADING REGISTRATION STATEMENTS AND PROSPECTUSES FOR THE 2001 AND 2002 OFFERINGS ........ 13

    A.    FLEXTRONICS' 2001 SECONDARY OFFERING ........................... 13

    B.    FLEXTRONICS' 2002 SECONDARY OFFERING ........................... 16

DEFENDANTS' SCHEME UNRAVELS ........................................ 19

    A.    DEFENDANTS ANNOUNCE THAT AN ADDITIONAL $150 MILLION IN RESTRUCTURING CHARGES ARE NECESSARY, AND THAT THE COMPANY CANNOT POSSIBLY MEET DEFENDANTS' PREVIOUS EARNINGS AND REVENUE FORECASTS FOR THE FIRST QUARTER OF FISCAL 2003 ............................... 19

POST-CLASS PERIOD EVENTS FURTHER DEMONSTRATING DEFENDANTS' WRONGDOING ............................................ 20

i

1  FLEXTRONICS' FALSE FINANCIAL REPORTING
   DURING THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
2
         A.     FLEXTRONICS' FAILURE TO TIMELY RECORD AN IMPAIRMENT IN THE VALUE OF
3               LONG-LIVED ASSETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

4        B.     FLEXTRONICS' FAILURE TO TIMELY RECORD AN IMPAIRMENT IN
                THE VALUE OF ITS INVENTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
5
         C.     FLEXTRONICS IMPROPERLY RELEASES RESERVES TO
6               MEET PREDETERMINED EARNINGS TARGETS . . . . . . . . . . . . . . . . . . . . . . . . . . 30

7  NO SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

8  CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

9  FIRST CLAIM
   (Violation of Section 11 of the Securities Act Against All Defendants
10 In Regard To The 2001 Secondary Offering) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

11 SECOND CLAIM
   (Violation of Section 12(a)(2) of the Securities Act Against All
12 Defendants In Regard To The 2001 Secondary Offering) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

13 THIRD CLAIM
   (Violation of Section 15 of the Securities Act Against the Individual Defendants
14 In Regard to the 2001 Secondary Offering) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

15 FOURTH CLAIM
   (Violation of Section 11 of the Securities Act Against Flextronics, the Individual
16 Defendants and Banc of America Securities In Regard To The 2002 Secondary Offering) . . . . 38

17 FIFTH CLAIM
   (Violation of Section 12(a)(2) of the Securities Act Against Flextronics, the Individual
18 Defendants and Banc of America Securities in Regard to the 2002 Secondary Offering) . . . . . 40

19 SIXTH CLAIM
   (Violation of Section 15 of the Securities Act Against the Individual Defendants
20 In Regard to the 2002 Secondary Offering) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

21 JURY TRIAL DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

22

23

24

25

26

27

28

# INTRODUCTION

Plaintiffs, by their attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Class Action Complaint Pursuant To The Securities Act of 1933 (Complaint), make the following allegations against defendants upon information and belief (except as to allegations specifically pertaining to plaintiffs and their counsel, which are based on personal knowledge) based upon the thorough investigation conducted by and under the supervision of plaintiffs' counsel, which included reviewing and analyzing information and financial data relating to the relevant time period concerning defendant Flextronics International, Ltd. (Flextronics or the Company) and obtained from numerous public and proprietary sources (such as LEXIS-NEXIS, Dow Jones and Bloomberg), including, among other things, filings with the Securities and Exchange Commission, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead plaintiffs' claims with particularity.  Plaintiffs' investigation also included interviewing or consulting with numerous individuals, including former Flextronics employees who worked at the Company during the relevant period, and are knowledgeable about Flextronics' business and operations and/or the industry and markets in which Flextronics operates.  Except as alleged herein, the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiffs and the public and lie exclusively within the possession and control of defendants and other insiders, thus preventing plaintiffs from further detailing defendants' misconduct.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

# JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Sections 1331 and 1337, and Section 22 of the Securities Act of 1933 (Securities Act) [15 U.S.C. § 77v].

2.     The claims asserted herein arise under Sections 11, 12(a) and 15 of the Securities Act [15 U.S.C. §§ 77k, 77l(2) and 77o].

1    3.    Venue has been set in this Court pursuant to the April 23, 2003 order of the

2    Southern District of New York transferring this case pursuant to 28 U.S.C. § 1404(a).

3    4.    In connection with the acts, conduct and other wrongs alleged in this complaint,

4    defendants, directly or indirectly, used the means and instrumentalities of interstate commerce

5    including the mail, the internet, telephone communications and the facilities of national

6    securities exchanges.

7    **PARTIES**

8    **A.    PLAINTIFFS**

9    5.    *Lead Plaintiffs*.  Lead plaintiffs The Vieyra Family,[1] Optimum Investment

10   Advisors and Gordon Buck purchased the securities of Flextronics at artificially inflated prices,

11   as set forth in the certifications that are attached hereto in Exhibit A, and were damaged thereby.

12   The Southern District of New York previously designated these individuals to serve as lead

13   plaintiffs pursuant to an Order dated October 9, 2002.

14   6.    *Additional Plaintiffs*.  Numerous additional plaintiffs purchased Flextronics

15   securities and were damaged thereby.  These plaintiffs have signed appropriate certifications

16   under the Private Securities Litigation Reform Act (PSLRA), and, if needed, are willing and able

17   to serve as class representatives.  The certifications of these plaintiffs are being filed (or have

18   previously been filed) with the Court.

19   7.    Plaintiffs purchased shares pursuant to or traceable to the secondary offerings of

20   Flextronics stock on February 1, 2001 (2001 Offering) and January 7, 2002 (2002 Offering).

21   **B.    FLEXTRONICS DEFENDANTS**

22   8.    Defendant Flextronics is a corporation organized under and with its principal

23   place of business located within the Republic of Singapore, but conducts substantial business

24   within this District.  The Company's principal place of business is located at 11 Ubi Road 1,

25   #07-01/02, Meiban Industrial Building, Singapore, 408723.  Flextronics provides electronics

26   manufacturing services (EMS) and automated supply-chain services.  The Company's customers

27
       [1] The Vieyra Family consists of plaintiffs Manuel Bordelove, David Hoiness, Roland
28   Pang, Rodney Peterson, May Taylor, Erik Vieyra, Jeffrey Vieyra, Virginia Stockton and
       Matthew Vieyra.

1    include original equipment manufacturers (OEMs) in the telecommunications, networking,

2    computer, consumer electronics and medical device industries.

3           9.     Defendant Michael E. Marks has been the Company's Chief Executive Officer

4    since January 1994 and was its Chairman of the Board from July 1993 to January 2003.

5           10.    Defendant Robert R.B. Dykes has been Chief Financial Officer of Flextronics and

6    President of its Systems Group since February 1997.  In addition, he was a Director of the

7    Company from 1994 to 1997.

8           11.    Defendant Michael McNamara is the Company's Chief Operating Officer and

9    was President, Americas Operations from 1997 to 2001, and Vice President, North American

10   Operations from 1994 to 1997.

11          12.    Defendant Thomas J. Smach was Vice President, Finance at all relevant times.

12          13.    Defendant Tsui Sung Lam was a Director of the Company at all relevant times.

13          14.    Defendant Michael J. Moritz was a Director of the Company at all relevant times.

14          15.    Defendant Richard L. Sharp was a Director of the Company at all relevant times.

15          16.    Defendant Patrick Foley was a Director of the Company at all relevant times.

16          17.    Defendant Chuen Fah Alain Ahkong was a Director of the Company at all

17   relevant times.

18          18.    Defendants Marks, Dykes, McNamara, Smach, Lam, Mortiz, Sharp, Foley and

19   Ahkong (Individual Defendants) signed registration statements for the 2001 and 2002 Offerings,

20   which were filed with the SEC pursuant to the Securities Act.

21          19.    The Individual Defendants were at all relevant times controlling persons of

22   Flextronics within the meaning of Section 15 of the Securities Act.

23   **C.      UNDERWRITER DEFENDANTS**

24          20.    Defendant Banc of America Securities LLC (Banc of America Securities), a

25   subsidiary of Bank of America Corporation, is a full-service U.S. investment bank and brokerage

26   firm.  Banc of America Securities acted as Book-Running Manager of Flextronics' 2001

27   Offering, and was the sole underwriter of the Company's 2002 Offering.  As an underwriter of

28   the offerings, Banc of America Securities was obligated to make reasonable and diligent

1   investigations of the statements contained in the Registration Statements and Prospectuses for

2   the 2001 and 2002 Offerings at the time they were filed with the SEC and/or became effective.

3   As described herein, such Registration Statements and Prospectuses contained materially false

4   and misleading statements as to Flextronics' business operations and financial results.

5        21.    Defendant Goldman, Sachs & Co. is an integrated financial services institution

6   headquartered in New York City that, through its controlled subsidiaries and divisions (Goldman

7   Sachs), acted as co-lead manager of Flextronics' 2001 Offering.  As an underwriter of the

8   offering, Goldman Sachs was obligated to make reasonable and diligent investigations of the

9   statements contained in the Registration Statement and Prospectus for the 2001 Offering at the

10  time it was filed with the SEC and/or became effective.  As described herein, such Registration

11  Statement and Prospectus contained materially false and misleading statements as to Flextronics'

12  business operations and financial results.

13       22.    Defendant Salomon Smith Barney is an integrated financial services institution

14  headquartered in New York City that, through its controlled subsidiaries and divisions (Salomon

15  Smith Barney), acted as co-lead manager of Flextronics' 2001 Offering.  As an underwriter of

16  the offering, Salomon Smith Barney was obligated to make reasonable and diligent

17  investigations of the statements contained in the Registration Statement and Prospectus for the

18  2001 Offering at the time it was filed with the SEC and/or became effective.  As described

19  herein, such Registration Statement and Prospectus contained materially false and misleading

20  statements as to Flextronics' business operations and financial results.

