MILBERG WEISS BERSHAD
   HYNES & LERACH LLP
RANDI D. BANDMAN (145212)
SYLVIA WAHBA (197612)
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
      -and-
PAUL D. YOUNG (*admitted pro hac vice*)
BRIAN C. KERR (*admitted pro hac vice*)
One Pennsylvania Plaza
New York, NY  10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

SCHIFFRIN & BARROWAY, LLP
JACOB A. GOLDBERG
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA  19004
Telephone: (610) 667-7706

STULL, STULL & BRODY
PATRICE L. BISHOP
10940 Wilshire Boulevard, Suite 2350
Los Angeles, CA  90024
Telephone: (310) 209-2468

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re FLEXTRONICS INTERNATIONAL LTD. SECURITIES LITIGATION,<br><br>This Document Relates To:  ALL ACTIONS | Case No. C-03-2102-PJH<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## Table of Contents

Page

JURISDICTION AND VENUE ..................................................................................2

PARTIES ....................................................................................................................2

    A.    PLAINTIFFS ...................................................................................2

    B.    FLEXTRONICS DEFENDANTS .........................................................3

DEFENDANTS' WRONGFUL COURSE OF CONDUCT ........................................6

    A.    DEFENDANTS IMPROPERLY ESTABLISHED RESTRUCTURING RESERVES TO BE USED AS A GENERAL RESERVE TO MEET PREDEFINED EARNINGS TARGETS AND MANAGE FUTURE EARNINGS ............................................8

    B.    DEFENDANTS IMPROPERLY RELEASED RESERVES TO MEET PREDETERMINED EARNINGS TARGETS AND TO AVOID DISCLOSURE OF FLEXTRONICS' INABILITY TO THRIVE DURING THE SEVERE DOWNTURN IN THE TECHNOLOGY MARKET ..........................................................11

    C.    DEFENDANTS FAILED TO DISCLOSE THAT THE SEVERE DOWNTURN IN THE INTERNET AND TECHNOLOGY MARKETS CAUSED FLEXTRONICS TO HAVE A SIGNIFICANT AMOUNT OF EXCESS INVENTORY THAT NEEDED TO BE WRITTEN OFF ....................................................................15

    D.    DEFENDANTS ALSO FAILED TO DISCLOSE THAT FLEXTRONICS HAD A SIGNIFICANT AMOUNT OF EXCESS CAPACITY THAT SHOULD HAVE BEEN WRITTEN DOWN ....................................................................22

    E.    DEFENDANTS FALSELY REPRESENTED FLEXTRONICS' BUSINESS AND PROSPECTS WHILE ORDERING THE COMPANY'S PLANT CONTROLLERS TO DESTROY INTERNAL COPIES OF FORECASTS, WHICH CONTAINED MATERIAL ADVERSE INFORMATION ..........................................................26

    F.    FLEXTRONICS IMPROPERLY RECORDED REVENUE ON "PHANTOM SHIPMENTS" ..................................................................28

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........................................................................31

DEFENDANTS' SCHEME UNRAVELS ..................................................................85

    A.    DEFENDANTS ANNOUNCE THAT AN ADDITIONAL $150 MILLION IN RESTRUCTURING CHARGES ARE NECESSARY, AND THAT THE COMPANY CANNOT POSSIBLY MEET DEFENDANTS' PREVIOUS EARNINGS AND REVENUE FORECASTS FOR THE FIRST QUARTER OF FISCAL 2003 ..........................85

POST-CLASS PERIOD EVENTS FURTHER DEMONSTRATING DEFENDANTS' FRAUD ............................................................................................................86

ADDITIONAL SCIENTER ALLEGATIONS ...........................................................87

      A.      INSIDER SELLING DURING THE CLASS PERIOD .......................................................87

      B.      FLEXTRONICS' $1.5 BILLION IN PUBLIC STOCK OFFERINGS DURING THE
              CLASS PERIOD .............................................................................................................91

NO SAFE HARBOR ............................................................................................................................91

CLASS ACTION ALLEGATIONS ....................................................................................................92

FRAUD-ON-THE-MARKET DOCTRINE .......................................................................................93

FLEXTRONICS' GUIDANCE TO SECURITIES ANALYSTS AND ITS USE OF
      ANALYSTS AS A CONDUIT TO PROVIDE MATERIALLY FALSE AND
      MISLEADING INFORMATION TO THE SECURITIES MARKETS .........................95

FIRST CLAIM ......................................................................................................................................97

SECOND CLAIM ...............................................................................................................................101

THIRD CLAIM ...................................................................................................................................102

FOURTH CLAIM ...............................................................................................................................103

FIFTH CLAIM ....................................................................................................................................107

SIXTH CLAIM ...................................................................................................................................112

SEVENTH CLAIM .............................................................................................................................113

EIGHTH CLAIM ................................................................................................................................123

NINTH CLAIM ..................................................................................................................................134

PRAYER ..............................................................................................................................................135

JURY TRIAL DEMAND ...................................................................................................................136

1.     Plaintiffs, by their attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Amended Class Action Complaint (Complaint), make the following allegations against defendants upon information and belief (except as to allegations specifically pertaining to plaintiffs and their counsel, which are based on personal knowledge) based upon the thorough investigation conducted by and under the supervision of plaintiffs' counsel, which included reviewing and analyzing information and financial data relating to the relevant time period concerning defendant Flextronics International, Ltd. (Flextronics or the Company) and obtained from numerous public and proprietary sources (such as LEXIS-NEXIS, Dow Jones and Bloomberg), including, among other things, filings with the Securities and Exchange Commission, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead plaintiffs' claims with particularity.  Plaintiffs' investigation also included interviewing or consulting with numerous individuals, including former Flextronics employees who worked at the Company during the Class Period (January 18, 2001 through June 4, 2002), and are knowledgeable about Flextronics' business and operations and/or the industry and markets in which Flextronics operates.  Except as alleged herein, the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiffs and the public and lie exclusively within the possession and control of defendants and other Flextronics insiders, thus preventing plaintiffs from further detailing defendants' misconduct.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. § 78aa], and Section 22 of the Securities Act of 1933 (Securities Act) [15 U.S.C. § 77v].

3.      The claims asserted herein arise under Sections 11, 12(a) and 15 of the Securities Act [15 U.S.C. §§ 77k, 77l(2) and 77o], Sections 10(b), 20(a) and 20A of the Exchange Act [15 U.S.C. § 78j(b), 78t(a), and 78t-1], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

4.      Venue has been set in this Court pursuant to the April 23, 2003 order of the Southern District of New York transferring this case pursuant to 28 U.S.C. § 1404(a).

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including the mail, the internet, telephone communications and the facilities of national securities exchanges.

## PARTIES

### A.      PLAINTIFFS

6.      *Lead Plaintiffs.* Lead plaintiffs The Vieyra Family,[1] Optimum Investment Advisors and Gordon Buck purchased the securities of Flextronics at artificially inflated prices during the Class Period, as set forth in the certifications that are attached as Exhibit A, and were damaged thereby.  The Southern District of New York previously appointed these lead plaintiffs pursuant to an Order dated October 9, 2002.