21       23.    Defendant Thomas Weisel Partners LLC is an integrated financial services

22  institution that, through its controlled subsidiaries and divisions (Thomas Weisel), acted as co-

23  lead manager of Flextronics' 2001 Offering.  As an underwriter of the offering, Thomas Weisel

24  was obligated to make reasonable and diligent investigations of the statements contained in the

25  Registration Statement and Prospectus for the 2001 Offering at the time it was filed with the

26  SEC and/or became effective.  As described herein, such Registration Statement and Prospectus

27  contained materially false and misleading statements as to Flextronics' business operations and

28  financial results.

1    24.    Defendant Bear, Stearns & Co. Inc. is an integrated financial services institution

2    headquartered in New York City that, through its controlled subsidiaries and divisions (Bear

3    Stearns), acted as co-underwriter of Flextronics' 2001 Offering.  As an underwriter of the

4    offering, Bear Stearns was obligated to make reasonable and diligent investigations of the

5    statements contained in the Registration Statement and Prospectus for the 2001 Offering at the

6    time it was filed with the SEC and/or became effective.  As described herein, such Registration

7    Statement and Prospectus contained materially false and misleading statements as to Flextronics'

8    business operations and financial results.

9    25.    Defendant Deutsche Bank (Alex Brown) is an integrated financial services

10   institution headquartered in New York City that, through its controlled subsidiaries and divisions

11   (Deutsche Bank), acted as co-underwriter of Flextronics' 2001 Offering.  As an underwriter of

12   the offering, Deutsche Bank was obligated to make reasonable and diligent investigations of the

13   statements contained in the Registration Statement and Prospectus for the 2001 Offering at the

14   time it was filed with the SEC and/or became effective.  As described herein, such Registration

15   Statement and Prospectus contained materially false and misleading statements as to Flextronics'

16   business operations and financial results.

17   26.    Defendant Lehman Brothers is an integrated financial services institution

18   headquartered in New York City that, through its controlled subsidiaries and divisions (Lehman

19   Brothers), acted as co-underwriter of Flextronics' 2001 Offering.  As an underwriter of the

20   offering, Lehman Brothers was obligated to make reasonable and diligent investigations of the

21   statements contained in the Registration Statement and Prospectus for the 2001 Offering at the

22   time it was filed with the SEC and/or became effective.  As described herein, such Registration

23   Statement and Prospectus contained materially false and misleading statements as to Flextronics'

24   business operations and financial results.

25   27.    Defendant FleetBoston Financial Corp. (FleetBoston) is the successor-in-interest

26   to Robertson Stephens, which was an integrated financial services institution that, through its

27   controlled subsidiaries and divisions (Robertson Stephens), acted as co-underwriter of

28   Flextronics' 2001 Offering.  As an underwriter of the offering, Robertson Stephens was

1   obligated to make reasonable and diligent investigations of the statements contained in the

2   Registration Statement and Prospectus for the 2001 Offering at the time it was filed with the

3   SEC and/or became effective.  As described herein, such Registration Statement and Prospectus

4   contained materially false and misleading statements as to Flextronics' business operations and

5   financial results.

6      28.   Defendants Banc of America Securities, Goldman Sachs, Salomon Smith Barney,

7   Thomas Weisel, Bear Stearns, Deutsche Bank, Lehman Brothers and FleetBoston (Underwriter

8   Defendants) are not sued for fraud, but rather, only under non-fraud provisions of the securities

9   laws.  No allegations of fraud are made against or directed at these defendants.

10                    **DEFENDANTS' WRONGFUL COURSE OF CONDUCT**

11     29.   The material adverse information set forth below was omitted and/or

12   misrepresented in defendants' Registration Statements and Prospectuses for the 2001 and 2002

13   Offerings.

14     30.   As set forth below, defendants failed to disclose the existence of, among other

15   things, (i) excess high technology inventory that was worthless because it was subject to rapid

16   technological change and the Company did not have customers to purchase it; (ii) excess

17   manufacturing capacity that could not be profitably operated; (iii) the true decline in Flextronics'

18   forecasted business as reflected by individual reports from plant managers; and (iv) the improper

19   release of reserves to meet predetermined earnings targets.  Flextronics also falsified financial

20   statements at the time of the 2001 and 2002 Offerings by failing to write off worthless plant and

21   equipment and inventory.

22     31.   If Flextronics had properly written off the massive amounts of plant and

23   equipment and inventory, the magnitude of the charge would have exceeded the Company's

24   earnings at the time of the 2001 and 2002 Offerings.  Nothing could be more fundamental or

25   material to purchasers of Flextronics stock.

26

27

28

## A. FLEXTRONICS RECORDED IN ITS FINANCIAL STATEMENTS SUBSTANTIAL AMOUNTS OF USELESS INVENTORY AND PROPERTY AND EQUIPMENT IN ORDER TO CONTINUE TO APPEAR TO BE PROFITABLE

32.     Since he became CEO of Flextronics, defendant Marks has led Flextronics on a massive acquisition campaign, completing over 50 acquisitions since 1999.  Flextronics has bought businesses and facilities all over the world.  These facilities are capital-intensive and rely on a high-volume technology market in the United States in order to be profitable to operate.

33.     The Company leases, acquires or constructs facilities to perform under multi-year supply "arrangements" and to manufacture products for original equipment manufacturers (OEMs).  These "arrangements" typically do not require any minimum volumes of purchases by an OEM.

34.     When the technology market began declining before the 2001 and 2002 Offerings, Flextronics was left with a substantial amount of excess manufacturing capacity and inventory.   Such manufacturing facilities and unmarketable inventory were impaired under Generally Accepted Accounting Principles (GAAP).  As explained more fully in the section entitled "Flextronics' False Financial Reporting During the Class Period," losses arising from such impairments were not timely recorded.  Therefore, the market did not and could not appreciate that anticipated cash flows from these assets were not likely to materialize.  In fact, at the time of the 2001 and 2002 Offerings, many of Flextronics' largest customers canceled their orders or lowered their budgeted production quantities.

35.     Thus, contrary to the Company's publicly stated policies, Flextronics was in fact failing to record in its financial statements substantial amounts of impaired inventory and property and equipment in order to continue to appear to be profitable, whereas if it had accurately written off such inventory and plant and equipment it would not have been able to create the appearance of growth at the time of the 2001 and 2002 Offerings.

**B.    DEFENDANTS FAILED TO DISCLOSE THAT THE SEVERE DOWNTURN IN THE INTERNET AND TECHNOLOGY MARKETS CAUSED FLEXTRONICS TO HAVE A SIGNIFICANT AMOUNT OF EXCESS INVENTORY THAT NEEDED TO BE WRITTEN OFF**

36.    Many of Flextronics' agreements with its customers are not memorialized in writing. Accordingly, many of the Company's customers terminated orders when the market downturn began. Because of the industry in which it operates, most of Flextronics' inventory is customer-specific. As a result, Flextronics was left with a tremendous amount of time-sensitive inventory that was rapidly becoming obsolete (including a massive amount of inventory at the Company's Silicon Valley manufacturing facilities in San Jose and Fremont, California). Nonetheless, Flextronics avoided recording the impairments of such assets, thereby allowing the Company to overstate its financial performance at the time of the 2001 and 2002 Offerings.

37.    According to a former program manager at Flextronics' San Jose facility, the Company had a substantial amount of excess inventory in connection with its "arrangement" with Motorola. Motorola's monthly forecasts were constantly being reduced in 2001, often changing between $3 million and $500,000 from week to week. Flextronics purchased enough materials to support the high end of the forecasts, even though the demand would disappear the next day. When the expected demand did not materialize, Flextronics was saddled with at least $5 million in excess inventory in early 2002 that it failed to write off.

38.    Similarly, in the Company's "arrangement" with Extreme Networks, a former Flextronics' employee explained that Extreme's demand for access switches dropped dramatically in late 2001 and early 2002 because of the industry-wide downturn described above. As a result, Extreme's monthly business with Flextronics plummeted from $6 million per month in early 2001 to $500,000 per month by the end of 2001. Flextronics then succumbed to pressure from Extreme Networks and agreed to maintain ownership of the Extreme inventory – which was described by a former Flextronics program manager as a "huge" amount.

39.    Flextronics also agreed to retain ownership of inventory that was supposed to be sold to Copper Mountain. According to a former supply chain leader for Flextronics, Copper Mountain experienced severe financial difficulties and forced the Company to store between $7 and $25 million of unsold Copper Mountain products in a Flextronics warehouse (including

1   finished goods, sub-assembled parts, and some defective parts).  In May 2002, there was at least

2   $15 million of excess inventory that should have been written off but was not.

3          40.     Flextronics also experienced significant problems with its Cisco "arrangement."

4   According to a former Flextronics employee, when the tech market began to decline, Cisco

5   reversed its previous practice and demanded that, if Flextronics wanted to keep Cisco's business,

6   the Company was responsible for procuring the necessary production materials.  Flextronics

7   acceded to Cisco's demands, even though Cisco was experiencing severe financial difficulties at

8   the time.  Cisco canceled its orders, and walked away from Flextronics at the end of 2001.

9   Flextronics was totally exposed and was left with millions of dollars in excess inventory.

10  Moreover, Flextronics had conducted a major review of its Cisco inventory in the spring of

11  2001, and had lost Cisco as a customer only months later.