---

[1]     The Vieyra Family consists of plaintiffs Manuel Bordelove, David Hoiness, Roland Pang, Rodney Peterson, May Taylor, Erik Vieyra, Jeffrey Vieyra, Virginia Stockton and Matthew Vieyra.

7.      *Additional Plaintiffs.*  Numerous additional plaintiffs purchased Flextronics securities in the open market during the Class Period and were damaged thereby.  These plaintiffs have signed appropriate certifications under the Private Securities Litigation Reform Act (PSLRA), and, if needed, are willing and able to serve as class representatives.

**B.      FLEXTRONICS DEFENDANTS**

8.      Defendant Flextronics is a corporation organized under the laws of, and with its principal place of business located within, the Republic of Singapore, but conducts substantial business within this District.

9.      Defendant Michael E. Marks has been the Company's Chief Executive Officer since January 1994 and was its Chairman of the Board from July 1993 to January 2003.  Defendant Marks made numerous untrue public statements during the Class Period, including, among others, statements during conference calls with analysts, statements quoted in the Company's press releases, letters to Flextronics' shareholders signed and/or authored by Marks, and statements filed with the SEC.  Defendant Marks sold a substantial number of Flextronics shares during the Class Period, reaping over $82 million in illegal proceeds.

10.     Defendant Robert R.B. Dykes has been Chief Financial Officer of Flextronics and President of its Systems Group since February 1997.  In addition, he was a Director of the Company from 1994 to 1997.  Defendant Dykes made numerous untrue public statements during the Class Period, including, among others, the Company's quarterly reports on Form 10-Q, which he signed.  Defendant Dykes sold a substantial number of Flextronics shares during the Class Period, reaping almost $17 million in illegal proceeds.

11.     Defendant Michael McNamara is the Company's Chief Operating Officer and was President, Americas Operations from 1997 to 2001, and Vice President, North American Operations from 1994 to 1997.  Defendant McNamara made numerous untrue public statements during the

Class Period, including, among others, the Company's various public filings with the SEC. Defendant McNamara sold a substantial number of Flextronics shares during the Class Period, reaping more than $2.5 million in illegal proceeds.

12.     Defendants Marks, Dykes and McNamara (the Individual Defendants) were at all relevant times during the Class Period controlling persons of Flextronics within the meaning of Section 20(a) of the Exchange Act. Because of their positions with the Company, the Individual Defendants had access to undisclosed adverse information about its business, operations, balance sheets, accounting policies, operational trends, financial condition, and present and future business prospects through access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the board and committees thereof, and through reports and other information provided to them in connection therewith.

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances and financial condition as alleged herein. Said defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein (including SEC filings, press releases and other publications), were aware of or recklessly disregarded that materially false or

misleading statements were being issued regarding the Company and nonetheless approved or ratified these statements in violation of the federal securities laws.

14.     As officers, directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the Nasdaq National Market (NASDAQ), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, earnings, management, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications concerning Flextronics that are complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and the omissions therefrom, and were aware of their materially false and misleading nature. Because of their positions with Flextronics, each of the Individual Defendants had access to adverse undisclosed information about Flextronics' business prospects and financial condition and performance as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the statements complained of herein materially false and misleading.

16.     The Individual Defendants, because of their positions of control and authority as officers and controlling persons of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during

the Class Period. Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases and statements detailed herein, and is therefore primarily liable for the representations contained therein.

17.     Each of the Individual Defendants is liable as a participant in the fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Flextronics common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (1) deceived the investing public regarding Flextronics' business, operations, management and the intrinsic value of Flextronics common stock; (2) enabled the Individual Defendants to sell over $100 million in Flextronics stock for personal gain at artificially inflated prices without disclosing the material adverse facts about the Company to which they were privy; (3) allowed defendants to sell approximately 47 million shares in public offerings of Flextronics common stock during the time defendants had access to material undisclosed adverse information about the Company, thereby allowing Flextronics to raise over $1.5 billion in proceeds; and (4) caused plaintiffs and other members of the Class to purchase Flextronics securities at artificially inflated prices.

**DEFENDANTS' WRONGFUL COURSE OF CONDUCT**

18.     The material adverse information set forth below was omitted and/or misrepresented in both (i) defendants' public statements concerning the Company's purported ability to prosper during a severe downturn in the internet and telecommunications sector, and (ii) Flextronics' publicly filed financial statements, which showed that the Company was experiencing "record" financial results throughout the Class Period.

19.     First, as specified below, defendants falsely represented that Flextronics' business was uniquely able to thrive in the throes of a collapse in the technology market and that its business prospects remained strong, without disclosing the true state of affairs of the Company.  As set forth below, defendants knew or were reckless in not knowing that, among other things: (i) as the internet and telecommunications industries faltered, the Company improperly established accounting reserves and subsequently released them into earnings in order to meet predefined earnings targets that they had published to investors and securities analysts; (ii) the severe downturn in customer demand in the internet and technology markets caused Flextronics to have a significant amount of excess inventory that should have been written off because, among other reasons, most of the inventory was time-sensitive and specifically manufactured for its customers who had cancelled their orders and did not want Flextronics' products; (iii) as a result of the significant reduction in demand for Flextronics' products, the Company had excess manufacturing capacity that could not be profitably operated and should have been written off; (iv) Flextronics' internal forecasts were drastically lower than the forecasts announced to the public – as evidenced by the fact that the Company's Finance Department (with the approval of defendants Marks and McNamara) ordered Plant Controllers throughout Flextronics to *destroy* internal copies of forecasts so that the public would not discover the Company's true financial condition; and (v) Flextronics improperly recorded revenue on "phantom shipments" that were actually shipped to trailers in the Company's parking lots in order to meet earnings targets that defendants published to investors and securities analysts.

20.     Second, defendants falsified Flextronics' financial statements issued during the Class Period.  As detailed below, defendants: (1) improperly established restructuring reserves to be used as a general reserve to meet predefined earning targets and manage future earnings; (2) falsely inflated the Company's earnings by releasing into income these excess or general reserves, which were originally purportedly established for restructuring activities; (3) failed to record an

impairment in the value of the Company's inventory; (4) failed to timely record an impairment in the value of long-lived assets; and (5) improperly recognized revenue on the sham sales of Flextronics products to meet predefined earnings targets.  Nonetheless, at all relevant times during the Class Period, defendants represented that Flextronics' financial statements when issued, were prepared in accordance with GAAP (which are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time).  However, in violation of GAAP and SEC reporting requirements, defendants engaged in improper accounting practices to manipulate reserves and manage earnings, and falsely overstate assets and earnings during the Class Period.

21.     As set forth in detail below, if Flextronics had properly utilized its reserves, written off the massive amounts of worthless plant and equipment and inventory that existed at the beginning of the Class Period (which was subsequently written off after the Class Period), and recorded revenue properly, the magnitude of the accounting adjustments would have exceeded the entirety of the Company's reported earnings in any quarter during the Class Period.  Nothing could be more material to purchasers of Flextronics stock.