12         41.     A former Flextronics employee described that, by the fall of 2001, the Company

13  also had $10 million in obsolete inventory at its plant in Richardson, Texas, which defendants

14  failed to record as a loss.  The inventory consisted of raw materials to manufacture cabinets that

15  one of Flextronics' customers decided not to purchase.  This material, as is frequently the case

16  with Flextronics' arrangement, could only be used for a certain customer.

17         42.     Numerous former employees have stated that the Company's manufacturing

18  facilities were loaded with inventory they could not sell.  For example, one former Flextronics

19  employee stated, "I've been a VP, I ran a company and I know when books are being straight and

20  when they are not."  The former employee stated that when he questioned the Company's

21  reported profits and why the Company had not written off what he believed to be excessive

22  levels of unwanted inventory, he was told by his superiors to "shut up."  The former employee

23  said that he felt that Flextronics was "keeping inventory on the books for two years when they

24  shouldn't have."

25         43.     Another former Flextronics employee stated that there was "a lot" of excess

26  inventory "sitting around."  The former employee stated each month he would review his

27  division's profit and loss statement, adding: "I was just looking at my customers and the figures

28  just did not add up . . .  I just could not figure out how they came up with the numbers they did."

9

44.     A former Flextronics senior accountant in San Jose, California stated that "your eyes would pop out" if you saw the amount of inventory stored at the Sunnyvale, California warehouse.  In fact, a former Site Manager/Director of Operations in San Jose recalled at least $4-5 million in excess inventory that should have been written-off.

45.     Moreover, the conditions in the Company's industry that existed at the time of the 2001 and 2002 Offerings rapidly drove down the utility and replacement cost for Flextronics' inventory.  In fact, prior to the 2001 Offering, the Company established a Material Review Board (MRB) to monitor Flextronics' excess inventory.

**C.     DEFENDANTS ALSO FAILED TO DISCLOSE THAT FLEXTRONICS HAD A SIGNIFICANT AMOUNT OF EXCESS CAPACITY THAT NEEDED TO BE WRITTEN DOWN**

46.     As a contract manufacturer, Flextronics is required to make significant capital investments in various facilities to manufacture unique products its for customers.  As explained more fully in the section below entitled, "Flextronics' False Financial Reporting During the Class Period," beginning no later than the fourth quarter of 2000, Flextronics' customers began to cancel orders due to the massive decline in the demand for internet and telecommunications products and services.  Moreover, not only did Flextronics' customers cancel existing contracts during 2000, but major customers also pressured the Company to accept return of product previously purchased from Flextronics that they could not sell.

47.     As a result of the significant reduction in demand for Flextronics' products, which resulted in order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets decreased significantly.  In fact, one witness recalled that plants in the Company's Enclosures Systems division were going idle by the end of 2000, with the efficiency rate of the division's manufacturing facilities plummeted from 100% to 20%.

48.     Nonetheless, in direct contravention of the Company's publicly disclosed policy of accounting for its long-lived assets, defendants caused Flextronics to improperly delay the recognition of impairment in the value of long-lived assets until they sold hundreds of millions of dollars of Flextronics stock at artificially inflated prices.  Indeed, a former Flextronics senior

1  quality manager responsible for all supplier quality engineering issues explained that Flextronics

2  never did admit how severe the downturn was and that Flextronics only said things were slow,

3  and was not forthcoming in admitting that things were really bad.

4  **D.  DEFENDANTS FALSELY REPRESENTED FLEXTRONICS' BUSINESS AND PROSPECTS
   WHILE ORDERING THE COMPANY'S PLANT CONTROLLERS TO DESTROY INTERNAL
5  COPIES OF FORECASTS, WHICH CONTAINED MATERIAL ADVERSE INFORMATION**

6  49.  At the time of the 2001 and 2002 Offerings, Flextronics' plant controllers were

7  required to submit 12-month rolling forecasts to the Company's corporate finance department

8  each month.

9  50.  In late 2001 or early 2002, however, Flextronics directed all of its plant

10  controllers by email to ***destroy*** all hard and soft copies of these internal forecasts after they were

11  sent to the Company's regional headquarters in San Jose, California.

12  51.  Upon information and belief, defendants ordered that all copies of internal

13  forecasts be destroyed because they were drastically different (*i.e.*, lower) than the false and

14  misleading forecasts that were being delivered to analysts and investors.

15  52.  According to a former Flextronics manager, the only reason for defendants'

16  decision to send the email ordering the document destruction was that "***the forecasts being***

17  ***submitted to analysts and Wall Street were false, and someone was afraid the real numbers***

18  ***would get into the wrong hands***."

19  53.  One witness recalls that defendants were so concerned that their request to

20  destroy forecasts would become public that it was delivered on a strict "need to know" basis.  As

21  a result, according to several former Flextronics employees, the Company's finance department

22  (with the approval of defendants Marks and McNamara) sent the email only to plant controllers

23  and others charged with preparing 12-month forecasts.

24  54.  Defendants also manipulated their forecasts in connection with the Company's

25  acquisition of Telecom Global Solutions (TGS) in August 2001.  According to a former

26  Flextronics' sales representative, immediately after the TGS acquisition in September 2001, the

27  Company's sales representatives told management (including defendant Marks and Magnus

28  Friberg, who was Flextronics' Vice President of Global Sales and Marketing) that the previously

1   announced forecasts were not accurate because of the significant downturn in the

2   telecommunications sector.  Defendants refused to correct the forecasts.  In fact, one former

3   Flextronics' sales representative recalled that the difference between projected sales and the

4   actual sales he was achieving for the Company's Network Services business unit was at least ***20-***

5   ***30%***.

6       55.    Similarly, according to several Flextronics former employees with personal

7   knowledge of the relevant facts, corporate headquarters engaged in "creative accounting" and

8   routinely inflated internal forecasts after receiving them.  For example, a former program

9   manager in the Company's San Jose office who dealt with some of Flextronics' largest

10  customers (including Motorola) recalled that the forecasts he received from corporate did not

11  match the figures he had for his own customers.  In addition, a former accounting manager for

12  Flextronics' Network Services Division specifically recalled that after his numbers were passed

13  on to corporate headquarters, the figures "did not match."

14  **E.    DEFENDANTS IMPROPERLY RELEASED RESERVES TO MEET PREDETERMINED
         EARNINGS TARGETS AND TO AVOID DISCLOSURE OF FLEXTRONICS' INABILITY TO**
15       **THRIVE DURING THE SEVERE DOWNTURN IN THE TECHNOLOGY MARKET**

16      56.    As explained more fully in the section below entitled, "Flextronics' False

17  Financial Reporting During the Class Period," defendants improperly released accounting

18  reserves commencing no later than the third quarter of fiscal 2002, in order to meet certain

19  predetermined earnings targets and to mask defendants' inability to prosper in the adverse tech

20  market.  According to a witness that worked closely with the Company's Corporate Controller,

21  defendants accomplished this by establishing at least two separate reserve accounts prior to the

22  2002 Offering (the "memorial" and "dark period" accounts), which were commonly referred to

23  in the Company (and treated) as "***slush funds***" accounts.

24      57.    Defendants utilized the "dark period" reserves in connection with the Company's

25  acquisitions.  According to a witness that worked closely with Flextronics' corporate controller's

26  office, defendants directed acquired companies to take huge write-offs and charges so that the

27  Company could increase Flextronics' reported earnings after the acquisitions.  The "dark period"

28  reserve – which derives its name from the fact that it remains hidden from regulators and

1   auditors during the "dark period" following an acquisition – was at least $12-$15 million at any

2   given time between October 2001 and June 2002.

3       58.     In regard to the "memorial" reserves, which were utilized after Flextronics took a

4   $500 million "one-time" restructuring charge in October 2001, the witness who worked with the

5   Company's corporate controller explained that the Corporate Controller's office instructed

6   divisions throughout Flextronics to release accounting reserves in amounts ranging from $5

7   million to $12 million each month, not because it was proper to release the reserves, but in order

8   to meet predetermined earnings targets.  This effort to "reverse engineer" (i.e., artificially inflate)

9   earnings was done prior to and after the 2002 Offering, and was performed at the direction of

10  Flextronics' Corporate Controller.

11      **DEFENDANTS' MATERIALLY FALSE AND MISLEADING REGISTRATION
        STATEMENTS AND PROSPECTUSES FOR THE 2001 AND 2002 OFFERINGS**

12

13      59.     All of the above-described material adverse information was omitted and

14  misrepresented in defendants' Registration Statements and Prospectuses for the 2001 and 2002

15  Offerings.  Rather than disclosing the true state of affairs at Flextronics – the excess inventory

16  that was worthless without a customer to purchase it, the excess manufacturing capacity that

17  could not be profitably operated, the true decline in Flextronics' forecasted business as reflected

18  by individual reports from plant managers, and the improper release of reserves – defendants

19  falsely represented that Flextronics' business was uniquely thriving in an adverse business

20  climate and that its business prospects remained strong.  Flextronics also falsified its financial

21  statements at the time of the 2001 and 2002 Offerings by failing to write off worthless inventory

22  and plant and equipment.

23  **A.    FLEXTRONICS' 2001 SECONDARY OFFERING**

24      60.     On or about February 1, 2001, Flextronics sold 27 million shares of common

25  stock in a public offering (2001 Offering) at $37.9375 per share.  Banc of America Securities

26  LLC was sole book manager for this secondary offering of Flextronics common stock.

27  Goldman, Sachs & Co., Salomon Smith Barney, Thomas Weisel Partners LLC, Bear, Stearns &

28  Co. Inc., Deutsche Bank Alex. Brown Inc., Lehman Brothers Inc. and Robertson Stephens, Inc.

1   were also underwriters for the 2001 Offering.  Flextronics raised approximately $1.024 billion in

2   the 2001 Offering.