A.  **DEFENDANTS IMPROPERLY ESTABLISHED RESTRUCTURING RESERVES TO BE USED AS A GENERAL RESERVE TO MEET PREDEFINED EARNINGS TARGETS AND MANAGE FUTURE EARNINGS**

22.     Flextronics recorded restructuring charges in its financial statements filed on Forms 10-Q and 10-K filed with the SEC throughout the Class Period as follows (in thousands of dollars):

| Quarter Charge Recorded | Long Lived Asset Impairment | Exit Costs (inc. inventory write-down) | Severance | Other Unusual Charges | **Total Quarterly Charges** |
|---|---|---|---|---|---|
| Q3 2001 | $16,469 | $19,703 | $3,606 | - | **$39,778** |
| Q4 2001 | $155,046 | $160,368 | $60,703 | $9,450 | **$385,567** |
| Q1 2002 | - | - | - | - | - |
| Q2 2002 | $163,724 | $212,660 | $123,961 | $15,750 | **$516,095** |
| Q3 2002 | - | - | - | - | - |

| Q4 2002 | | | $29,637 | $28,694 | **$58,331** |
|---|---|---|---|---|---|
| Q1 2003 | $56,279 | $67,187 | $76,901* | $7,456 | **$207,823** |

* Includes $64 million of inventory write-offs

23.     GAAP requires that any charges associated with restructurings be the result of an exit plan that is sufficiently formulated and that asset impairment be sufficiently specific and documented. Exit plan requirements are set forth in Staff Accounting Bulletin No. 100 (SAB 100), *Restructuring and Impairment Charges* (November 1999) and Emerging Issues Task Force (EITF) No. 94-3, *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)* (March 1994)[2].

24.     EITF 94-3 provides that "the exit plan specifically identify all significant actions to be taken to complete the exit plan. . . . [T]he period of time to complete the exit plan indicates that significant changes to the exit plan are not likely." Consistent with EITF 94-3, SAB 100 Topic 5P states that a "liability for exit costs arising from a discretionary management action should be accrued only if the discretionary action is part of a comprehensive plan that has been rigorously developed and thoroughly supported." As a prerequisite to accruing exit costs at the commitment date, SAB 100 also states that a "company must be able to estimate reliably the nature, timing and the amount of the exit costs associated with the significant actions is identifies." Factors to be considered when determining whether exit costs can be estimated reliably include: (1) whether the estimate reflects the most likely expected outcome given all the information currently available to management; (2) whether the exit plan identifies all significant actions expected to be taken; (3) whether the plan includes an expected timetable for completing those actions; (4) whether the plan is the one that will be used for the performance of those responsible for executing the plan and for

---

[2] The provisions of EITF 94-3 were nullified by Statement of Financial Accounting Standard (SFAS) No. 146, *Accounting for Costs Associated with Exit or Disposal Activities.* The provisions of this Statement are effective for exit or disposal activities that are initiated after December 31, 2002.

making periodic comparisons of planned versus actual results and variances; (5) whether all significant actions are documented in the plan with sufficient detail, including but not limited to details such as, geographic locations, estimated costs, etc.; (6) whether the components used in making the detailed calculations in the plan and arriving at the estimated liability have a reasonably supportable basis; and (7) whether the key assumptions used in developing the plan have a reasonably supportable basis.

25.     After the close of the market on June 3, 2002 (the end of the Class Period), Flextronics held its mid-quarter conference call for the first quarter of fiscal 2003 (i.e., the period ending June 30, 2002). Defendants announced that the restructuring charge of $516.1 million that it had originally announced in the second quarter of fiscal 2001 (i.e., the period ending September 30, 2000) and the restructuring activities substantially completed thereafter, were still far from complete and an additional $150 million restructuring charges had to be recorded. (In the end, additional restructuring charges of $208 million were actually recorded.) These additional charges clearly show, and (as set forth below) securities analysts comments confirm, that the Company was making significant changes to its original plan. Accordingly, defendants were also admitting through this announcement that the initial restructuring plan in the second quarter of fiscal 2001 (i.e., the period ending September 30, 2000), resulting in the charge of $516.1 million, did not meet the requirements of EITF 94-3 and SAB 100, since it did not specifically identify all actions required to complete the plan. The announcement at the end of the Class Period and the significant change to the restructuring reserves in the first quarter of fiscal 2003 (i.e., the period ending June 30, 2002), establishes that the original charges of $516.1 million recorded in the second quarter of fiscal 2002 (i.e., the period ending September 30, 2001) were not restructuring charges as defined by GAAP, but were used as a general reserve to meet predefined earning targets and manage future earnings over the following quarters as explained below.

26.     Defendants knowingly or recklessly disregarded that the creation and manipulation of these improper reserves was in direct contravention of GAAP, and as a result materially misstated earnings during the Class Period.

**B.     DEFENDANTS IMPROPERLY RELEASED RESERVES TO MEET PREDETERMINED EARNINGS TARGETS AND TO AVOID DISCLOSURE OF FLEXTRONICS' INABILITY TO THRIVE DURING THE SEVERE DOWNTURN IN THE TECHNOLOGY MARKET**

27.     According to a witness in Chicago, Illinois who worked closely with the Company's Corporate Controller from 1998 through December 2002, and as confirmed by Flextronics' own internal documents (including emails and adjusting journal entries), Flextronics' "general reserves" were known throughout the Corporate Controller's Office as "MEMORIAL" reserves and/or "DARK PERIOD" reserves.  This witness explained that they functioned as "slush funds" to allow Flextronics to meet predetermined earnings targets and were not used exclusively for their specific purpose of restructuring.  The witness stated that each month between October 2001 and June 2002, the Corporate Controller's office would instruct divisions throughout the Company to release accounting reserves in amounts ranging from at least $17-27 million each month in order to foster the false appearance of profitability.  In addition, normal day-to-day operating expenses were often inappropriately applied against the reserve.

28.     According to the same witness, defendants utilized the "DARK PERIOD" reserves in connection with the Company's acquisitions.  Defendants directed acquired companies to take huge write-offs and charges so that the Company could increase Flextronics' reported earnings after the acquisitions by releasing the reserves into income.  The witness explained that the Company released from the "DARK PERIOD" reserve – which derives its name from the fact that it remains hidden from regulators and auditors during the "DARK PERIOD" following an acquisition – at least $12-$15 million for each month between October 2001 and the end of the Class Period.

29.     In regard to the "MEMORIAL" reserves, which were utilized after Flextronics took a $500 million "unusual" restructuring charge in October 2001, the same witness explained that the Corporate Controller's office instructed divisions throughout Flextronics to release accounting reserves in amounts ranging from $5-12 million each month, not because it was proper to release the reserves, but in order to meet predetermined earnings targets. Thus, according to this witness, defendants' effort to "reverse engineer" (i.e., artificially inflate) earnings through the improper release of accounting reserves was done until the end of the Class Period, and was performed at the direction of Flextronics' Corporate Controller.