3          61.    **False Statement**:  In connection with the 2001 Offering, Flextronics filed a

4   registration statement on February 1, 2001, incorporating a prospectus (2001 Registration

5   Statement and Prospectus), which supplemented an earlier prospectus filed by the Company on

6   October 6, 2000.  The 2001 Registration Statement and Prospectus, which was signed by the

7   Individual Defendants, falsely reported the Company's financial results for the third quarter of

8   fiscal 2001:

9          Third Quarter Financial Results. On January 18, 2001, we announced our
           financial results for the third quarter of fiscal year 2001. . . .  Gross profit
10         increased from $170.1 million in the third quarter of fiscal 2000 to $236.7 million
           in the third quarter of fiscal 2001, and operating income increased from $83.6
11         million in the third quarter of fiscal 2000 to $115.2 million in the third quarter of
           fiscal 2001. Net income before amortization, merger related costs and other one-
12         time charges increased from $58.5 million in the third quarter of fiscal 2000 to
           $122.7 million in the third quarter of fiscal 2001. Net income after amortization,
13         merger related costs and other one-time charges increased from $47.8 million in
           the third quarter of fiscal 2000 to $67.8 million in the third quarter of fiscal 2001.
14         As a result, our diluted earnings per share increased from $0.12 for the third
           quarter of fiscal 2000 to $0.14 for the third quarter of fiscal 2001.

15         62.    **False Statement**:  The 2001 Registration Statement and Prospectus also

16  identified several contingent risk factors that, unknown to investors, were already having an

17  adverse effect on the Company.  The 2001 Registration Statement and Prospectus falsely stated:

18         OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE
19         PRODUCTION QUANTITIES OR DELAY PRODUCTION.

20         Electronics manufacturing service providers must provide increasingly rapid
           product turnaround for their customers. We generally do not obtain firm, long-
21         term purchase commitments from our customers and we continue to experience
           reduced lead-times in customer orders. Customers may cancel their orders,
22         change production quantities or delay production for a number of reasons.
           Cancellations, reductions or delays by a significant customer or by a group of
23         customers would seriously harm our results of operations.

24         In addition, we make significant decisions, including determining the levels of
           business that we will seek and accept, production schedules, component
25         procurement commitments, personnel needs and other resource requirements,
           based on our estimates of customer requirements. The short-term nature of our
26         customers' commitments and the possibility of rapid changes in demand for their
           products reduces our ability to estimate accurately future customer requirements.
27         This makes it difficult to schedule production and maximize utilization of our
           manufacturing capacity. We often increase staffing, purchase materials and incur
28         other expenses to meet the anticipated demand of our customers. Anticipated

orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. On occasion, customers may require rapid increases in production, which can stress our resources and reduce margins. Although we have increased our manufacturing capacity, and plan further increases, we may not have sufficient capacity at any given time to meet our customers' demands. In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross margins and operating income.

63.    **False Statement**:  The 2001 Registration Statement and Prospectus also falsely stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

. . . The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues would be harmed.

64.    **Reasons Why The 2001 Registration Statement and Prospectus Was False and Misleading**:  These statements in the 2001 Registration Statement and Prospectus were materially false and misleading for the reasons set forth above in paragraphs 29 through 58.  The statements were also materially false and misleading because the Company presently had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn. The statements were also materially false and misleading because many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases.  The statements were also materially false and misleading because, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers.  The statements were also materially false and misleading because the adverse events identified as potential risk factors in the 2001 Registration Statement and Prospectus were already occurring.  As set forth below in paragraphs 76 through 119, defendants also engaged in various improper accounting practices that were designed to fraudulently manipulate and inflate the Company's reported financial performance.

15

**B.    FLEXTRONICS' 2002 SECONDARY OFFERING**

65.     As set forth above, in late 2001 or early 2002, Flextronics directed all of its plant controllers by email to ***destroy*** all hard and soft copies of these internal forecasts after they were sent to the Company's regional headquarters in San Jose, California because, upon information and belief, they were drastically different (*i.e.*, lower) than the false and misleading forecasts that were being delivered to analysts and investors.

66.     On January 7, 2002, the Company sold 20,000,000 shares of common stock in another public offering of common stock priced at $25.96 per share, thereby raising over $500 million in gross proceeds (2002 Offering).  The Company also announced that it had granted the underwriters of this offering (Banc of America Securities LLC) an over-subscription allotment whereby they could purchase an additional 3,000,000 shares of Flextronics common stock at that price within thirty days, which shares would in turn be sold to the public.

67.     **False Statement**:  In connection with the 2002 Offering, Flextronics filed a registration statement on January 8, 2002, incorporating a prospectus (2002 Registration Statement and Prospectus), which supplemented an earlier prospectus filed by the Company on October 6, 2000.  The 2002 Registration Statement and Prospectus, which was signed by the Individual Defendants, stated:

> We "incorporate by reference" in this prospectus information from other documents that we file with the SEC, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference . . . any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 prior to the sale of all the shares covered by this prospectus . . . .

Therefore, the 2002 Registration Statement and Prospectus incorporated defendants' materially false and misleading statements contained in the Company's filings with the SEC, which are set forth in plaintiffs' Consolidated Class Action Complaint Pursuant to the Securities Exchange Act of 1934, dated December 17, 2002.

68.   **False Statement**:  The 2002 Registration Statement and Prospectus also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company.  The 2002 Registration Statement and Prospectus falsely stated:

**Our customers may cancel their orders, change production quantities or delay production.**

EMS providers must provide increasingly rapid product turnaround for their customers. We generally do not obtain firm, long-term purchase commitments from our customers and we continue to experience reduced lead-times in customer orders. Customers may cancel their orders, change production quantities or delay production for a number of reasons. Many of our customers'' industries are experiencing a significant decrease in demand for their products and services. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them, and placing purchase orders for lower volumes of products than previously anticipated. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations by reducing the volumes of products manufactured by us for the customers and delivered in that period, as well as causing a delay in the repayment of our expenditures for inventory in preparation for customer orders and lower asset utilization resulting in lower gross margins.

In addition, we make significant decisions, including determining the levels of business that we will seek and accept, production schedules, component procurement commitments, personnel needs and other resource requirements, based on our estimates of customer requirements. The short-term nature of our customers'' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, increase capacity and incur other expenses to meet the anticipated demand of our customers, which may cause reductions in our gross margins if customer orders are delayed or canceled. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers'' products. On occasion, customers may require rapid increases in production, which can stress our resources and reduce margins. Although we have increased our manufacturing capacity, and plan further increases, we may not have sufficient capacity at any given time to meet our customers'' demands. In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

69.   **False Statement**:  The 2002 Registration Statement and Prospectus also falsely stated:

**The majority of our sales come from a small number of customers; if we lose any of these customers, our sales could decline significantly.**

\* \* \*

17

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

70.    **Reasons Why The 2002 Registration Statement and Prospectus Was False and Misleading**:  These statements in the 2002 Registration Statement and Prospectus were materially false and misleading, including those incorporated by reference therein, for the reasons set forth above in paragraphs 29 through 58.  The statements were also materially false and misleading because the Company presently had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn.  The statements were also materially false and misleading because many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases.  The statements were also materially false and misleading because, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers.  The statements were also materially false and misleading because the charges the Company was taking for the write-down of long-lived and current assets did not include the large amount of other assets known by defendants to be worthless.  The statements were also materially false and misleading because the adverse events identified as potential risk factors had already occurred.  The statements were also materially false and misleading because Flextronics was manipulating its publicly announced forecasts in order to disguise the fact that Flextronics' financial results were declining.  The statements were also materially false and misleading because Flextronics was manipulating its publicly announced forecasts in order to disguise the fact that Flextronics' financial results were declining.  As set forth below in paragraphs 76 through 119, defendants also engaged in various improper accounting practices that were designed to fraudulently manipulate and inflate the Company's reported financial performance.

71.    On May 8, 2002, Flextronics announced that it had decided to fire and replace its outside auditors, Arthur Andersen.  Following the preparation of the Company's year-end

1   financial statements, defendants announced that while there were "no disagreements between the

2   Company and Andersen on any matter of accounting principles or practices," Flextronics would

3   replace the outside auditors.

## DEFENDANTS' SCHEME UNRAVELS

A.   **DEFENDANTS ANNOUNCE THAT AN ADDITIONAL $150 MILLION IN RESTRUCTURING CHARGES ARE NECESSARY, AND THAT THE COMPANY CANNOT POSSIBLY MEET DEFENDANTS' PREVIOUS EARNINGS AND REVENUE FORECASTS FOR THE FIRST QUARTER OF FISCAL 2003**

72.     After the market close on June 3, 2002, and only months after defendants unloaded over $500 million of Company shares priced at almost $26.00 per share upon unsuspecting investors, Flextronics held its mid-quarter conference call for the first quarter of fiscal 2003.  During the call, defendants shocked the market when they finally revealed that the restructuring, which was purportedly paid for in October 2001 and substantially completed thereafter, was still far from complete.  Defendants now admitted that there were at least an additional $150 million in restructuring charges that had to be recorded.  In addition, defendants also stated that they could not possibly meet the Company's previous earnings and revenue forecasts for its first fiscal quarter 2003.   Defendants now admitted that the Company would earn as little as $0.05 per share, 62% less than the $0.13 per share defendants had forecasted only weeks earlier.  Revenue estimates were also suddenly reduced, with only $3 billion in revenue now forecast for the first quarter 2003, compared to prior estimates of $3.3 billion.