30.     Flextronics' earnings manipulations are also confirmed by a former Director of Operations, who worked at the Company from January 2001 through August 2002. As Director of Operations, this witness reported to Flextronics' Vice President of North American Operations (Curt Lloyd), who communicated directly with defendant McNamara. The witness stated that between July and September 2001, he was told by the CFO for Flextronics' Enclosures division (Terry Ray) that the division was tapping into its reserves when it failed to make quarterly earnings targets. He stated that around June 2001, the reserves in the Enclosures Division were in excess of $200 million, and that the Company was "constantly drawing from them" in order to manage its earnings during the downturn in the internet and telecommunications markets that existed during the Class Period. "They would be completely draining them out during that time. Once drained these would be filled back up with the new acquisitions Flex made. It was definitely going on, starting in June-July 2001. It was definitely taking place by that time and it was definitely continuing on up until I know April 2002. Then in April 2002, the Flex Enclosures division was done away with and that became . . . Flex International. . . . [Then] beginning in April 2002 when [the] Flex Enclosures division was done away with they would pull in -- I'll call them slush funds -- they would have these different slush funds set up and if they had a bad month they would use those slush funds in order to

show that they made money." In fact, "[i]n the Enclosures division, there wasn't a facility making any money, whether it be in China or in North America or Eastern Europe. There wasn't a facility making money. They were actually using the reserve that they got."

31.    The witness provided some examples of this reverse engineering of earnings:

- "[Defendant] McNamara [or Ross Manire, President of Flextronics Enclosures division] would put out calls on the Enclosures side. Manire and McNamara were tied at the hip. The reserves – what do we need to pull in. The bulk of the reserves, Flex Enclosures would have come from the sale of Chatham Technologies. I would probably say in excess of 70%."

- "[I]f you look closely into the purchasing of the Xerox facility in Canada and then they shut that facility down less than a year later after they bought it. You would probably see some of that taking place."

32.    The same witness also confirmed that (at a minimum) defendant McNamara was fully aware of the Company's falsification of earnings by manipulating its accounting reserves. For example, the witness stated "[t]here were also meetings that would take place to discuss financial performance. Around October [2001] through April [2002] it would happen on a monthly basis. [Defendant] McNamara would be heavily involved with Ross Manire [President of Flextronics Enclosures], Curt Lloyd [VP of North American operations], Paul Humphries [VP of Global Operations, Flextronics International] and Terry Ray [CFO for Flextronics Enclosures], in Chicago and out in San Jose. The reason I knew about it was because I had to know my boss' schedule, who was Curt Lloyd, and he would tell me what was going on."

33.    Flextronics falsely inflated its earnings through the release into income of these excess or "general" reserves originally established in the second quarter of fiscal 2002 (i.e., the period ending September 30, 2001) for restructuring activities. Flextronics' use of these reserves violated GAAP and its intentional or reckless use of reserves for this purpose was fraudulent.

34.    Generally, GAAP requires the establishment and accrual of reserves for expenses, losses and liabilities, even though payment of the expense, or realization of the loss, may be

contingent upon future events.  Pursuant to Statement of Financial Accounting Standards No. 5

(FAS 5), *Accounting for Contingencies* (March 1975), ¶ 8:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> (a)   Information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements . . . [and]
>
> (b)   The amount of loss can be reasonably estimated [emphasis in original; footnotes omitted].

35.   Pursuant to FAS 5, companies may establish reserves for identifiable, probable and estimable risks.  GAAP specifically forbids the accrual of "general" reserves.  *See* FAS 5, ¶ 14. General or unspecified business risks do not meet the conditions for accrual, and no accrual for loss shall be made.

36.   Any reserves that do not meet the accrual requirements of FAS 5, when identified, should be immediately released into income.  A systematic or timed release of excess reserves into income violates GAAP.

37.   Indeed, Flextronics manipulated earnings between October 2001 and the end of the Class Period through the improper establishment and release of restructuring reserves.  In fact, as set forth above, a witness who worked closely with the Company's Corporate Controller stated that Flextronics' accounting reserves were "***reverse engineered***" to allow Flextronics to meet predetermined earnings targets.  In so doing, as the chart below demonstrates, Flextronics failed to file financial statements with the SEC that conformed with or were reconciled to the requirements of GAAP, and defendants disseminated financial statements of Flextronics that were presumptively misleading and inaccurate.[3]

_____

[3] As set forth in Financial Accounting Standards Board (FASB) Statements of Concepts (Concept Statement) No. 1, Objectives of Financial Reporting by Business Enterprises (November 1978), one of the fundamental objectives of financial reporting is that it provides accurate and reliable



C. **DEFENDANTS FAILED TO DISCLOSE THAT THE SEVERE DOWNTURN IN THE INTERNET AND TECHNOLOGY MARKETS CAUSED FLEXTRONICS TO HAVE A SIGNIFICANT AMOUNT OF EXCESS INVENTORY THAT NEEDED TO BE WRITTEN OFF**

38.     Since he became CEO of Flextronics, defendant Marks has led Flextronics on a massive acquisition campaign, completing over 50 acquisitions since 1999. Flextronics has bought businesses and facilities all over the world. These facilities, however, are capital-intensive and rely on a high-volume technology market in the United States in order to be profitable to operate.

39.     The Company leases, acquires or constructs facilities to perform under multi-year supply "arrangements" and to manufacture products for original equipment manufacturers (OEMs). These "arrangements" typically do not require any minimum volumes of purchases by an OEM.

40.     Many of Flextronics' agreements with its customers are not memorialized in writing. Accordingly, many of the Company's customers terminated orders when the market downturn began. Because of the industry in which it operates, most of Flextronics' inventory is customer-specific. As a result, Flextronics was left with a tremendous amount of time-sensitive inventory that

information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluation of past enterprise performance.

was rapidly becoming obsolete (including a massive amount of inventory at the Company's Silicon Valley manufacturing facilities in San Jose and Fremont, California).

41.     According to a former program manager at Flextronics' San Jose facility who worked for Flextronics from October 1999 through May 2002 with some of the Company's largest customers (including Motorola and Extreme Networks), the Company had a substantial amount of excess inventory in connection with its "arrangement" with Motorola. Motorola's monthly forecasts were constantly being reduced throughout the Class Period, often changing between $3 million and $500,000 from week to week. Flextronics purchased enough materials to support the high end of the forecasts, even though the demand would disappear the next day. When the expected demand did not materialize, Flextronics was saddled with at least $5 million in excess inventory in early 2002 (which it failed to write off during the Class Period).

42.     Similarly in the Company's "arrangement" with Extreme Networks, the same former program manager in San Jose explained that Extreme's demand for access switches dropped dramatically in late 2001 and early 2002 because of the industry-wide downturn described above. As a result, Extreme's monthly business with Flextronics plummeted from $6 million per month in early 2001 to $500,000 per month by the end of 2001. Flextronics then succumbed to pressure from Extreme Networks and agreed to maintain ownership of the Extreme inventory – which was described by the former Flextronics program manager in San Jose as a "huge" amount.