73.     Defendant Marks stated during the June 3, 2002 conference call:

> [W]e will not earn what we expect to either this quarter or next.  For the current quarter we believe that earnings before restructuring charges will be 5 to 8 cents on about $3 billion in revenue and we will be about 25% below EPS expectations for next quarter with EPS of 7 to 10 cents on about $3.2 billion in revenue.  As we move beyond the September quarter, we are hopeful that the results of everything I have discussed here will begin to show the kind of improvement that our investors expect.  In the future, we intend to give you more detailed updates on the progress towards our return to robust profit.  Hopefully this will enhance your ability to develop your own expectations of our short-term and long-term earnings estimates as well as better assess our competitive position and strength.  In the current quarter we will take a restructuring charge of approximately $150 million.  We thought the fees would be behind us but the baggage due to the downturn and our intense desire to get our cost structure in line in the near term require us to move quickly.

74.     In response to this negative announcement, the price of Flextronics common stock dropped precipitously, falling from $12.32 per share to as low as $9.50 per share, a decline of almost 23%, on tremendous volume of 47 million Flextronics shares traded.

**POST-CLASS PERIOD EVENTS FURTHER DEMONSTRATING**
**DEFENDANTS' WRONGDOING**

75.     Analysts reacted very harshly to defendants' belated disclosure.  For example:

• "Management has been saying for a long time they are already seeing signs of a recovery, and it was clear from the call that isn't the case.  The miss was rather dramatic." (*Bloomberg*, 6/4/02, Michelle Lin Gutierrez, analyst for SoundView Technology Group).

• "***When you add back the charges, they never made any money***.  This is their sixth charge in eight months, and no one expected any more." (*Bloomberg*, 6/4/02, James Grefenstette, co-manager Federated Growth Strategies Fund) (emphasis added).

• "The [$150 billion] charge is a surprise.  They've taken well over $1.2 billion in the past six quarters and had said that was all they were going to take." (*Bloomberg*, 6/4/02, Kevin Denney, analyst for Brean Murray & Co.).

• "It was unfortunate and disappointing they had to take another restructuring charge.  They had indicated that was over." (*Bloomberg*, 6/4/02, Jaye Morency, manager DBL Technology Fund).

• "Flextronics' management had previously indicated they were going to make no further restructuring charges and we anticipate the Company will record an additional $150 million in charges this quarter.  It appears that the Company continues to right-size its operations and the payback from prior restructuring charges (including the $399 million in one-time charges taken in 2QFY02) has been difficult to achieve." (Kaufman Brothers analyst report by David Miller, June 4, 2002).

**FLEXTRONICS' FALSE FINANCIAL REPORTING**
**DURING THE CLASS PERIOD**

76.     Flextronics engaged in various improper accounting practices that were designed to fraudulently manipulate and inflate its financial statements at the time of the 2001 and 2002 Offerings in an effort to misrepresent and fraudulently conceal the true state of Flextronics' operating results and to bolster the market price of its securities.  Flextronics engaged in these practices in an attempt to make good on its false representations and reassurances to the investing public that, despite a massive contraction and retrenchment of the internet and telecommunications sectors, the Company's growth would continue unabated at the time of the 2001 and 2002 Offerings.

77.     Beginning in 2000, the demand for the Company's manufactured products began to stall.  In an attempt to mask the adverse effects ensuing from a dramatic slowdown in the business of its internet and telecommunications customers, Flextronics engaged in improper conduct that was designed to create the false impression that the demand for the Company's manufactured products continued to be robust.

78.     These practices violated GAAP and falsely reflected the value of Flextronics' assets and earnings so that the Company could sell $1.5 billion in Flextronics stock at artificially inflated prices to unsuspecting investors.

79.     Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

80.     As set forth in Financial Accounting Standards Board (FASB) Statements of Concepts (Concepts Statement) No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluation of past enterprise performance.

81.     At the time of the 2001 and 2002 Offerings, Flextronics' periodic reports filed with the SEC materially overstated Flextronics' assets as a result of the Company's improper failure to timely record an impairment of the value of its long-lived assets and inventory.  In so doing, Flextronics also materially overstated its gross profit, gross margins, and earnings at the time of the 2001 and 2002 Offerings.[2]

82.     Ultimately, on November 14, 2002, Flextronics reported "unusual" charges of $516.1 million during the quarter ended September 30, 2001, which included a charge of $163.7 million for the write down of property, plant and equipment associated with various

---

[2] Gross profit is defined as the excess of sales over cost of goods sold and is referred to as gross margin when expressed as a percentage of sales.

21

1   manufacturing and administrative facility closures and a $98 million charge for impaired

2   inventory and accounts receivable.  However, the accounting reserves, including those

3   established to record the $516.1 million charge during the September 2001 quarter, were falsely

4   and improperly released into earnings to allow Flextronics to meet predefined earnings targets.

5   Thereafter, during the quarter ended June 30, 2002, Flextronics recorded yet another "unusual"

6   charge of $207.8 million to, in part, reestablish the previous reserves that were improperly

7   released.

8   **A.   FLEXTRONICS' FAILURE TO TIMELY RECORD AN IMPAIRMENT IN THE VALUE OF LONG-LIVED ASSETS**

9
10          83.     GAAP generally provides that circumstances involving possible losses "shall be

    accrued by a charge to income" if: (i) information indicates that it is probable that an asset had
11
    been impaired or a liability had been incurred at the date of the financial statements; and (ii) the
12
    amount of the loss can be reasonably estimated.  FASB's Statement of Financial Accounting
13
    Standards (SFAS) No. 5, ¶ 8.
14
            84.     With respect to long-lived assets, such as property and equipment, GAAP in
15
    FASB's SFAS No. 121, required that where events or changes in circumstances indicate that the
16
    carrying value of long-lived assets may not be recoverable, then: 1) the entity shall estimate the
17
    future undiscounted cash flows resulting from the asset, and 2) compare the estimated future
18
    cash flows against the carrying (*i.e.*, the reported) value of the asset.[3]  If the sum of the expected
19
    future cash flows is less than the carrying value, the entity was required to record an impairment
20
    loss to the extent that the carrying value of the asset(s) exceeds the fair value.  In estimating
21
    future cash flows to measure impairment, assets were required to be grouped at the *lowest* level
22
    for which there are identifiable cash flows.
23
            85.     Flextronics' audited March 31, 2000 annual financial statements included in its
24
    2000 Form 10-K disclosed the following policy of accounting for long-lived assets:
25
26          The Company reviews long-lived assets for impairment whenever events or
            changes in circumstances indicate that the carrying amount of an asset may not be

27          ────────────────────
            [3] The provisions of FASB's SFAS  No. 121 relating to long-lived assets have been
28   superseded by SFAS No. 144.  SFAS No. 144 became effective beginning with Flextronics'
     fiscal year ended March 31, 2003.

recoverable. Recoverability of property and equipment is measured by comparison of its carrying amount, including the unamortized portion of goodwill allocated to the property and equipment, to future net cash flows the property and equipment are expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the property and equipment, including the allocated goodwill, if any, exceeds its fair market value. The Company assesses the recoverability of enterprise level goodwill and intangible assets as well as long-lived assets by determining whether the unamortized balances can be recovered through undiscounted future results of the operation or asset. The amount of enterprise level long lived asset impairment, if any, is measured based on projected discounted future results using a discount rate reflecting the Company's average cost of funds. To date, the Company has made no adjustments to the carrying value of its long-lived assets.

86.    As a contract manufacturer, Flextronics is required to make significant capital investments in numerous facilities so that it can manufacture unique products for its customers. As noted above, beginning no later than the fourth quarter of 2000, Flextronics' customers began to cancel orders due to a massive contraction in the demand for their internet and telecommunications products and services.  This significant shift in the demand for products manufactured by Flextronics, beginning no later than the fourth quarter of 2000, was an "event or change in circumstances" contemplated under SFAS No. 121 warranting an assessment as to whether the value of Company's long-lived assets was impaired.  In fact, SFAS No. 121 cites a significant adverse change in an entity's business climate as an example of an event or change in circumstances requiring an entity to test its long-lived assets for impairment.

87.    In fact, not only did Flextronics' customers cancel existing contracts during 2000, but major customers also pressured the Company to accept return of product previously purchased from Flextronics that they could not sell.  For example, *a former Flextronics employee explained that when the technology industry started "falling apart" at the end of 2000 and into 2001, the Company would buy back product it previously sold to its customers out of fear that if it did not do so, the customer would terminate its relationship with Flextronics.*

88.    As a result of the significant reduction in the demand for the products manufactured by Flextronics due to order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets

1   decreased significantly.  In fact, according to one witness, order cancellations that commenced in

2   the fourth quarter of 2000 caused certain of the Company's manufacturing facilities to run at less

3   than 20% of capacity.  Operating a manufacturing facility at that level did not make economic

4   sense, and could only mean that the facility would have to be shut down and that the assets

5   associated with the facility were impaired.  Indeed, a former production supervisor in Santa

6   Clara, California stated that *beginning as early as March 2000, "things got pretty slow" in the*

7   *Company's fiberoptics division and "got slower and slower and never really ramped ."  In fact,*

8   *the former production supervisor stated "we were pretty much left to sit around most of the*

9   *time and got paid for it."*

10      89.      Flextronics' customers could cancel business at will, thereby impairing the value

11   of the Company's long-lived assets used to manufacture unique customer-specific products.  In

12   fact, Flextronics' March 31, 2000 Form 10-K disclosed that "*[c]ustomers may cancel their*

13   *orders, change production quantities or delay production for a number of reasons.*

14   *Cancellations, reductions or delays by a significant customer or by a group of customers*

15   *would seriously harm our results of operations,*" and that "*our principal customers may not*

16   *continue to purchase services from us at current levels, if at all.  Significant reductions in*

17   *sales to any of these customers, or the loss of major customers, would seriously harm our*

18   *business. If we are not be able to timely replace expired, canceled or reduced contracts with*

19   *new business, our revenues would be harmed.*"  In fact, such risks of cancellation, delays and

20   loss of customers had already come to pass.