43.     Flextronics also agreed to retain ownership of inventory that was supposed to be sold to Copper Mountain. According to a former inventory control/supply chain leader who worked for Flextronics in San Jose from March 2000 through September 2002, Copper Mountain experienced severe financial difficulties and forced the Company to store between $7 and $25 million of unsold Copper Mountain products in a Flextronics warehouse during the Class Period (including finished goods, sub-assembled parts, and some defective parts). Another former Flextronics employee, who

1  was Site Manager/Director of Operations in San Jose from February 1999 through February 2001

2  and was responsible for dealing with the Copper Mountain problems, and who reported to the Chief

3  Technical Officer who in turn reported to the Head of Operations for the western region who in turn

4  reported to defendant McNamara, stated "[t]o lose complete visibility of that amount of material, 14

5  million dollars, is just totally inexcusable."  This former employee also stated that Flextronics had

6  an online computer system monitoring the Company's profit/loss so they would actually see "what

7  was being ordered, what was in the building, and what was obsolete on a day to day basis."

8  

9      44.    Flextronics also experienced significant problems with its Cisco "arrangement."

10  According to a former Global Account Manager at Flextronics from 1998 through 2002 who was

11  responsible for forecasting, for the western United States and who reported directly to defendant

12  McNamara in 2001, when the tech market began to decline, Cisco reversed its previous practice and

13  demanded that, if Flextronics wanted to keep Cisco's business, the Company was responsible for

14  procuring the necessary production materials.  According to a former senior project manager for

15  Flextronics International in California from August 1999 through March 2002 who reported to Dave

16  Ottener, Flextronics acceded to Cisco's demands, even though defendants were completely aware

17  that Cisco was experiencing severe financial difficulties at the time.  Cisco canceled its orders, and

18  walked away from Flextronics at the end of 2001.  Flextronics was totally exposed and was left with

19  millions of dollars in excess inventory.  Moreover, the witness explained that defendants knew by

20  the summer of 2001 that Flextronics would be losing Cisco as a client, and were already aware of

21  the value of excess inventory, having conducted a major review of its Cisco inventory in the spring

22  of 2001.

23  

24      45.    A former Flextronics' senior manager in Garland, Texas, who worked at the

25  Company until March 2002, described that, by the fall of 2001, the Company also had $10 million

26  in obsolete inventory at its plant in Richardson, Texas, which defendants failed to record as a loss.

The inventory consisted of raw materials needed to manufacture cabinets that one of Flextronics' customers decided not to purchase. This material, as is frequently the case with Flextronics' "arrangements," could only be used for that customer.

46.     Defendants were aware of Flextronics' ballooning level of undesired inventory as numerous former employees have stated that the Company's manufacturing facilities were loaded with inventory they could not sell. For example, a former senior quality manager at Flextronics' San Jose facility from 1998 through June 2002, who was responsible for all supplier base and supplier quality engineering issues, as well as supplier maintenance and customer service, stated "I've been a VP, I ran a company and I know when books are being straight and when they are not." The former employee stated that when he questioned the Company's reported profits and why the Company had not written off what he believed to be excessive levels of unwanted inventory, he was told by his superiors to "shut up." The former employee said that he felt that Flextronics was "keeping inventory on the books for two years when they shouldn't have."

47.     Another former Flextronics employee (a program manager for Flextronics in San Jose from October 1999 through May 2002 who worked on the Company's largest accounts, including Motorola and Extreme Networks) stated that there was "a lot" of excess inventory "sitting around." The former employee stated each month he would review his division's profit and loss statement, adding: "I was just looking at my customers and the figures just did not add up . . . I just could not figure out how they came up with the numbers they did."

48.     A former Flextronics fixed assets senior accountant in San Jose, California from May 2001 through June 2002 stated that "your eyes would pop out" if you saw the amount of inventory stored at the Sunnyvale, California warehouse. In fact, a former Site Manager/Director of Operations in San Jose from February 1999 through February 2001 (who was responsible for dealing with the Copper Mountain problems, and who reported to the Chief technical Officer, who

reported to the Head of Operations for the Western region, who reported to defendant McNamara) recalled at least $4-5 million in excess inventory that should have been written-off during the Class Period.

49.    Moreover, defendants knew or recklessly disregarded that the conditions in the Company's industry that existed during the Class Period rapidly drove down the utility and replacement cost for Flextronics' inventory.  In fact, prior to the Class Period, the Company established a Material Review Board (MRB) to monitor Flextronics' excess inventory.

50.    Defendants violated GAAP by failing to take a timely charge against earnings to account for the fact that the market value of inventory had deteriorated substantially below cost because, among other things, projected demand requirements decreased due to softening market conditions in the internet and telecommunications sector.  Specifically, Flextronics' customers no longer wanted the inventory they had ordered and also returned significant volumes of inventory at-will during the Class Period.

51.    Flextronics' audited March 31, 2000, 2001 and 2002 annual financial statements included in Forms 10-K, disclose the Company's policy for inventory as follows:

> Inventories are stated at the lower of cost (first-in, first-out basis) or market value. Cost is comprised of direct materials, labor and overhead.

52.    In this regard, Accounting Research Bulletins (ARB) No. 43 *Restatement and Revision of Accounting Research Bulletins* (June 1953) provides:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost.  Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period.  This is generally accomplished by stating such goods at a lower level commonly designated as *market*.  ARB 43, Chapter 4, State. 5.  [Emphasis in original.]

53.    Additionally, GAAP, in Accounting Principles Board (APB) Opinion No. 28 *Interim Financial Reporting* (May 1973) ¶ 14, provides that inventory losses from market declines should

not be deferred beyond the period in which the decline occurs. APB Opinion No. 28, ¶ 17 also

states:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

54.   GAAP also provides that an estimated loss from a loss contingency "shall be accrued

by a charge to income" if: (i) information available prior to issuance of the financial statements

indicated that it is probable that an asset had been impaired or a liability had been incurred at the

date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.

Statement of Financial Accounting Standards (SFAS) No. 5 *Accounting for Contingencies* (March

1975) ¶ 8.  SFAS No. 5 also requires that financial statements disclose contingencies when it is at

least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred.  The

disclosure shall indicate the nature of the contingency and shall give an estimate of the possible

loss, a range of loss or state that such an estimate cannot be made.

55.   The SEC considers the disclosure of loss contingencies to be so important to an

informed investment decision that it promulgated Regulation S-X, which provides that disclosures

in interim period financial statements may be abbreviated and need not duplicate the disclosure

contained in the most recent audited financial statements, *except that*, "where material

contingencies exist, disclosure of such matters shall be provided even though a significant change

since year end may not have occurred."  17 C.F.R. § 210.10-01.[4]

56.   In addition, FASB Statement of Concepts No. 5 (CON5) *Recognition and*

*Measurement of Financial Statements of Business Enterprises* (December 1984) states, "[a]n

---

[4] Regulation S X [17 C.F.R. § 210.4 01(a)(1)] also states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated."

57.     Additionally, defendants knew of various factors specific to Flextronics' products and customers necessitating a write-down, such as (i) most customers were OEMs, (ii) the Company manufactured customer-specific products, (iii) products often took 3-6 months to manufacture and (iv) OEMs frequently cancelled orders during the manufacturing process and returned products at-will.