21      90.      Nonetheless, in violation of GAAP and in direct contravention of Flextronics'

22   publicly disclosed policy of accounting for its long-lived assets, Flextronics' financial statements

23   delayed the recognition of an impairment in the value of long-lived assets.  Indeed, a former

24   Flextronics senior quality manager responsible for all supplier quality engineering issues

25   explained that *Flextronics never did admit how severe the downturn was* and that *Flextronics*

26   *only said things were slow, and was not forthcoming in admitting things were really bad.*

27

28

**B.** **FLEXTRONICS' FAILURE TO TIMELY RECORD AN IMPAIRMENT IN THE VALUE OF ITS INVENTORY**

91.     In furtherance of its attempt to inflate the Company's operating results, Flextronics also improperly delayed recording an impairment of inventory that customers no longer wanted or that they returned to Flextronics.

92.     Flextronics' audited March 31, 2000, 2001 and 2002 annual financial statements included in its Forms 10-K disclose its policy of accounting for inventory as follows:

> Inventories are stated at the lower of cost (first-in, first-out basis) or market value. Cost is comprised of direct materials, labor and overhead.

93.     GAAP, in Chapter 4 of Accounting Research Bulletin (ARB) No. 43, provides:

> A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues. . .

> The primary basis for accounting for inventories is cost. . . .  A departure from the cost basis of pricing inventories ***is required*** when the utility of goods is longer as great as its cost.  Where there is evidence that the utility of goods, in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss in the current period.  This is generally accomplished by stating such goods at the lower level commonly designated as *market.* [First emphasis added.]

> The term market means the current replacement cost except that :

> a)     Market should not exceed the . . . estimated selling price in the ordinary course of business less reasonably predictable costs of . . . disposal; and

> b)     Market should not be less than the . . . estimated selling price in the ordinary course of business less reasonably predictable costs of . . . disposal reduced by a . . . normal profit margin.

94.     Accordingly, for financial reporting purposes, the issue is not whether a product is not usable or obsolete, but, rather, whether obsolescence, physical deterioration, changes in price levels, or other factors cause inventory to be worth less than its stated cost.  In fact, GAAP, in Accounting Principles Board (APB) Opinion No. 28, paragraph 14 provides that inventory losses from market declines should not be deferred beyond the period in which the decline occurs.

95.     At the time of the 2001 Offering, Flextronics' financial statements violated GAAP by improperly accounting for its inventory and cost of goods sold.  Flextronics did so by failing to timely record an impairment in the value of its inventory.  Indeed, according to numerous

1  former Flextronics employees, the inventory levels at Flextronics were steadily increasing as

2  many of Flextronics' large customers began canceling orders while the decline in the

3  internet/telecommunications industry was accelerating.

4       96.    As Flextronics represented as a contingent risk in its Form 10-K for the year

5  ended March 31, 2000, "*[c]ustomers may cancel their orders, change production quantities or*

6  *delay production for a number of reasons. Cancellations, reductions or delays by a significant*

7  *customer or by a group of customers would seriously harm our results of operations.*"

8       97.    Flextronics' March 31, 2000 Form 10-K also disclosed that:

9       WE DEPEND ON THE ELECTRONICS INDUSTRY WHICH CONTINUALLY
        PRODUCES TECHNOLOGICALLY ADVANCED PRODUCTS WITH SHORT
10      LIFE CYCLES; OUR INABILITY TO CONTINUALLY MANUFACTURE
        SUCH PRODUCTS ON A COST-EFFECTIVE BASIS WOULD HARM OUR
11      BUSINESS.

12      Factors affecting the electronics industry in general could seriously harm our
        customers and, as a result, us. These factors include:

13
         - the inability of our customers to adapt to rapidly changing technology and
14      evolving industry standards, which results in short product life cycles;

15      - the inability of our customers to develop and market their products, some of
        which are new and untested, the potential that our customers' products may
16      become obsolete or the failure of our customers' products to gain widespread
        commercial acceptance; and
17
        - recessionary periods in our customers' markets. If any of these factors
18      materialize, our business would suffer.  (Emphasis in original.)

19      98.    Such Form 10-K also disclosed:

20      *The electronics manufacturing services industry is extremely competitive* and
        includes hundreds of companies, several of which have achieved substantial
21      market share. Current and prospective customers also evaluate our capabilities
        against the merits of internal production. Some of our competitors, including
22      Solectron, Celestica and SCI Systems, have substantially greater market share
        than us, and substantially greater manufacturing, financial, research and
23      development and marketing resources. *In recent years, many participants in the
        industry, including us, have substantially expanded their manufacturing
24      capacity. If overall demand for electronics manufacturing services should
        decrease, this increased capacity could result in substantial pricing pressures,
25      which could seriously harm our operating results.*  (Emphasis added.)

26      99.    Flextronics failed to disclose, however, that these contingent risks – such as

27  rapidly changing technology, evolving industry standards, short product life cycles, significant

28  competition, increased industry manufacturing capacity, and the ability of customers to cancel,

1   delay or reduce orders *at will* that could "*seriously harm*" Flextronics' business – had already

2   been realized, and that Flextronics' financial statements failed to reflect the true value of the

3   Company's inventory and their effect on Flextronics' profits and financial health.

4        100.    These factors required Flextronics' management to be ever vigilant in timely

5   evaluating whether the value of Flextronics' inventory was impaired pursuant to GAAP.

6   Nonetheless, Flextronics' representations concerning the value of its inventory and its reported

7   gross profits, gross margins and earnings were materially overstated at the time of the 2001

8   Offering.

9        101.    For example, a former Flextronics manager indicated that the Company's

10   inventories ballooned rapidly when the demand for products of the Company's customers in the

11   telecommunications and internet industries began to wane.  The former employee explained that

12   the huge increase in inventory was due, in part, to pressure exerted on Flextronics by its major

13   customers, such as Cisco, to maintain high levels of inventories in anticipation of demand by

14   users of Flextronics' manufactured products.

15        102.    As a result of product returns and order cancellations, Flextronics' inventory

16   swelled at a time when its sales growth stalled.  In fact, ***during the six months between October***

17   ***1, 2000 and March 31, 2001, Flextronics' net sales increased by only 1% (compared to a 38%***

18   ***increase during the preceding six month period) while inventories increased by 14%.***

19        103.    ***According to a former Flextronics' general manager, the margins on***

20   ***Flextronics' products were razor thin.  As a result, a relatively small decline in the sales price***

21   ***of Flextronics' products can give rise to an inventory impairment charge.***  For example, during

22   fiscal 2001, the Company's gross profit margin (net sales divided by net sales - cost of sales) was

23   always less than 9%.  This means that, for example, products that Flextronics sold for $100.00,

24   cost more than $91.00 to produce.  Accordingly, a mere 10% decline in the selling price of

25   Flextronics products is likely, under GAAP, to necessitate a charge for an impairment in the

26   value of the Company's inventory.

27        104.    Additionally, ***the increasing age of Flextronics' inventory also signaled an***

28   ***impairment in the value of the Company's inventory***.  Indeed, the increasing age of the

1   Company's inventory is evident upon reviewing inventory related financial measures during the

2   2000-2002 time frame.

3   　　　105.　　As noted in the chart below, beginning in the fourth quarter of 2000, the rate at

4   which the Company turned over its inventory began to skyrocket.  The increase in Flextronics'

5   inventory turnover in days indicated the increasing age of the Company's inventory.  In fact, the

6   age of the Company's inventory increased because product in the Flextronics' manufacturing

7   facilities was unsalable and was required to have been written off.

8

9

10

11

12

13

14

15

16

17

18

19

20

21



22   　　　106.　　Only after Flextronics recorded "unusual" charges in excess of $500 million

23   during the quarter ended September 30, 2001, did the Company's rate of inventory turnover

24   begin to return to its then normal levels.

25   　　　107.　　Indeed, numerous former employees have stated that the Company's

26   manufacturing facilities were loaded with inventory they could not sell.  For example, one

27   former Flextronics employee stated "*I've been a VP, I ran a company and I know when books*

28   *are being straight and when they are not.*"  The former employee stated that when he

1  *questioned the Company's reported profits and why the Company had not written off what he*

2  *believed to be excessive levels of unwanted inventory, he was told by his superiors to "shut*

3  *up." The former employee said that Flextronics was "keeping inventory on the books for 2*

4  *years when they shouldn't have."*

5       108.    Another former Flextronics employee stated that ***there "was a lot" of excess***

6  ***inventory "sitting around." The former employee stated each month he would review his***

7  ***division's profit and loss statement, adding: "I was just looking at my customers and the***

8  ***figures just did not add up . . .  I just could not figure out how they came up with the numbers***

9  ***they did."***

10       109.    When questioned about the Company's inventory problems, ***yet another former***

11  ***employee laughed and stated the amount Flextronics inventory was "just massive"*** in San Jose

12  and Fremont, California.  A former Flextronics senior accountant in San Jose stated that ***"your***

13  ***eyes would pop out" if you saw the amount of inventory stored at the Sunnyvale warehouse.***

14       110.    A former Flextronics design engineer stated that ***customer sales orders dropped***

15  ***off sharply in early 2000 with customer orders off about 50% in the domestic market.***  The

16  former engineer stated ***"It was like somebody turned  the spigot off."***

17       111.    The former engineer explained that historically the Company shipped soon after

18  product was manufactured.  However, that practice changed, as the former engineer explained,

19  ***"in the same day, you would build and ship, maybe a day or two but I walked around one time***

20  ***and there were two tractor trailer loads of stuff that wouldn't normally be sitting.  In my***

21  ***experience, it wouldn't have made sense to build that much inventory and leave it sitting on***

22  ***the dock."***

23       112.    The conditions in the Company's industry that existed at the time of the 2001 and

24  2002 Offerings rapidly drove down the utility and replacement cost for Flextronics' inventory.