58.     Defendants also knew of various factors specific to the industry in which Flextronics operates, such as rapidly changing technology, evolving industry standards, short product life cycles, significant competition and increased industry manufacturing capacity.  Defendants failed to disclose, however, that these contingent risks had already been realized, and that Flextronics' financial statements failed to reflect the true value of the Company's inventory thereby overstating net assets and earnings prior to the quarter ended September 30, 2001 (i.e., the second quarter of fiscal 2002).

59.     Indeed, during the Class Period, defendants failed to write off approximately $64 million of excess and obsolete inventory as previously described above.  As set forth below, this would have materially reduced reported earnings or increased the reported loss for any quarter during the Class Period.



**D.   DEFENDANTS ALSO FAILED TO DISCLOSE THAT FLEXTRONICS HAD A SIGNIFICANT AMOUNT OF EXCESS CAPACITY THAT SHOULD HAVE BEEN WRITTEN DOWN**

60.     As a contract manufacturer, Flextronics is required to make significant capital investments in various facilities to manufacture unique products for its customers.  Beginning no later than the fourth quarter of fiscal 2000 (i.e., the period ending March 31, 2000), Flextronics' customers began to cancel orders due to the massive decline in the demand for internet and telecommunications products and services.  Moreover, not only did Flextronics' customers cancel existing contracts during 2000, but major customers also pressured the Company to accept return of product previously purchased from Flextronics that they could not sell.

61.     As a result of the significant reduction in demand for Flextronics' products, which resulted in order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets decreased significantly.  In fact, according to a former financial consolidator for Flextronics Enclosures who worked at the Company for three and a half years starting in May 1999, plants in the Company's Enclosures Systems division were going idle before the start of the Class Period, as the efficiency rate of the division's manufacturing facilities plummeted from 100% to 20% by the end of 2000.

62.     Nonetheless, in direct contravention of the Company's publicly disclosed policy of accounting for its long-lived assets, defendants caused Flextronics to improperly delay the recognition of impairment in the value of long-lived assets until they sold hundreds of millions of dollars of Flextronics stock at artificially inflated prices.  Indeed, a former Flextronics senior quality manager in San Jose from 1998 through June 2002 who was responsible for all supplier quality engineering issues as well as supplier maintenance and customer service, explained that Flextronics never did admit how severe the downturn was.

63.     GAAP generally provides that circumstances involving possible losses "shall be accrued by a charge to income" if: (i) information indicates that it is probable that an asset had been

impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated. SFAS No. 5, ¶ 8.

64.     With respect to long-lived assets, such as property and equipment, SFAS No. 121 *Accounting for the Impairment of Long-Lived Assets and Long-Lived Assets to be Disposed Of* (March 1995),[5] requires that where events or changes in circumstances indicate that the carrying value of long-lived assets may not be recoverable, then: (1) the entity shall estimate the future undiscounted cash flows resulting from the asset, and (2) compare the estimated future cash flows against the carrying (i.e., the reported) value of the asset. If the sum of the expected future cash flows is less than the carrying value, the entity is required to record an impairment loss to the extent that the carrying value of the asset(s) exceeds the fair value. In estimating future cash flows to measure impairment, assets are required to be grouped at the *lowest* level for which there are identifiable cash flows. For asset impairment in the context of "unusual"/restructuring charges, EITF 94-3 states that asset impairment must be specific.

65.     Flextronics' audited March 31, 2000 annual financial statements included in its 2000 Form 10-K disclosed the following policy of accounting for long-lived assets:

> The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of property and equipment is measured by comparison of its carrying amount, including the unamortized portion of goodwill allocated to the property and equipment, to future net cash flows the property and equipment are expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the property and equipment, including the allocated goodwill, if any, exceeds its fair market value. The Company assesses the recoverability of enterprise level goodwill and intangible assets as well as long-lived assets by determining whether the unamortized balances can be recovered through undiscounted future results of the operation or asset. The amount of enterprise level long lived asset impairment, if any, is measured based on projected discounted future results using a discount rate reflecting the Company's average cost of funds. To date, the Company has made no adjustments to the carrying value of its long-lived assets.

---

[5] The provisions of FASB's SFAS No. 121 relating to long-lived assets have been superseded by SFAS No. 144. SFAS No. 144 became effective beginning with Flextronics' fiscal year ended March 31, 2003.

This publicly stated policy is consistent with GAAP (i.e., FAS 121).  However, it is not the policy that Flextronics actually followed during the Class Period.

66.     As a contract manufacturer, Flextronics is required to make significant capital investments in numerous facilities so that it can manufacture unique products for its customers.  As noted above, beginning no later than the fourth quarter of fiscal 2000 (i.e., the period ending March 31, 2000), Flextronics' customers began to cancel orders due to a massive contraction in the demand for their internet and telecommunications products and services.  This significant shift in the demand for products manufactured by Flextronics, beginning no later than the fourth quarter of fiscal 2000, was an "event or change in circumstances" contemplated under SFAS No. 121 warranting an assessment as to whether the value of Company's long-lived assets was impaired.  In fact, SFAS No. 121 cites a significant adverse change in an entity's business climate as an example of an event or change in circumstances requiring an entity to test its long-lived assets for impairment.

67.     In fact, not only did Flextronics' customers cancel existing contracts during 2000, but major customers (including Cisco, Extreme Networks and Copper Mountain) pressured the Company to accept return of product previously purchased from Flextronics that they could not sell.

68.     As a result of the significant reduction in the demand for the products manufactured by the Company due to order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets decreased significantly.  In fact, according to a former financial consolidator for Flextronics Enclosures who worked at the Company for three and a half years starting in May 1999, order cancellations that commenced in the fourth quarter of fiscal 2000 caused certain of the Company's manufacturing facilities, including the Enclosures Division, to run at less than 20% of capacity.  Operating a manufacturing facility at that level did not make economic sense and could only mean that the

facility would have to be shut down and that the assets associated with the facility were impaired. In June 2002, Flextronics ultimately recorded a $56 million charge at the beginning of the Class Period.

69.     Defendants knew and fully appreciated that Flextronics' OEMs could cancel business at will, thereby impairing the value of the Company's long-lived assets used to manufacture unique customer-specific products.  In fact, according to a former Global Account Manager at Flextronics from 1998 through 2002 who was responsible for forecasting, for the western United States and who reported directly to defendant McNamara in 2001, such risks of cancellation, delays and loss of customers had already occurred.  Additionally, the announcement on June 30, 2002 that the original restructuring in the second quarter of fiscal 2001 (i.e., the period ending September 30, 2000) was incomplete, indicated that the impairment charge in the second quarter of fiscal 2001 was understated.

70.     Nonetheless, in violation of GAAP and in direct contravention of Flextronics' publicly disclosed policy of accounting for its long-lived assets, defendants caused Flextronics to improperly recognize an impairment in the value of long-lived assets until they sold more than $100 million of Flextronics stock at artificially inflated prices.  As a result the value of the long-lived assets and Flextronics' financial statements were materially overstated.