25  In fact, prior to the 2001 Offering, the Company established a Material Review Board (MRB) to

26  monitor Flextronics' inventory.

27       113.    Nonetheless, Flextronics failed to timely record an impairment in the value of its

28  inventory.  Ultimately, in the quarter ended September 30, 2001, Flextronics recorded a charge

of approximately $100 million to write down its inventory and accounts receivable to net realizable value.

114.    By failing to timely write down the value of its impaired assets, Flextronics' financial statements violated the dictates of GAAP and, consequently, materially overstated, among other things, its inventory, gross profit, gross margin, net income and earnings per share. Moreover, Flextronics also violated, and thereby misrepresented, its stated policies of accounting for its long-lived assets and inventory as disclosed in its audited year-end financial statements.

**C.    FLEXTRONICS IMPROPERLY RELEASES RESERVES TO MEET PREDETERMINED EARNINGS TARGETS**

115.    In addition to the Company's financial manipulations noted above, Flextronics manipulated its accounting reserves established when Flextronics acquired various entities and when it recorded the "unusual" charges it reported during the fiscal quarter ending September 30, 2001.  Indeed, ***a witness who worked closely with the Company's Corporate Controller's office stated the Company established "memorial" reserves and/or "dark period" reserves, which functioned as "slush funds" to allow Flextronics to meet predetermined earnings targets.  The witness explained that each month between October 2001 and June 2002, the Corporate Controller's office would instruct divisions throughout Flextronics to undiscriminatingly release accounting reserves in amounts ranging from $5 million to $12 million a month to meet predetermined earnings targets.  The witness also explained that the reserve account entitled "memorial" was formerly referred to as the "slush fund" account and that such reference was changed to the more innocuous reference of "memorial."***  In addition, the witness explained that normal day-to-day operating expenses were inappropriately applied against the reserve.

116.    GAAP expressly prohibits the manipulation of accounting reserves described above.  Pursuant to SFAS No. 5, companies may establish reserves for identifiable, probable and estimable risks and precludes the use of reserves for general or unknown business risks, including excess reserves, because they do not meet the accrual requirements of SFAS No. 5. Any reserves that do not meet the accrual requirements of SFAS No. 5, when identified, should

1    be immediately released into income.  A systematic or timed release of excess reserves into

2    income violates GAAP.  *See e.g., In re Rush*, SEC Exchange Act of 1934 Release No. 44501

3    (July 2, 2001); *SEC v Dunlap*, No. 01-8437-Civ, SEC Litig. Release No. 17710 (Sept. 4, 2002);

4    *Xerox Settles SEC Enforcement Action*, SEC Press Release No. 2002-52 (Apr. 11, 2002).

5          117.    Indeed, Flextronics' reported earnings between October 2001 and June 2002 were

6    inflated due to the manipulation of accounting reserves as noted above.  In fact, a witness who

7    worked closely with the Company's Corporate Controller stated that Flextronics' accounting

8    reserves were **"reverse engineered"** to allow Flextronics to meet predetermined earnings targets

9          118.    In so doing, Flextronics failed to file financial statements with the SEC that

10   conformed with or reconciled to the requirements of GAAP, and the Company disseminated

11   financial statements of Flextronics that were presumptively misleading and inaccurate.  In

12   addition to the violations of GAAP noted above, the Company presented its financial results and

13   statements in a manner that also violated the following fundamental accounting principles:

14          a.     The principle that interim financial reporting should be based upon the

15   same accounting principles and practices used to prepare annual financial statements (APB No.

16   28, ¶12);

17          b.     The concept that financial reporting should provide information that is

18   useful to present and potential investors and creditors and other users in making rational

19   investment, credit, and similar decisions was violated (Concepts Statement No. 1, ¶34);

20          c.     The concept that financial reporting should provide information about the

21   economic resources of an enterprise, the claims to those resources, and effects of transactions,

22   events, and circumstances that change resources and claims to those resources was violated

23   (Concepts Statement No. 1, ¶40);

24          d.     The concept that financial reporting should provide information about how

25   management of an enterprise has discharged its stewardship responsibility to owners

26   (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that

27   management offers securities of the enterprise to the public, it voluntarily accepts wider

28

1   responsibilities for accountability to prospective investors and to the public in general (Concepts

2   Statement No. 1, ¶50);

3          e.      The concept that financial reporting should provide information about an

4   enterprise's financial performance during a period was violated.  Investors and creditors often use

5   information about the past to help in assessing the prospects of an enterprise.  Thus, although

6   investment and credit decisions reflect investors' expectations about future enterprise

7   performance, those expectations are commonly based at least partly on evaluations of past

8   enterprise performance (Concepts Statement No. 1, ¶42);

9          f.      The concept that financial reporting should be reliable in that it represents

10  what it purports to represent was violated.  That information should be reliable as well as

11  relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

12         g.      The concept of completeness, which means that nothing is left out of the

13  information that may be necessary to insure that it validly represents underlying events and

14  conditions was violated (Concepts Statement No. 2, ¶79); and

15         h.      The concept that conservatism be used as a prudent reaction to uncertainty

16  to try to ensure that uncertainties and risks inherent in business situation are adequately

17  considered was violated.  The best way to avoid injury to investors is to try to ensure that what is

18  reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

19         119.    The Company's Forms 10-Q and 10-K filed with the SEC at the time of the 2001

20  and 2002 Offerings, as well as its Registration Statements and Prospectuses for such offerings,

21  were also materially false and misleading in that they failed to disclose known trends, demands,

22  commitments, events, and uncertainties that were reasonably likely to have a materially adverse

23  effect on the Company's liquidity, net sales, revenues and income from continuing operations, as

24  required by Item 303 of Regulation S-K.

25                              **NO SAFE HARBOR**

26         120.    The statutory safe harbor provided for forward-looking statements under certain

27  circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

28  Many of the specific statements pleaded herein were not identified as "forward-looking

1   statements" when made.  To the extent there were any forward-looking statements, there were no

2   meaningful cautionary statements identifying important factors that could cause actual results to

3   differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

4   extent that the statutory safe harbor does apply to any forward-looking statements pleaded

5   herein, defendants are liable for those false forward-looking statements because at the time each

6   of those forward-looking statements was made, the particular speaker knew that the particular

7   forward-looking statement was false, and/or the forward-looking statement was authorized

8   and/or approved by an executive officer of Flextronics who knew that those statements were

9   false when made.

**CLASS ACTION ALLEGATIONS**

11        121.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

12  Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

13  otherwise acquired the securities of Flextronics pursuant to or traceable to the Company's

14  Secondary Offerings of Flextronics stock on February 1, 2001 and January 7, 2002, and who

15  were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the

16  defendants, at all relevant times, members of their immediate families and their legal

17  representatives, heirs, successors or assigns and any entity in which defendants have or had a

18  controlling interest.

19        122.    The members of the Class are so numerous that joinder of all members is

20  impracticable.  Throughout the relevant period, Flextronics common shares were actively traded

21  on the NASDAQ.  While the exact number of Class members is unknown to plaintiffs at this

22  time and can only be ascertained through appropriate discovery, plaintiffs believe that there are

23  hundreds or thousands of members in the proposed Class.  Record owners and other members of

24  the Class may be identified from records maintained by Flextronics or its transfer agent and may

25  be notified of the pendency of this action by mail, using the form of notice similar to that

26  customarily used in securities class actions.

27

28

123.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

124.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

125.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws are violated by defendants' acts as alleged herein;

b.    whether statements made by defendants to the investing public during the 2001 and 2002 Offerings misrepresented material facts about the business, operations and management of Flextronics; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

126.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**

**(Violation of Section 11 of the Securities Act Against All Defendants
In Regard To The 2001 Secondary Offering)**

131.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

34

132.     This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all defendants, on behalf of plaintiffs and those Class members who purchased shares issued in connection with, or traceable to, the 2001 Offering.

133.     The Registration Statement and Prospectus, when they became effective, were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

134.     Plaintiffs and the other members of the Class purchased Flextronics common stock pursuant to or traceable to the Registration Statement and Prospectus.

135.     Flextronics is the registrant for the shares sold to plaintiffs and other members of the Class.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

136.     As issuer of the shares, Flextronics is strictly liable to plaintiffs and the Class for the misstatements and omissions contained in the Registration Statement and Prospectus.

137.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not materially misleading.

138.     Defendants issued, caused to be issued, and participated in the issuance of, materially false and misleading written statements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

139.     At the times they purchased Flextronics shares, plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the 2001 Offering.

140.     This action has been brought within one year after the discovery of the untrue statements or the omissions, or after such discovery should have been made by the exercise of

35

reasonable diligence, and within three years after the security was bona fide offered to the public.

141.   As a result of the foregoing, plaintiffs and the other members of the Class who purchased Flextronics common stock pursuant to or traceable to the Registration Statement and Prospectus have sustained damages.  The value of Flextronics shares has declined substantially subsequent to and due to defendants' violations of the federal securities laws.

### SECOND CLAIM

**(Violation of Section 12(a)(2) of the Securities Act Against All
Defendants In Regard To The 2001 Secondary Offering)**

142.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

143.   This Claim is brought by plaintiffs against all defendants pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class members who purchased shares issued in connection with, or traceable to, the 2001 Offering.