**E.**    **DEFENDANTS FALSELY REPRESENTED FLEXTRONICS' BUSINESS AND PROSPECTS WHILE ORDERING THE COMPANY'S PLANT CONTROLLERS TO DESTROY INTERNAL COPIES OF FORECASTS, WHICH CONTAINED MATERIAL ADVERSE INFORMATION**

71.     During the Class Period, Flextronics' plant controllers were required to submit 12-month rolling forecasts to the Company's corporate finance department each month.  In late 2001 or early 2002, however, Flextronics directed all of its plant controllers by email to *destroy* all hard and soft copies of these internal forecasts after they were sent to the Company's regional headquarters in San Jose, California.  Defendants ordered that all copies of internal forecasts be destroyed because they were drastically lower than the false and misleading forecasts that were being published to analysts and investors.

72.     According to a former senior manager who worked at Flextronics' enclosure systems plant in Garland, Texas until March 2002, who reported to Ron Barauskas (VP of Human Resources), the only reason for defendants' decision to send the email ordering the document destruction was that "*the forecasts being submitted to analysts and Wall Street were false, and someone was afraid the real numbers would get into the wrong hands*."  The same witness recalls that defendants were so concerned that their request to destroy forecasts would become public that it was delivered on a strict "need to know" basis.  As a result, according to former Flextronics employees (including a former Controller/Director of Finance for Flextronics in Chicago, Illinois from October 1999 through July 2002, and a former Senior Financial Analyst for Flextronics' enclosures unit in Chicago from August 2001 through August 2002), the Company's finance department (with the approval of defendants Marks and McNamara) sent the email only to plant controllers and others charged with preparing 12-month forecasts.

73.     A former Director of Operations, who worked at Flextronics from January 2001 through August 2002, and who reported to Curt Lloyd, the VP of North American operations, who communicated directly with defendant McNamara, confirmed that the Company ordered the

destruction of internal forecasts that were contrary to publicly announced earnings targets.  The witness stated, "I would say that from being involved with staff meetings, . . . whether it be staff meetings at local level or [finance] staff up in Chicago – they would make it very clear when conversations were going off line, and what would need to be done with paperwork. . . .  [I]t was common practice. . . .  [A] lot of people in sales . . . indicated to me – there's this email that came out, basically, get rid of any financial information and forecast information. . . .  There should be only one person who should have this information and if you have any copies of it you need to get rid of it.  [They ordered the destruction of internal forecasts] to control the amount of information out there which was showing the true financial performance of the organization.  When Marks would say . . . 'business is looking good and things are doing great.'  We're sitting in our offices listening to this and going, 'what the hell is this man talking about?'  We just laid off another fifty people and our forecasts have tanked for the month.  You would hear these conversations going on . . . to the stockholders and they just wouldn't be there.  Any time Marks or McNamara would tell the stockholders that restructuring was over with or that business would be upturned from June 2001 until the time I left in September 2002, this was just not the truth."

74.     Defendants also manipulated their public forecasts in connection with the Company's acquisition of Telecom Global Solutions (TGS) in August 2001.  According to a former sales representative from Duluth, Georgia who worked at Flextronics from October 2000 through January 20002, immediately after the TGS acquisition in September 2001, the Company's sales representatives told management (including defendant Marks and Magnus Friberg, Flextronics' Vice President of Global Sales and Marketing) that the publicly announced forecasts were not accurate because of the significant downturn in the telecommunications sector.  Defendants refused to correct the forecasts.  In fact, the former Flextronics' sales representative recalled that the

difference between publicly projected sales and the actual sales he was achieving for the Company's Network Services business unit was at least *20-30%*.

75.     Similarly, according to former Flextronics employees with personal knowledge of the relevant facts, corporate headquarters engaged in "creative accounting" and routinely inflated internal forecasts after receiving them.  For example, a former program manager in the Company's San Jose office from October 1999 through May 2002, who dealt with some of Flextronics' largest customers (including Motorola), recalled that the forecasts he received from corporate did not match the figures he had for his own customers.  In addition, a former accounting manager for Flextronics' Network Services Division from February 2000 through August 2001 specifically recalled that the numbers he passed on to corporate headquarters were significantly lower than the figures released publicly by the Company.

**F.     FLEXTRONICS IMPROPERLY RECORDED REVENUE ON "PHANTOM SHIPMENTS"**

76.     Flextronics also recognized revenue improperly on the sale of its products to customers to meet predefined earnings targets. Recognition of this revenue was in violation of GAAP, because the product sold to OEMs was either known to be defective, incomplete or was not "shipped" as defined by GAAP.

77.     GAAP provides that revenue should not be recognized until it is realized or realizable and earned. FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* (CON 5) (December 1984), ¶83-84; Accounting Research Bulletin No. 43, *Restatement and Revision of Accounting Research Bulletins* (June 1953) Chapter 1A ¶1; Accounting Principles Board Opinion No. 10 Omnibus Opinion, (December 1966), ¶12. The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the sale price to the buyer is fixed or determinable, collectability is reasonably assured, and the seller has substantially

accomplished what it must do to be entitled to the benefits represented by the revenues. Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements* (SAB 101) (December 1999) and CON 5 ¶ 83.

78.   Further, revenue that arises from circumstances involving uncertainty as to possible gains should not be recognized since to do so might result in gain being recognized prior to its realization. FASB Statement of Financial Accounting Standard (SFAS) No. 5, *Accounting for Contingencies* (March 1975), ¶ 12.

79.   Flextronics' fiscal 2001 and 2002 Form 10-Ks included the following disclosure with respect to the Company's policy of accounting for revenue recognition:

> In December 1999, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin No. 101 ("SAB 101"), "Revenue Recognition in Financial Statements." SAB 101 provides guidance on applying generally accepted accounting principles to revenue recognition issues in financial statements. The Company adopted SAB 101 as required in the fourth quarter of fiscal 2001 and the adoption did not have a material impact on the Company's consolidated financial statements...Revenue from manufacturing services is generally recognized upon shipment of the manufactured product. Revenue from other services and after-market services is generally recognized as the services are performed.

This publicly stated policy is consistent with FASB pronouncements, as well as SEC rules and regulations. However, it is not the policy that Flextronics actually followed during the Class Period.

80.   During the Class Period, sales were faked so that Flextronics could publicly appear to meet earnings numbers at or near month and quarter ends. For example, according to a former shipping manager in Flextronics' Sunnyvale facility (who was employed by the Company from 1998 until December 2001, and who reported to the Logistic Manager, who reported to the General Manager of Flex Enclosures, who in turn reported to defendant and CEO Marks), revenue recognized on products that did not leave Flextronics' warehouse was commonly referred to as "phantom shipments." Products that were shipped to trailers in the Company's parking lot were referred to as "Fedex shipments." These products were returned and a return material authorization was processed the next day, which was generally in the following month or quarter.