144.   Defendants were sellers, offerors, and/or solicitors of sales of shares of Flextronics stock to plaintiffs and the members of the Class pursuant to the Registration Statement and Prospectus.

145.   The Registration Statement and Prospectus contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading.  The acts of solicitation by Flextronics and the Underwriter Defendants included participating in the preparation of the false and misleading Registration Statement and Prospectus.

146.   Defendants owed to the purchasers of Flextronics shares, including plaintiffs and other members of the Class who purchased Flextronics shares in connection with or traceable to the 2001 Offering, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the Registration Statement and Prospectus contained therein, to insure that such statements were true and that there was no omission to state

1  a material fact required to be stated in order to make the statements contained therein not

2  misleading.

3      147.   Plaintiffs and other members of the Class purchased Flextronics shares pursuant

4  to or traceable to the defective Registration Statement and Prospectus.  Plaintiffs and those Class

5  members did not know, or in the exercise of reasonable diligence could not have known, of the

6  material untruths and omissions contained in the Registration Statement and Prospectus.

7      148.   By reason of the foregoing, plaintiffs and the members of the Class who

8  purchased shares in or traceable to the 2001 Offering have been damaged.

9      149.   By reason of the conduct alleged herein, defendants violated, and/or controlled a

10  person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, plaintiffs and

11  members of the Class who hold Flextronics shares purchased pursuant to the Registration

12  Statement and Prospectus have the right to rescind and recover the consideration paid for their

13  Flextronics shares and, hereby elect to rescind and tender their Flextronics shares to defendants.

14  Plaintiffs and Class members who have sold the Flextronics shares they purchased pursuant to

15  the 2001 Offering are entitled to rescissory damages.

16      150.   Plaintiffs, individually and representatively, hereby tender Flextronics shares to

17  defendants that he and other Class members similarly situated continue to own, on behalf of all

18  members of the Class who continue to own such securities, in return for the consideration paid

19  for those securities together with interest thereon.

20      151.   This action has been brought within one year after the discovery of the untrue

21  statements or the omissions, or after such discovery should have been made by the exercise of

22  reasonable diligence, and within three years after the sale of the securities at issue.

23                          **THIRD CLAIM**

24  **(Violation of Section 15 of the Securities Act Against the Individual Defendants
     In Regard to the 2001 Secondary Offering)**

25

26      152.   Plaintiffs repeat and reallege each and every allegation contained above as if fully

     set forth herein.

27

28

153.    The Individual Defendants were controlling persons of Flextronics within the meaning of Section 15 of the Securities Act.  By virtue of their high-level positions and/or their ownership of the Company's stock and/or participation in the Company's operations, the Individual Defendants had the power to influence and control, and did influence and control, the decision-making of the Company, including the content and dissemination of the Registration Statement and Prospectus that plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's Registration Statement and Prospectus prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

154.    By virtue of their positions as controlling persons, the Individual Defendants are liable to plaintiffs and the members of the Class who purchased shares in or traceable to the 2001 Offering, pursuant to Section 15 of the Securities Act, for Flextronics' violations of Sections 11 and 12(a)(2) of the Securities Act, as alleged in the First and Second Claims.

**FOURTH CLAIM**

**(Violation of Section 11 of the Securities Act Against Flextronics, the Individual Defendants and Banc of America Securities In Regard To The 2002 Secondary Offering)**

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

156.    This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against Flextronics, the Individual Defendants and Banc of America Securities, on behalf of plaintiffs and those Class members who purchased shares issued in connection with, or traceable to, the 2002 Offering.

157.    The Registration Statement and Prospectus, when they became effective, were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

158.    Plaintiffs and the other members of the Class purchased Flextronics common stock pursuant to or traceable to the Registration Statement and Prospectus.

159.   Flextronics is the registrant for the shares sold to plaintiffs and other members of the Class.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

160.   As issuer of the shares, Flextronics is strictly liable to plaintiffs and the Class for the misstatements and omissions contained in the Registration Statement and Prospectus.

161.   None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not materially misleading.

162.   Defendants issued, caused to be issued, and participated in the issuance of, materially false and misleading written statements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

163.   At the times they purchased Flextronics shares, plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the 2002 Offering.

164.   This action has been brought within one year after the discovery of the untrue statements or the omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

165.   As a result of the foregoing, plaintiffs and the other members of the Class who purchased Flextronics common stock pursuant to or traceable to the Registration Statement and Prospectus have sustained damages.  The value of Flextronics shares has declined substantially subsequent to and due to defendants' violations of the federal securities laws.

**FIFTH CLAIM**

**(Violation of Section 12(a)(2) of the Securities Act Against Flextronics, the Individual Defendants and Banc of America Securities in Regard to the 2002 Secondary Offering)**

166.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

167.    This Claim is brought by plaintiffs against Flextronics, the Individual Defendants and Banc of America Securities pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class members who purchased shares issued in connection with, or traceable to, the 2002 Offering.

168.    Defendants Flextronics, the Individual Defendants and Banc of America Securities were sellers, offerors, and/or solicitors of sales of shares of Flextronics stock to plaintiffs and the members of the Class pursuant to the Registration Statement and Prospectus.

169.    The Registration Statement and Prospectus contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading.  The acts of solicitation by Flextronics, the Individual Defendants and Banc of America Securities included participating in the preparation of the false and misleading Registration Statement and Prospectus.

170.    Flextronics, the Individual Defendants and Banc of America Securities and owed to the purchasers of Flextronics shares, including plaintiffs and other members of the Class who purchased Flextronics shares in connection with or traceable to the 2002 Offering, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the Prospectuses contained therein, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

171.    Plaintiffs and other members of the Class purchased Flextronics shares pursuant to or traceable to the defective Registration Statement and Prospectus.  Plaintiffs and those Class members did not know, or in the exercise of reasonable diligence could not have known, of the material untruths and omissions contained in the Registration Statement and Prospectus.

172.   By reason of the foregoing, plaintiffs and the members of the Class who purchased shares in or traceable to the 2002 Offering have been damaged.

173.   By reason of the conduct alleged herein, Flextronics, the Individual Defendants and Banc of America Securities violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, plaintiffs and members of the Class who hold Flextronics shares purchased pursuant to the Registration Statement and Prospectus have the right to rescind and recover the consideration paid for their Flextronics shares and, hereby elect to rescind and tender their Flextronics shares to Flextronics, the Individual Defendants and Banc of America Securities.  Plaintiffs and Class members who have sold the Flextronics shares they purchased pursuant to the 2002 Offering are entitled to rescissory damages.

174.   Plaintiffs, individually and representatively, hereby tender Flextronics shares to defendants that he and other Class members similarly situated continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

175.   This action has been brought within one year after the discovery of the untrue statements or the omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of the securities at issue.

**SIXTH CLAIM**

**(Violation of Section 15 of the Securities Act Against the Individual Defendants
In Regard to the 2002 Secondary Offering)**

176.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177.   The Individual Defendants were controlling persons of Flextronics within the meaning of Section 15 of the Securities Act.  By virtue of their high-level positions and/or their ownership of the Company's stock and/or participation in the Company's operations, the Individual Defendants had the power to influence and control, and did influence and control, the decision-making of the Company, including the content and dissemination of the Registration Statement and Prospectus that plaintiffs contend are false and misleading.  The Individual

1    Defendants were provided with or had unlimited access to copies of the Company's Registration

2    Statement and Prospectus prior to and/or shortly after these statements were issued and had the

3    ability to prevent the issuance of the statements or cause the statements to be corrected.

4        178.    By virtue of their positions as controlling persons, the Individual Defendants are

5    liable to plaintiffs and the members of the Class who purchased shares in or traceable to the 2002

6    Offering, pursuant to Section 15 of the Securities Act, for Flextronics' violations of Sections 11

7    and 12(a)(2) of the Securities Act, as alleged in the Fourth and Fifth Claims.

8        **WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

9        (a)    Determining that this action is a proper class action and certifying

10   plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

11       (b)    Awarding rescissory and compensatory damages in favor of plaintiffs and

12   the other Class members against all defendants, jointly and severally, for all damages sustained

13   as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest

14   thereon;

15       (c)    Awarding extraordinary, equitable and/or injunctive relief as permitted by

16   law;

17       (d)    Awarding plaintiffs and the Class their reasonable costs and expenses

18   incurred in this action, including counsel fees and expert fees; and

19       (e)    Such other and further relief as the Court may deem just and proper.

20           **JURY TRIAL DEMAND**

21       Plaintiffs hereby demand a trial by jury.

22   Dated: June 6, 2003        MILBERG WEISS BERSHAD HYNES &
                                  LERACH LLP
23                              RANDI D. BANDMAN (145212)
                                SYLVIA WAHBA (197612)
24

25                              By:_____
                                100 Pine Street, 26th Floor
26                              San Francisco, CA 94111
                                Telephone: 415/288-4545
27

28

1                      MILBERG WEISS BERSHAD HYNES &
                           LERACH LLP

2                      PAUL D. YOUNG (*pro hac vice application pending*)
                      BRIAN C. KERR (*pro hac vice application pending*)

3                      One Pennsylvania Plaza
                      New York, NY 10119

4                      Telephone: (212) 594-5300

5                      SCHIFFRIN & BARROWAY, LLP
                      JACOB A. GOLDBERG

6                      Three Bala Plaza East, Suite 400
                      Bala Cynwyd, PA 19004

7                      Telephone: 610/667-7706

8                      STULL, STULL & BRODY
                      MICHAEL BRAUN

9                      10940 Wilshire Boulevard, Suite 2350
                      Los Angeles, CA 90024

10                    Telephone: 310/209-2468

11                    *Co-Lead Counsel for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28