81.     With respect to defective or incomplete product, this generally represented approximately 5-20% of shipments at the Sunnyvale facility for any given month through the end of 2001.  Flextronics negotiated deals with certain customers such as Motorola and Cabletron to accept this defective product over month and quarter ends with the understanding that they would return the product almost immediately the following month.  The Company improperly recognized revenue on the sale of this product, knowing that it had not substantially accomplished what it must do to be entitled to the benefits represented by the revenue – i.e., the manufacturing and testing process was not complete.

82.     Defendants knowingly or recklessly disregarded that the recognition of such revenue was improper and fraudulent and as a result, materially overstated Flextronics' earnings throughout the Class Period.[6]

_____

[6] In addition to the violations of GAAP noted above, the Company presented its financial results and statements in a manner that also violated the following fundamental accounting principles: (a) that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶ 12); (b) that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions was violated (Concepts Statement No. 1, ¶ 34); (c) that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources was violated (Concepts Statement No. 1, ¶ 40); (d) that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50); (e) that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42); (f) that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59); (g) completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (Concepts Statement No. 2, ¶ 79); and (h) that conservatism be used as a prudent reaction to

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

83.     As set forth below, defendants falsely represented throughout the Class Period that Flextronics' business was uniquely thriving in an adverse business climate and that its business prospects remained strong, rather than disclosing the true state of affairs at Flextronics, including that:

   a.     as the internet and telecommunications industry faltered, the Company improperly established accounting reserves and subsequently improperly released them into earnings in order to appear to meet predefined earnings targets that they had published to investors and securities analysts;

   b.     the severe downturn in customer demand in the internet and technology markets caused Flextronics to have a significant amount of excess inventory that should have been written off because, among other reasons, most of the inventory was time-sensitive and specifically manufactured for its customers who had cancelled their orders and did not want Flextronics' products;

   c.     as a result of the significant reduction in demand for Flextronics' products, the Company had excess manufacturing capacity that could not be profitably operated and should have been written off;

   d.     Flextronics' internal forecasts were drastically lower than the forecasts announced to the public – as evidenced by the fact that the Company's Finance Department (with the approval of defendants Marks and McNamara) ordered Plant Controllers throughout Flextronics to *destroy* internal copies of forecasts so that the public would not discover the Company's true financial condition; and

   e.     Flextronics improperly recorded revenue on "phantom shipments" that were actually shipped to trailers in the Company's parking lot in order to meet earnings targets that defendants published to investors and securities analysts.

---

uncertainty to try to ensure that uncertainties and risks inherent in business situation are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).  The Company's Class Period Forms 10-Q and 10-K filed with the SEC, as well as its Registration Statements and Prospectuses, were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

84.    Flextronics also manipulated its financial reporting in order to report "record" financial results when the Company was at all times during the Class Period operating at a loss. Specifically, Flextronics routinely set up improper accounting reserves as "slush funds" and then improperly released a portion of the reserves each quarter during the Class Period in order to falsely appear to be profitable (or to create the false impression that the Company's net loss was not as significant as it would otherwise be). In addition, defendants: (1) falsely inflated the Company's earnings by releasing into income these excess or general reserves, which were originally established for restructuring activities; (2) failed to timely record an impairment in the value of long-lived assets; (3) failed to record an impairment in the value of the Company's inventory; and (4) improperly recognized revenue on the sale of Flextronics' products to appear to meet predefined earnings targets.

85.    <u>False Statement</u>: On or about January 18, 2001, the first day of the Class Period, Flextronics announced its results for the third quarter of fiscal 2001 (i.e., the period ending December 31, 2000) in a press release, falsely stating that cash net income grew 110% to $122.7 million, and diluted cash earnings per share grew 73% to 26 cents. The press release also falsely stated that gross margin of 8.5% in the third quarter of fiscal 2001 was up sequentially from the 8.1% reported in the second fiscal quarter. The press release also falsely stated that "[c]ash operating margin reached 5.0%, equaling the Company's long-term target. Cash net income reached 3.8% of revenues, up from 3.4% in the last quarter." The press release also falsely reported that inventories for the quarter were $1.73 billion, property and equipment was $1.86 billion, total assets were $6.7 billion, and cash net income was $85 million.

86.    <u>False Statement</u>: Defendant Marks also falsely stated in Flextronics' January 18, 2001 press release that Flextronics would thrive during an economic downturn:

> "Despite somewhat difficult times for many of our OEM customers, we are
> extremely pleased to announce record revenues, margins and earnings as well as

sequential improvement in inventory turns and return on invested capital. . . . *We have long suggested that a downturn in our customers' end-markets would increase the outsourcing opportunities for tier-one EMS companies, and our current pipeline of opportunities proves that to be true. As a result, our bias towards next fiscal year is increasingly positive* and we will continue to aggressively pursue the more significant opportunities."

(Emphasis added.)

87.   Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading: These statements in the January 18, 2001 press release were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82.  Defendants also knew or recklessly disregarded that, at the time, the Company had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn. Defendants also knew or recklessly disregarded that many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases. Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers.  Defendants failed to record an impairment in long-lived assets and inventory, which overstated gross profit, gross margin, and earnings.

88.   On or about February 1, 2001, Flextronics sold 27 million shares of common stock in a public offering (2001 Offering) at $37.9375 per share.  Banc of America Securities LLC was sole book manager for this secondary offering of Flextronics common stock.  Goldman, Sachs & Co., Salomon Smith Barney, Thomas Weisel Partners LLC, Bear, Stearns & Co. Inc., Deutsche Bank Alex. Brown Inc., Lehman Brothers Inc. and Robertson Stephens, Inc. were also underwriters for the 2001 Offering.  Flextronics raised approximately $1.024 billion in the 2001 Offering.

89.    <u>False Statement</u>: In connection with the 2001 Offering, Flextronics filed a registration statement on February 1, 2001, incorporating a prospectus (2001 Registration Statement and Prospectus).  The 2001 Registration Statement and Prospectus, which was signed by the Individual Defendants, falsely reported the Company's financial results for the third quarter of fiscal 2001 (i.e., the period ending December 31, 2000):

> Third Quarter Financial Results. On January 18, 2001, we announced our financial results for the third quarter of fiscal year 2001. . . .  Gross profit increased from $170.1 million in the third quarter of fiscal 2000 to $236.7 million in the third quarter of fiscal 2001, and operating income increased from $83.6 million in the third quarter of fiscal 2000 to $115.2 million in the third quarter of fiscal 2001. Net income before amortization, merger related costs and other one-time charges increased from $58.5 million in the third quarter of fiscal 2000 to $122.7 million in the third quarter of fiscal 2001. Net income after amortization, merger related costs and other one-time charges increased from $47.8 million in the third quarter of fiscal 2000 to $67.8 million in the third quarter of fiscal 2001. As a result, our diluted earnings per share increased from $0.12 for the third quarter of fiscal 2000 to $0.14 for the third quarter of fiscal 2001.

90.    <u>False Statement</u>: The 2001 Registration Statement and Prospectus also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company.  The 2001 Registration Statement and Prospectus falsely stated:

> OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.
>
> . . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.
>
> . . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduces our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross margins and operating income.

91.    <u>False Statement</u>: The 2001 Registration Prospectus also falsely stated:

> THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.