downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers.  Defendants also knew or recklessly disregarded that Flextronics was manipulating its publicly announced forecasts in order to disguise the fact that Flextronics' financial results were declining.  Defendants also knew or recklessly disregarded that they were improperly releasing reserves into earnings.

156.  <u>False Statement</u>: On or about January 23, 2002, Flextronics held a conference call to discuss the results of Flextronics' third quarter of fiscal 2002 (which ended December 31, 2001). During the call, Marks stated that Flextronics was keeping its prior forecasts for the fourth quarter of fiscal 2002:

> MARKS:   As announced in the press release, revenue in the quarter was at an all time record of $3.45 billion dollars up 7% from a year ago and up 6% sequentially.  Cash operating profit was $117 million dollars, a 14% sequential increase, cash net income was $85 million dollars, an increase of 17% sequentially and diluted cash earnings per share was 17 cents, a 13% increase sequentially.  Cash earnings per share in the prior year period was 26 cents.  Slide 4: Gross margin in the quarter was 6.6%, SG&A was 3.2 percent of sales, down from 3.5% a year ago, and reduced in dollar amount by approximately $4 million dollars from the previous year.  Operating profit was 3.4% of sales, down from the previous year, but up sequentially.  Cash net income was also up sequentially to 2.5% of sales, but down from 3.8% a year ago.  Return on invested capital was 10.9%, up sequentially from 9.4%.  Please note that intangibles amortization was approximately $3 million dollars in the quarter, or less than three quarters of one cent in gap earnings per share.  ***As promised, there were no one time charges in the quarter***. . . .  Inventory was down slightly to $1.4 billion dollars, as inventory turns improved to 9.2 times.

> \* \* \*

> MARKS:   Now for the exciting part.  While Flextronics became the industry leader in profits and market capitalization several quarters ago, this is the first quarter in which Flextronics led the industry in revenue, which is the metric of choice by most people in determining industry leadership.  ***Even better, though, is that during the recently completed quarter Flextronics led the industry in each of several important metrics, which include revenue, operating profits, net income, DSO [days sales outstanding], inventory turns and return on invested capital***.

> \* \* \*

> MARKS:   As we see the situation in Flextronics, ***there are no changes from our last update and we are maintaining our financial outlook and***

1         *guidance*.  The secular trend towards outsourcing should continue to
2         be the growth driver of the EMS industry and we believe we are in a
         position to win more than our fair share of this business.

3                                   *   *   *

4 MARKS:     Lastly, *we are in the final stages of completing the previously*
5          *announced restructuring activities which are going according to*
         *plan and this should also help to improve our operational and*
6          *financial metrics*.

7                                     *   *   *

8 MARKS:     I've been spending some time in New York and talking to investors
9          and talking and listening to some analysts and listening to what
         everybody says, you know, I mean I'm not getting on this call and
10        telling you, you know that I expect any major increases [in revenue]
         because I don't until we see them.  I think that we'll see them when,
11       you know, we'll see them when we see them.  I don't really know
         what to say much else about that.  But we're not changing guidance
12      so I mean if people are uncomfortable with that I don't know what to
         say about that, I mean right now our view of the world is about the
         way it was a month ago or two months ago, or three months ago.

13 (Emphasis added.)

14     157.  <u>False Statement</u>: Defendant Marks also made several false statements concerning the

15 Company's inventory levels during the January 23, 2002 conference call:

16 Q:         Its Salomon Smith Barney.  Michael you made a passing reference in
17          your prepared remarks about inventory levels. I was hoping that you
         could maybe flesh that out a little bit, on your perception on the
18      inventory levels, by sector preferably, but just generally would be
         great too.

19 MARKS:     Yeah.  I think that, you know, I'm not sure, you know, I don't have
20          hard data so I mean its really more anecdotal and it mostly comes
         from talking to the customers and seeing some increase in orders
21      without an actual increase in end-market demand. . . .  So my
         comment, my passing reference is that, *we clearly have a lot less*
22      *inventory as you can see, I mean, we're running just over 5 weeks*
         *company wide now, which means that our suppliers who haven't*
23      *been getting orders from us are going to see more orders because,*
         *you know, we can maybe get it down to four weeks, but we obviously*
24      *have to go out and order more even though our revenue doesn't go*
         *up, so we're going to see the same thing*.  Supply base should get a
25      little bit better from that standpoint because we are pretty close to the
         end of bleeding off any excess inventory, I mean the same as what our
26      customers tell us.  So as long as this business doesn't deteriorate
         anymore *I think we are going to start to see some increases in order*
27      *that are not end-market demand related, but rebuilding of*
         *inventories.  That's what we are hoping for*.

28

* * *

Q:      [T]he comment I guess from the press release was, you know, not focusing on revenues so much, but focusing on profits, and to that end could you talk about, I mean obviously there's several components to better margins, cost reductions, different types of businesses, but would you continue to expect the sequential improvement albeit small or whatever in the operating margin and what are the components of that over the next couple of quarters?

MARKS:    . . . [W]e are totally focused on operations execution at this point.  We are trying to drive cash flow, you know and no one time charges, you know, watching capital expenditures you know, driving up inventory turns.  *I am very pleased about the inventory performance, I think that, you know, its one of the things we really can control in this environment and I think we have done that very well, and we think we are going to continue to improve that as Bob indicated already. . . . The investment community should understand that you know, we're into making money.  There's been a lot of growth here and you know we took our charges and we did a lot of reorganizations and now we're just driving these metrics all the time and my expectations as to, you know, the company is that that is going to bear fruit, you know, not necessarily in a straight line, but certainly I expect when we are having this call this time next year to see you know, real improvements in really all those metrics.*

* * *

Q:      . . . I just wanted to get a sense . . . you've clearly done a great job in terms of improving your inventory turns.  Could you give us a sense to what is it that you think you're doing that is giving you a competitive edge?  Because clearly some of your competition has not done as well on the inventory side.

MARKS:    I can say a couple things about that.  One is *we have a real focus on it [inventory turns] and it's because this management team, specifically me, I believe that inventory turn is a real measure of the health of the business.  It's obviously not the only measure but it is something we've been talking about since the day I joined the company in 1993 and it's shared by the management team.  And we just went through a meltdown which reminded everybody in case anybody had forgotten how important it is to really have control of this information.*  You know, if you look at our five weeks of inventory, and it's a competitive advantage, we have five weeks and the other company has 8 weeks then . . . and there's a decrease in the materials cost which there typically are all the time, we get to take advantage of that 3 weeks sooner than the competition.  Its exactly what Dell's done to successfully compete. And *we view inventory turn as a competitive weapon and we're trying to develop every competitive weapon we can so we have a huge focus on it.  Some people say we're able to have higher inventory turns because of a higher preponderance of consumer-type product and I just think that's not true because half our business billed is 55% or something is data com-telecom that are more difficult than the high-volume products but I think the answer to it is we have a big investment in*

*IT systems. We've really made tremendous improvements in the last year. I'm very pleased at the working level with what we've been able to do with the IT systems that we have in place. We now have better visibility than we've ever had about what products we have where. We have very good visibility to now . . . we now, for example, get a daily report about any purchasing activity that takes place in the world where our buyers have purchased materials from suppliers who are not strategic suppliers when they could have, when they weren't required by the customer. And so we have immediate visibility to get that changed and make sure that we're buying from the strategic suppliers which has a value to it not only in price but also on inventory turns because the strategic suppliers are ones that we have good relationships with. It's where they're holding more inventory for us, where we have return rights and all the other kinds of things. And so we've made great progress in the last year in getting all these systems together so that we have the kind of visibility it takes to do this and there's no reason to think we can't make inventory turns a lot better than this. And we're gonna try.*

(Emphasis added.)

158.   <u>Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading</u>: Defendant Marks' statements during the January 23, 2002 conference call with securities analysts were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82.  Defendants also knew or recklessly disregarded that the Company, at the time, had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn.  Defendants also knew or recklessly disregarded that many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases.  Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers.  Defendants also knew or recklessly disregarded that Flextronics was manipulating its publicly announced forecasts in order to disguise the fact that Flextronics' financial results were declining.  Defendants also knew or recklessly disregarded that they were improperly releasing reserves into earnings.

159.   <u>False Statement</u>: On or about January 23, 2002, defendants also sent a letter directly to Flextronics shareholders, signed by defendant Marks, which falsely stated that:

> Now for the exciting part. While Flextronics became the industry leader in profits and market capitalization several quarters ago, this is the first quarter in which Flextronics led the industry in revenue, which is the metric of choice by most people in determining industry leadership. ***Even better, though, is that during the recently completed quarter, Flextronics led the industry in each of several important metrics, which include revenue, operating profits, net income, inventory turns, and return on invested capital.***

> \* \* \*

> Now let me comment on what we see ahead in terms of financial performance. It is evident that there will not be a rapid improvement in capital expenditures in the telecom industry. This will continue to negatively impact us, because telecom hardware companies along with high-end datacom companies account for a high percentage of sales of semiconductors, printed circuit boards, backplanes, enclosures, and other high dollar components from suppliers in the technology industry.

> While we remain bullish on these markets in the long run, near term improvements are very uncertain. We will watch as these markets develop and give you more information with each succeeding update. In the meantime, most other sectors appear to have stabilized from a macro perspective and inventory levels seem to be reducing. While there is little evidence of any meaningful upturns in across-the-board end-market demand, neither is there much evidence of any meaningful weakening. ***As we see the situation at Flextronics, there are no changes from our last update and we are maintaining our financial outlook and guidance.***

> The secular trend towards outsourcing should continue to be the growth driver in the EMS industry and we believe we are positioned to win more than our share of this business. We will continue to actively pursue and add to the opportunities in the pipeline. The end markets will eventually recover and will once again become a growth driver for our industry. In the meantime, we will continue driving the operational improvements previously mentioned. We will also seek to increase our internal sourcing of higher value and add higher margin services such as design, semiconductors, printed circuit boards, backplanes, and enclosures to help offset the previously mentioned softness. Lastly, we are in the final stages of completing the previously announced restructuring activities, which are going according to plan, and this should also help to improve our operational and financial metrics.

160.   <u>Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading</u>: The statements in the foregoing letters to shareholders were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82. Defendants also knew or recklessly disregarded that the Company, at the time, had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of

Flextronics' largest customers were canceling orders in the face of a severe economic downturn.
Defendants also knew or recklessly disregarded that many of Flextronics' customers were
experiencing severe financial difficulty and were unable to complete anticipated purchases.
Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic
downturn, Flextronics was actually experiencing severe financial difficulties like many of its
customers. Defendants also knew or recklessly disregarded that Flextronics was manipulating its
publicly announced forecasts in order to disguise the fact that Flextronics' financial results were
declining. Defendants also knew or recklessly disregarded that they were improperly releasing
reserves into earnings.

161. <u>False Statement</u>: On or about February 12, 2002, the Company filed its Form 10-Q
for the third quarter of fiscal 2002 (i.e., the period ending December 31, 2001). The Form 10-Q,
which was signed by defendant Dykes, falsely reported net income of $82 million for the quarter.
The Form 10-Q also falsely reported $8.32 in total assets. The Form 10-Q also falsely reported
gross profit of $226.58 million, and earnings per share (diluted) of $0.16. The Form 10-Q also
falsely stated that, "[t]he Company recognized unusual pre-tax charges of approximately $516.1
million during the second quarter of fiscal 2002."

162. <u>False Statement</u>: The Form 10-Q also identified several contingent risk factors that,
unknown to investors, were already having an adverse effect on the Company. The Form 10-Q
falsely stated:

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION
QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay
production for a number of reasons. Many of our customers industries are
experiencing a significant decrease in demand for their products and services. The
generally uncertain economic condition of several of the industries of our customers
has resulted, and may continue to result, in some of our customers delaying the
delivery of some of the products we manufacture for them, and placing purchase
orders for lower volumes of products than previously anticipated. Cancellations,
reductions or delays by a significant customer or by a group of customers would
seriously harm our results of operations by reducing the volumes of products

manufactured by us for the customers and delivered in that period, as well as causing a delay in the repayment of our expenditures for inventory in preparation for customer orders and lower asset utilization resulting in lower gross margins.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, increase capacity and incur other expenses to meet the anticipated demand of our customers, which may cause reductions in our gross margins if customer orders are delayed or canceled. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

163.  <u>False Statement</u>: The Form 10-Q also falsely stated:

THE MAJORITY OF OUR SALES COME FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

\*    \*    \*

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

164.  <u>Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading</u>: These statements in the Form 10-Q for the third quarter of fiscal year 2002 were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82. Defendants also knew or recklessly disregarded that the Company, at the time, had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn. Defendants also knew or recklessly disregarded that many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases. Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial

difficulties like many of its customers.  Defendants also knew or recklessly disregarded that the charges the Company was taking for the write-down of long-lived and current assets did not include the large amount of other inventory and assets known by defendants to be worthless.  Defendants also knew or recklessly disregarded that the adverse events identified as potential risk factors had already occurred.  Defendants also knew or recklessly disregarded that they were improperly releasing reserves into earnings.

165.    False Statement: On April 25, 2002, despite an earlier warning that they would come in at the lower range of analysts' expectations as a result of market weakness, defendants announced financial results for the fourth quarter of fiscal 2002 (i.e., the period ending March 31, 2002), which met consensus estimates of $0.12 per share, excluding severance and other costs.  The Company falsely reported net income of $5.74 million, or $0.01 per share, compared to a loss of $193.2 million, or $0.41 per share reported in the fourth quarter of fiscal 2001.

166.    False Statement: Defendant Marks also falsely stated in the April 25, 2002 press release:

> "***Despite a lot of bad news with regard to our customers' end markets, we believe that Flextronics is successfully working through a very difficult environment.*** We continue to generate strong revenues and cash flows, while remaining profitable. This, to be honest, is something we feel very good about," stated Marks.  Marks further added, "We're busy with new customer activities, so ***while the deterioration in communications markets makes daily headlines, we are building many new relationships that will add to growth in future quarters and years***.  In addition, we will continue to drive efficiencies so that when the inevitable upturn arrives, we should have considerable earnings leverage."

167.    Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading: These statements in the Company's April 25, 2002 press release were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82. Defendants also knew or recklessly disregarded that the Company, at the time, had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of

Flextronics' largest customers were canceling orders in the face of a severe economic downturn. Defendants also knew or recklessly disregarded that many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases. Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers. Defendants also knew or recklessly disregarded that Flextronics was manipulating its publicly announced forecasts in order to disguise the fact that Flextronics' financial results were declining. Defendants also knew or recklessly disregarded that they were improperly releasing reserves into earnings.

168.   <u>False Statement</u>: On or about April 25, 2002, Flextronics held a conference call to discuss the results of Flextronics' fourth quarter of fiscal 2002 (which ended March 31, 2001). During the call, Marks falsely stated, among other things, that Flextronics was "successfully working through a very difficult environment":

> MARKS:   As announced in the press release, revenue in the quarter was $3.3 billion dollars up 5.8% from a year ago, pro forma net income was $61 million dollars or .12 cents per diluted share, while cash net income was $5.7 million dollars or .1 cent per diluted earnings per share. During the quarter, the company revalued its investment portfolio by $28.6 million dollars to take into account the negative impact of deteriorating conditions in the communications markets and the difficult environment for new software companies, many of which Flextronics invest in and works with to create new tools for the industry. Also during this quarter, the company downsized a number of operations and took approximately $29.6 million dollars in severance costs. Amortization of intangibles reduced our GAAP diluted earnings per share by one cent and the investment in severance charges reduced it by ten cents. For the full fiscal year, revenue was $13.1 billion dollars up 8.2 percent from the prior fiscal year, pro forma net income was $310 million dollars, down from $416 million dollars from a year ago. Pro forma diluted earnings per share was .61 cents down from .87 cents a year ago. Slide 4: gross margin in the quarter was 6.5% of sales, approximately the same as the two previous quarters. . . . Inventory was down $108 million dollars exactly in line with the decrease in revenue to obtain our industry leading inventory turns at 9.2 times as seen on slide 6.

*   *   *

MARKS:      I can't remember a more difficult period, although it is representative of what happens in a severe market downturn. Which quite frankly we see lasting for a while. Slide 13: On the other hand, *at Flextronics we continue to generate strong revenues and cash flow by remaining profitable, which to be honest, we feel very good about. The consumer segments of our business are stable*.

                              *   *   *

MARKS:      *Overall though, despite lots of bad news with regard to our customers end market demand, we believe that Flextronics is successfully working through a very difficult environment maintaining profitability when many suppliers, customers and competitors are not, and we will continue to drive efficiencies so that when the inevitable upturn arrives, we should have considerable earnings leverage. We believe that given our current runrate, our normalized earnings power given our current mix of business is approximately $1.00 per share and at $20 billion of revenues we think the earnings powers double to about $2.00 per share*.

                              *   *   *

MARKS:      I think in terms of you know, our own guidance I mean the higher end of the range we're projecting is about the same as the March quarter and you know, that's doable.

169.    <u>False Statement</u>: Defendant Marks also falsely stated during the April 25, 2002 conference call that the Company was not losing money because of excess capacity:

Q:          Could I get a sense of what your benefit from past restructurings was this quarter? What you expect for next quarter and then maybe get a sense of what is your organic business decline this quarter and what's your expectations are for the fiscal first quarter and for '03.

                              *   *   *

MARKS:      Yes. We actually don't break out the information that way, so –

Q:          Ok. So. I'm trying to get a sense for, you've done a significant amount of restructuring in the past and if you look at the first quarter of last year, you know, you look at a 3.5% SG&A line. Do you have the same exact flat assumption as far as 6-1/2% gross and 3-1/2, you get to the 12 to 13 cent number your looking for, I'm trying to understand when the benefits are to come from past restructurings on the SG&A or on the gross margin line.

MARKS:      If we hadn't done those restructurings, we would be losing a tremendous amount of money right now, so, *I mean, yes, I'm not sure exactly how you answer that, but we've still got a huge amount of capacity and if that capacity were still sitting there we would be losing tons of money instead of making money*.

170.   <u>Reasons Why and Defendants' Knowledge that Their Statements Were False and</u> <u>Misleading</u>: Defendant Marks' statements during the April 25, 2002 conference call with securities analysts were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82.  Defendants also knew or recklessly disregarded that the Company, at the time, had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn.  Defendants also knew or recklessly disregarded that many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases.  Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers.  Defendants also knew or recklessly disregarded that Flextronics was manipulating its publicly announced forecasts in order to disguise the fact that Flextronics' financial results were declining.  Defendants also knew or recklessly disregarded that they were improperly releasing reserves into earnings.

171.   <u>False Statement</u>: On or about April 25, 2002, defendants also sent a letter to Flextronics shareholders, in which defendant Marks again falsely portrayed the Company as being different than others that were suffering from adverse market conditions, stating that then-existing market conditions were actually ***benefitting*** the Company:

> ***[W]e continue to generate strong revenues and cash flow, while remaining*** ***profitable, which, to be honest, we feel very good about. The consumer segments of*** ***our business are stable.*** We continue to do well with cell phones, PC peripherals, printing and imaging products and so on. And we continue to win new customers, so far at a rate that offsets deterioration from other customers.

* * *

> ***We continue to be extremely busy with new customer activities. During the June*** ***quarter, we will almost certainly have a number of additional relationships to*** ***announce. So while the deterioration in communications markets makes daily***

*headlines, behind the scenes we are building many new relationships, which will add to growth in future quarters and years.*

So let me take a few minutes to remind investors about some of the most important characteristics of our industry. Downturns drive two critical activities. The first is cash generation, both through reductions in working capital from lowered sales, and in operating profits. *Our balance sheet, along with those of several competitors, has improved during this period.* Second, and probably more important, is that *customers continue to restructure their businesses, which is accruing to our benefit.* . .

As revenue falls, customers find that they have too many suppliers, and they begin to consolidate. This almost always accrues to the benefit of the top tier suppliers. *Weak suppliers go bankrupt, like ACT Manufacturing, EM Solutions and MCMS and their business flows to top tier suppliers. Customers look for additional outsourcing opportunities,* now often considering what used to be untouchable. This is happening in many companies as we speak. It takes quite a bit of time, but it is happening.

What is even more important to Flextronics is that many more companies are considering using us to provide the full suite of services that we offer. This is more complex than most of you realize. It involves changing an entire supply chain, often moving production not just from one company to another, but from one country to another at the same time. But with prospects for market improvement somewhat bleak, our customers are working with us to find other ways to take cost out of their products. As a consequence, *our design, logistics, and manufacturing people are busier than we have ever been working through complex engagements with both new and existing customers.* As this year progresses, we will have some specific examples to talk about. But these activities make us very bullish about our future, even if the end markets continue to struggle.

\* \* \*

*As our business changes, we will continue to react. If there is further deterioration in the end markets, we will cut costs more.* We continue to look at our overall base of assets to determine if we should make changes and will do so if appropriate. Again, *this is not a bad news only subject.* . .

\* \* \*

*Now let me address our outlook for coming quarters.* As I have just discussed, we have a lot of moving parts, and not as much visibility as we would like. Network Services is performing profitably and well. Design Services is slightly profitable, with activity picking up. Enclosures is in good shape as I reported. Asia is booming. The PCB business is improving, but will still show losses in the June quarter where six weeks ago we were hoping for breakeven performance. This is because of the continuing slowdowns in communications products, and high end computing. But *we have won new business, and we can see clear improvement.* Also during the March quarter, we restructured Multek's Irvine facilities, moving high volume production to lower cost sites and combining the technology center with quick turn production. We are extremely pleased with the results of these efforts.

*Going forward, we see more of the same for the next couple of quarters. In June, we expect revenue in the range of $3.0-$3.3 billion. Earnings should be in the range of $0.10-0.13 per share. In the September quarter we expect some*

*improvement from those numbers*. . . I would state our view as "*cautiously optimistic*."

This is a good time to be doing mid-quarter updates, because things can change quickly. *Overall, though, despite lots of bad news with regard to our customers' end market demand, we believe that Flextronics is successfully working through a very difficult environment, maintaining profitability when many suppliers, customers, and competitors are not. And we will continue to drive efficiencies so that when the inevitable upturn arrives, we should have considerable earnings leverage.*

172.    <u>Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading</u>: The statements in the foregoing letter to shareholders were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82. Defendants also knew or recklessly disregarded that the Company, at the time, had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn. Defendants also knew or recklessly disregarded that many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases. Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers. Defendants also knew or recklessly disregarded that Flextronics was manipulating its publicly announced forecasts in order to disguise the fact that Flextronics' financial results were declining. Defendants also knew or recklessly disregarded that they were improperly releasing reserves into earnings.

173.    The materially false and misleading statements issued by defendants had the effect intended by their publication. As evidence of this, the next day, following the announcement of the Company's fourth quarter and year-end financial results, Lehman Brothers issued a report that

maintained a "Strong Buy" rating on the Company's securities and a $23.00 near-term stock price target, stating that:

> FLEX's March quarter was below prior guidance, but at a level which we believe will be very acceptable to investors given the high level of concern surrounding results. Revenues were $3.3B, up 6% y/y, above our estimate. EPS came in-line with consensus at $0.12, but down about 45% y/y.
>
> Summary
>
> Management did provide one quarter's worth of guidance, suggesting revenues between $3.0 - $3.3B and EPS $0.10 - $0.13. We are maintaining our estimated of $3.2B in 1Q03 revenues, but moderating our EPS by $0.03 to $0.11. For FY03 we are moving to 13.3B and EPS of $0.50, down from $13.65B and $0.64.
>
> We think investors will take comfort that business held up reasonably well given the very challenging tech environment.  With the shares closing at $13.47, we suggest investors add to positions at this level. . . We maintain our 1-Strong Buy rating and our $23 price target.

174.   <u>False Statement</u>: On or about May 3, 2002, the Company filed its Form 10-K for the 2002 fiscal year ending March 31, 2002 (2002 Form 10-K).  The 2002 Form 10-K, which was signed by defendants Marks and Dykes, falsely reported total assets of $8.64 billion.  The 2002 Form 10-K also falsely reported $415.5 million in gross profit for fiscal 2002, $(153,758) million net loss and earnings per share (diluted) of $(0.31).

175.   <u>False Statement</u>: The 2002 Form 10-K also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company.  The 2002 Form 10-K falsely stated:

> *Our customers may cancel their orders, change production quantities or delay production.*
>
> . . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Many of our customers'' industries are experiencing a significant decrease in demand for their products and services. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them, and placing purchase orders for lower volumes of products than previously anticipated. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations by reducing the volumes of products manufactured by us for the customers and delivered in that period, as well as causing a delay in the repayment of our expenditures for inventory in preparation for customer orders and lower asset utilization resulting in lower gross margins.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, increase capacity and incur other expenses to meet the anticipated demand of our customers, which may cause reductions in our gross margins if customer orders continue to be delayed or canceled. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . .  In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

176.   <u>False Statement</u>: The 2002 Form 10-K also falsely stated:

*The majority of our sales come from a small number of customers; if we lose any of these customers, our sales could decline significantly.*

\* \* \*

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

177.   <u>Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading</u>: These statements in the 2002 Form 10-K were materially false and misleading, and were known by defendants to be materially false and misleading at the time of their issuance, or were recklessly disregarded as such, for the reasons set forth above in paragraphs 18 through 82. Defendants also knew or recklessly disregarded that the Company, at the time, had massive amounts of worthless inventory and excess capacity, resulting from the fact that many of Flextronics' largest customers were canceling orders in the face of a severe economic downturn. Defendants also knew or recklessly disregarded that many of Flextronics' customers were experiencing severe financial difficulty and were unable to complete anticipated purchases. Defendants also knew or recklessly disregarded that, rather than achieving growth in the economic downturn, Flextronics was actually experiencing severe financial difficulties like many of its customers.  Defendants also knew or recklessly disregarded that the adverse events identified as

potential risk factors had already occurred.  Defendants also knew or recklessly disregarded that they were improperly releasing reserves into earnings.

178.    On May 8, 2002, Flextronics announced that it had decided to fire and replace its outside auditors, Arthur Andersen.  Following the preparation of the Company's year-end financial statements, defendants announced that while there were "no disagreements between the Company and Andersen on any matter of accounting principles or practices," Flextronics would replace the outside auditors.

## DEFENDANTS' SCHEME UNRAVELS

**A.    DEFENDANTS ANNOUNCE THAT AN ADDITIONAL $150 MILLION IN RESTRUCTURING CHARGES ARE NECESSARY, AND THAT THE COMPANY CANNOT POSSIBLY MEET DEFENDANTS' PREVIOUS EARNINGS AND REVENUE FORECASTS FOR THE FIRST QUARTER OF FISCAL 2003**

179.    After the market close on June 3, 2002, and only months after defendants unloaded over $500 million of Company shares priced at almost $26.00 per share upon unsuspecting investors, Flextronics held its mid-quarter conference call for the first quarter of fiscal 2003 (i.e., the period ending June 30, 2002).  During the call, defendants shocked the market when they finally revealed that the restructuring, which was purportedly paid for in October 2001 and substantially completed thereafter, was still far from complete.  Defendants now admitted that there were at least an additional $150 million in restructuring charges that had to be recorded.  In addition, defendants also stated that they could not possibly meet the Company's previous earnings and revenue forecasts for its first fiscal quarter 2003.   Defendants now admitted that the Company would earn as little as $0.05 per share, 62% less than the $0.13 per share defendants had forecasted only weeks earlier.  Revenue estimates were also suddenly reduced, with only $3 billion in revenue now forecast for the first quarter 2003, compared to prior estimates of $3.3 billion.

180.    Defendant Marks stated during the June 3, 2002 conference call:

[W]e will not earn what we expect to either this quarter or next.  For the current quarter we believe that earnings before restructuring charges will be 5 to 8 cents on

about $3 billion in revenue and we will be about 25% below EPS expectations for next quarter with EPS of 7 to 10 cents on about $3.2 billion in revenue. As we move beyond the September quarter, we are hopeful that the results of everything I have discussed here will begin to show the kind of improvement that our investors expect. In the future, we intend to give you more detailed updates on the progress towards our return to robust profit. Hopefully this will enhance your ability to develop your own expectations of our short-term and long-term earnings estimates as well as better assess our competitive position and strength. In the current quarter we will take a restructuring charge of approximately $150 million. We thought the fees would be behind us but the baggage due to the downturn and our intense desire to get our cost structure in line in the near term require us to move quickly.

181.   In response to this negative announcement, the price of Flextronics common stock dropped precipitously, falling from $12.32 per share to as low as $9.50 per share, a decline of almost 23%, on tremendous volume of 47 million Flextronics shares traded.

## POST-CLASS PERIOD EVENTS FURTHER DEMONSTRATING DEFENDANTS' FRAUD

182.   Analysts reacted very harshly to defendants' belated disclosure. For example:

- "Management has been saying for a long time they are already seeing signs of a recovery, and it was clear from the call that isn't the case. The miss was rather dramatic." (*Bloomberg*, 6/4/02, Michelle Lin Gutierrez, analyst for SoundView Technology Group)

- "***When you add back the charges, they never made any money***. This is their sixth charge in eight months, and no one expected any more." (*Bloomberg*, 6/4/02, James Grefenstette, co-manager Federated Growth Strategies Fund) (emphasis added).

- "The [$150 billion] charge is a surprise. They've taken well over $1.2 billion in the past six quarters and had said that was all they were going to take." (*Bloomberg*, 6/4/02, Kevin Denney, analyst for Brean Murray & Co.).

- "It was unfortunate and disappointing they had to take another restructuring charge. They had indicated that was over." (*Bloomberg*, 6/4/02, Jaye Morency, manager DBL Technology Fund).

- "Flextronics' management had previously indicated they were going to make no further restructuring charges and we anticipate the Company will record an additional $150 million in charges this quarter. It appears that the Company continues to right-size its operations and the payback from prior restructuring charges (including the $399 million in one-time charges taken in 2QFY02) has been difficult to achieve." (Kaufman Brothers analyst report by David Miller, June 4, 2002).

# ADDITIONAL SCIENTER ALLEGATIONS

### A.   INSIDER SELLING DURING THE CLASS PERIOD

183.   In September 2001, the majority of Flextronics' upper-level management (including the Individual Defendants) decided to forego salary compensation in return for millions of dollars in stock options (to be priced at market).  Some members of management even decided to forego their entire cash-based compensation for valuable stock options.  For example, according to a Proxy Statement filed by Flextronics with the SEC on or about July 19, 2002, the Company modified its Executive Compensation Program during the Class Period, substantially increasing the stock component of defendant Marks' compensation, while reducing his base salary from $600,000 in fiscal 2001 to $266,528 in fiscal 2002.

184.   While defendants were issuing materially false favorable statements about the Company's financial condition and business prospects, and concealing or obscuring negative information, the Individual Defendants, who had access to confidential information and were aware of the truth about the Company and its financial condition, were benefiting from the illegal course of business or course of conduct described in this complaint by selling large blocks of the Company's stock at artificially inflated prices without disclosing the material adverse facts about the Company to which they were privy.  Such sales were unusual in their amount and in their timing.  The numerous and repeated insider sales of Flextronics common stock by the Individual Defendants imposed upon them an additional duty of full disclosure of all of the material facts alleged in this complaint.

185.   The following table shows the heavy insider selling (*totaling more than $107 million*) by the Individual Defendants during the Class Period:

| INDIVIDUAL DEFENDANTS' CLASS PERIOD SALES | | | | | |
|---|---|---|---|---|---|
| DEFENDANT | POSITION | DATE | SHARES | PRICE | VALUE |

| | | | | | |
|---|---|---|---|---|---|
| Michael Marks | CEO | 12/5/01 | 300,000 | $29.07 | $8,721,000.00 |
| Michael Marks | CEO | 12/3/01 | 225,000 | $25.44 | $5,724,000.00 |
| Michael Marks | CEO | 11/30/01 | 525,000 | $25.46 | $13,366,500.00 |
| Michael Marks | CEO | 11/29/01 | 1,450,000 | $25.59 | $37,105,500.00 |
| Michael Marks | CEO | 2/6/01 | 450,000 | $38.07 | $17,131,500.00 |
| **TOTAL** | | | **2,950,000** | | **$82,048,500.00** |
| | | | | | |
| Robert Dykes | CFO | 12/5/01 | 130,000 | $28.23 | $3,669,900.00 |
| Robert Dykes | CFO | 12/4/01 | 103,418 | $26.14 | $2,703,346.52 |
| Robert Dykes | CFO | 12/4/01 | 24,560 | $26.14 | $641,998.40 |
| Robert Dykes | CFO | 11/29/01 | 100,000 | $36.38 | $3,638,000.00 |
| Robert Dykes | CFO | 5/22/01 | 32,000 | $31.76 | $1,016,320.00 |
| Robert Dykes | CFO | 2/12/01 | 145,000 | $34.61 | $5,018,450.00 |
| **TOTAL** | | | **534,978** | | **$16,688,014.92** |
| | | | | | |
| Michael McNamara | COO | 5/22/01 | 80,000 | $32.40 | $2,592,000.00 |
| **TOTAL** | | | **80,000** | | **$2,592,000.00** |
| | | | | | |
| **Total Insider Selling By Individual Defendants** | | | **3,564,978** | | **$101,328,514.90** |

186.    The timing of the Individual Defendants' stock sales during the Class Period was not

consistent with their prior sales in earlier periods and did not reflect their desire to sell stock as part

of a regular trading program or as part of their regular financial or estate planning.  Instead, the

Individual Defendants' Class Period stock sales were highly unusual, as further demonstrated by the

fact that they had only sold 544,176 shares of Flextronics stock for proceeds of only $29.8 million

in the 18-month period prior to the start of the Class Period, compared to sales of almost 3.6 million shares of Flextronics stock during the Class Period for proceeds of more than $101 million.

187.    Other insiders in the Company similarly sold their Flextronics stock at artificially inflated prices, without disclosing the truth to other investors.

| CLASS PERIOD SELLING BY OTHER FLEXTRONICS INSIDERS | | | | | |
|---|---|---|---|---|---|
| NAME | TITLE | DATE | SHARES | PRICE | VALUE |
| Ronald Snyder | President, Flextronics Design Services | 12/6/01 | 5,000 | $29.62 | $148,100.00 |
| | | 12/5/01 | 5,000 | $28.12 | $140,600.00 |
| | | 12/4/01 | 5,000 | $27.50 | $137,500.00 |
| | | 12/4/01 | 100 | $27.00 | $2,700.00 |
| | | 11/28/01 | 10,000 | $26.90 | $269,000.00 |
| | | 11/28/01 | 4,900 | $27.00 | $132,300.00 |
| | | 11/15/01 | 25,000 | $23.99 | $599,750.00 |
| TOTAL | | | 55,000 | | $1,429,950.00 |
| Goh Thiam Poh | Director | 8/7/01 | 17,700 | $29.34 | $519,318.00 |
| | | 8/6/01 | 2,300 | $29.02 | $66,746.00 |
| | | 8/2/01 | 25,000 | $29.29 | $732,250.00 |
| | | 8/2/01 | 10,200 | $29.10 | $296,820.00 |
| | | 8/2/01 | 10,000 | $29.01 | $290,100.00 |
| | | 8/2/01 | 4,700 | $29.06 | $136,582.00 |
| | | 8/2/01 | 100 | $29.05 | $2,905.00 |
| | | 5/21/01 | 75,000 | $32.00 | $2,400,000.00 |
| | | 5/21/01 | 50,000 | $29.82 | $1,491,000.00 |
| | | 5/21/01 | 50,000 | $30.00 | $1,500,000.00 |
| | | 5/21/01 | 37,300 | $32.02 | $1,194,346.00 |
| | | 5/21/01 | 23,500 | $32.02 | $752,470.00 |
| | | 5/21/01 | 20,000 | $32.50 | $650,000.00 |
| | | 5/21/01 | 20,000 | $32.51 | $650,200.00 |
| | | 5/21/01 | 14,600 | $30.59 | $446,614.00 |
| | | 5/21/01 | 10,000 | $32.50 | $325,000.00 |
| | | 5/21/01 | 7,242 | $30.19 | $218,635.98 |
| | | 5/21/01 | 4,726 | $30.58 | $144,521.08 |
| | | 5/21/01 | 4,400 | $30.60 | $134,640.00 |
| | | 5/21/01 | 1,858 | $30.16 | $56,037.28 |
| | | 5/21/01 | 1,600 | $29.99 | $47,984.00 |

| CLASS PERIOD SELLING BY OTHER FLEXTRONICS INSIDERS | | | | | |
|---|---|---|---|---|---|
| **NAME** | **TITLE** | **DATE** | **SHARES** | **PRICE** | **VALUE** |
| | | 5/21/01 | 1,500 | $32.05 | $48,075.00 |
| | | 5/21/01 | 1,100 | $30.57 | $33,627.00 |
| | | 5/21/01 | 50,000 | $29.50 | $1,475,000.00 |
| | | 5/17/01 | 133,000 | $29.70 | $3,950,100.00 |
| | | 5/17/01 | 50,000 | $29.51 | $1,475,500.00 |
| | | 5/10/01 | 101,100 | $29.70 | $3,002,670.00 |
| | | 5/10/01 | 12,400 | $29.75 | $368,900.00 |
| | | 5/10/01 | 8,300 | $29.71 | $246,593.00 |
| | | 5/10/01 | 3,574 | $29.73 | $106,255.02 |
| | | 5/10/01 | 200 | $29.76 | $5,952.00 |
| | | 5/10/01 | 100 | $29.72 | $2,972.00 |
| | | 5/10/01 | 100 | $29.79 | $2,979.00 |
| **TOTAL** | | | **751,600** | | **$22,774,792.36** |
| Ashish Bhardwaj | President, Asia Pacific Operations and Senior Vice Pres. Of Strategic Accounts | 2/15/01 | 50,000 | $37.69 | $1,884,500.00 |
| | | 2/2/01 | 62,200 | $38.34 | $2,384,748.00 |
| | | 2/2/01 | 24,000 | $38.34 | $920,160.00 |
| | | 2/2/01 | 9,000 | $38.34 | $345,060.00 |
| | | 2/2/01 | 4,800 | $38.34 | $184,032.00 |
| **TOTAL** | | | **150,000** | | **$5,718,500.00** |
| Humphrey Porter | President, Flextronics Europe | 2/12/01 | 107,000 | $38.56 | $4,125,920.00 |
| | | 2/12/01 | 80,000 | $38.56 | $3,084,800.00 |
| | | 2/12/01 | 26,500 | $38.56 | $1,021,840.00 |
| **TOTAL** | | | **213,500** | | **$8,232,560.00** |
| Thomas Smach | VP of Finance | 12/6/01 | 10,000 | $27.50 | $275,000.00 |
| | | 11/28/01 | 9,700 | $24.24 | $235,128.00 |
| | | 11/28/01 | 300 | $24.27 | $7,281.00 |
| | | 11/14/01 | 10,000 | $26.90 | $269,000.00 |
| | | 2/12/01 | 6,000 | $35.66 | $213,960.00 |
| **TOTAL** | | | **36,000** | | **$1,000,369.00** |

| CLASS PERIOD SELLING BY OTHER FLEXTRONICS INSIDERS | | | | | |
|---|---|---|---|---|---|
| **NAME** | **TITLE** | **DATE** | **SHARES** | **PRICE** | **VALUE** |
| Sung Lam Tsui | Director | 5/25/01 | 20,000 | $29.50 | $590,000.00 |
| | | 5/18/01 | 20,000 | $29.33 | $586,600.00 |
| | | 5/17/01 | 10,000 | $29.00 | $290,000.00 |
| | | 5/2/01 | 10,000 | $29.00 | $290,000.00 |
| | | 2/15/01 | 10,000 | $37.44 | $374,400.00 |
| | | 1/22/01 | 20,000 | $37.13 | $742,600.00 |
| **TOTAL** | | | **90,000** | | **$2,873,600.00** |
| Patrick J. Foley | Director | 5/21/01 | 40,000 | $33.08 | $1,323,200.00 |
| **TOTAL** | | | **40,000** | | **$1,323,200.00** |
| Chuen Fah Alain Ahkong | Director | 5/17/01 | 20,000 | $29.32 | $586,400.00 |
| **TOTAL** | | | **20,000** | | **$586,400.00** |
| **Total Insider Selling by Other Flextronics Insiders** | | | **1,356,100** | | **$43,939,371.36** |

## B.   FLEXTRONICS' $1.5 BILLION IN PUBLIC STOCK OFFERINGS DURING THE CLASS PERIOD

188.    Defendants' scienter is also established by virtue of their efforts during the Class Period to raise $1.5 billion in cash by selling Flextronics stock in two separate public offerings (the 2001 and 2002 Offerings). These public offerings occurred while the price of the Company's stock was artificially inflated.

## NO SAFE HARBOR

189.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Flextronics who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

190.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Flextronics between January 18, 2001 and June 4, 2002, inclusive, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

191.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Flextronics common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Flextronics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

192.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

193.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

194.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws are violated by defendants' acts as alleged herein;

b.   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Flextronics; and

c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

195.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FRAUD-ON-THE-MARKET DOCTRINE**

196.   The market for Flextronics' securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Flextronics common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Flextronics securities relying upon the integrity of the market price of Flextronics' securities and market information relating to Flextronics, and have been damaged thereby.

197.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Flextronics common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

198.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Flextronics' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Flextronics and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

199.    At all relevant times, the market for Flextronics' securities was efficient for the following reasons, among others:

a.    Flextronics' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, Flextronics filed periodic public reports with the SEC and the NASDAQ;

c.     Flextronics regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.     Flextronics was followed by several securities analysts employed by major brokerage firms (including Bear, Stearns, Credit Suisse First Boston, Deutsche Bank, Goldman Sachs, Lehman Brothers, Merrill Lynch Global Securities and Morgan Stanley) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

200.    As a result of the foregoing, the market for Flextronics' securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Flextronics' stock price. Under these circumstances, all purchasers of Flextronics' securities during the Class Period suffered similar injury through their purchase of Flextronics' securities at artificially inflated prices and a presumption of reliance applies.

**FLEXTRONICS' GUIDANCE TO SECURITIES ANALYSTS AND ITS USE OF ANALYSTS AS A CONDUIT TO PROVIDE MATERIALLY FALSE AND MISLEADING INFORMATION TO THE SECURITIES MARKETS**

201.    Despite knowledge of: (i) excess inventory that was worthless without a customer to purchase it; (ii) excess manufacturing capacity that could not be profitably operated; and (iii) the true decline in Flextronics' forecasted business as reflected by individual reports from plant managers, defendants falsely portrayed the Company as thriving in the throes of a collapse in the technology market, and, without a reasonable basis, confirmed projections for the Company in order to artificially inflate the price of Flextronics common stock during the Class Period.

202.    Flextronics was followed by securities analysts employed by brokerage firms that throughout the Class Period reported information provided to them by defendants and made

recommendations concerning the Company's common stock based on the information provided by defendants.  Among the several securities firms that followed the Company during the Class Period were Bear, Stearns, Credit Suisse First Boston, Deutsche Bank, Goldman Sachs, Lehman Brothers, Merrill Lynch Global Securities and Morgan Stanley.  In writing their reports, analysts reflected information provided by defendants and their confirmation that information in the analysts' reports did not materially vary from defendants' internal knowledge of the Company's current operations and future prospects.

203.   Prior to and during the Class Period, it was the Company's frequent practice to have its top officers and key members of its management team, including the Individual Defendants, communicate regularly with securities analysts at the firms identified above (among others) on a regular basis to discuss, among other things, the Company's financial results, and to provide detailed guidance to these analysts with respect to the Company's business.  These communications included, but were not limited to, conference calls, meetings, analyst briefings and investor conferences where the defendants discussed relevant aspects of the Company's operations and financial prospects on, among others, the following dates: October 2, 2001, October 25, 2001, October 26, 2001, November 27, 2001, January 23, 2002, April 25, 2002, and June 3, 2002. Defendants knew that by participating in these regular and direct communications with analysts, the Company disseminated information to the investing community and that investors relied and acted on such information by purchasing and selling the Company's securities.

204.   Many of the analyst reports issued during the Class Period were remarkably similar or reported substantially the same facts after meetings with the Company.  This confirms that the information contained in analyst reports came from Flextronics.

205.   Defendants engaged in the above-referenced communications with analysts to cause or encourage them to issue favorable reports concerning Flextronics, and used these

communications to present the operations and prospects of Flextronics to the marketplace in a falsely favorable light to artificially inflate the market price of Flextronics' common stock. Flextronics also endorsed the reports of analysts, adopted them as its own, and placed its imprimatur on them as well as on the projections, forecasts, and statements contained therein, as set forth in more detail below.  Despite their duty to do so, defendants failed to correct these statements during the Class Period.

206.     The investment community, and in turn investors, relied and acted on the information communicated in these written reports that recommended that investors purchase Flextronics common stock.  Defendants manipulated and inflated the market price of Flextronics stock by falsely presenting to analysts, through regular meetings, and during both telephonic and written communications, the prospects of the Company, as well as by failing to disclose the true adverse information about the Company that was known only to them.

## FIRST CLAIM

### (Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5 Promulgated Thereunder
### Against Defendants Flextronics, Marks, Dykes and McNamara)

207.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

208.     During the Class Period, defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable the Individual Defendants to sell for personal gain over $100 million in Flextronics stock at artificially inflated prices without disclosing the material adverse facts about the Company to which they were privy; (iii) allow defendants to sell approximately 47 million shares of Flextronics common stock during the time defendants had access to material undisclosed adverse information about the Company, thereby allowing Flextronics to raise over $1.5 billion in proceeds; and (iv) cause plaintiffs and

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. C-03-2102-PJH                                                 97

other members of the Class to purchase Flextronics' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

209.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Flextronics' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

210.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Flextronics as specified herein.

211.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Flextronics' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Flextronics and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Flextronics securities during the Class Period.

212.   Defendants Marks, Dykes and McNamara's primary liability, and controlling person liability, arises from the following facts: (i) they were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

213.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Flextronics' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

214.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Flextronics' securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Flextronics' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Flextronics securities during the Class Period at artificially high prices and were damaged thereby.

215.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Flextronics was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Flextronics securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

216.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

217.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### (Violation Of Section 20(a) Of
### The Exchange Act Against Defendants Marks, Dykes and McNamara)

218.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

219.     Defendants Marks, Dykes and McNamara acted as controlling persons of Flextronics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

220.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

221.     As set forth above, Flextronics and defendants Marks, Dykes and McNamara each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, defendants Marks, Dykes and McNamara are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants'

wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### THIRD CLAIM

#### (Violation of Section 20A of the Exchange Against Defendants Marks, Dykes and McNamara)

222.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

223.    This Claim is brought by plaintiffs Szu-Chiang King, Narayana B. Bhat, Jose S. Ramos, Milton A. Werde, William A. Lemieux, Steven J. Ciardullo, Heroe Soedjak, David C. Lidderdale, Charles Varney, Jerry Bell, Harthia Bockmon, Cary Boyko, Philippe R. Forton, Roger A. Green, William J. Hickmann, Lorraine Sussman, William Naj, Pawan K. Kedia, Philip L. Cordes, Jr. (Trustee), Arlaine Cerbino, Allan S. Billehus, Robert & Ruth Stiasny, Michael W. Francis, Gerald R. Barrington, William R. Chadwick, Ranjit S. Khurana, Liling Tan and against defendants Marks, Dykes and McNamara.  As set forth in the chart attached as Exhibit B, each of the plaintiffs purchased Flextronics common stock contemporaneously with sales of Flextronics stock by defendants Marks, Dykes and McNamara.

224.    By virtue of their positions as senior insiders of Flextronics, defendants Marks, Dykes and McNamara were in possession of material, non-public information about the Company at the time of their collective sales of more than *$100 million* of their own Flextronics stock to plaintiffs and members of the Class at artificially inflated prices.

225.    By virtue of their participation in the scheme to defraud investors described, herein, and their sales of stock while in possession of material, non-public information about the adverse information detailed herein, these defendants violated the Exchange Act and applicable rules and regulations thereunder.

226.     Plaintiffs and all other members of the Class who purchased shares of Flextronics stock contemporaneously with the sales of Flextronics stock by defendants: (1) have suffered substantial damages in that they paid artificially inflated prices for Flextronics stock as a result of the violations of Sections 10(b) and 20(a) and Rule 10b-5 herein described; and (2) would not have purchased Flextronics stock at the prices they paid, or a all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements.

227.     Defendants Marks, Dykes and McNamara are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## FOURTH CLAIM

### (Violation of Section 11 of the Securities Act Against All Defendants In Regard To The 2001 Secondary Offering)

228.     This Claim is brought pursuant to Section 11 of the Securities Act (15 U.S.C. § 77k), against all defendants, on behalf of plaintiffs and those Class members who purchased shares issued in connection with, or traceable to, Flextronics' public offering of 27 million shares of common stock on or about February 1, 2001 at $37.9375 per share (2001 Offering).

229.     Plaintiffs and the other members of the Class purchased Flextronics common stock pursuant to or traceable to the 2001 Registration Statement and Prospectus.

230.     Flextronics is the registrant for the shares sold to plaintiffs and other members of the Class.

231.     Defendants Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong signed the registration statement for the 2001 Offering, which was filed with the SEC pursuant to the Securities Act, and were thus soliciting the public to purchase Flextronics stock.

232.     Defendants Banc of America Securities LLC, Goldman, Sachs & Co., Salomon Smith Barney, Thomas Weisel Partners LLC, Bear, Stearns & Co. Inc., Deutsche Bank (Alex

Brown), Lehman Brothers, and FleetBoston Financial Corp. (as the successor-in-interest to Robertson Stephens) were at all relevant times integrated financial services institutions that acted as co-underwriters of Flextronics' 2001 Offering (collectively referred to as the Underwriter Defendants).

233.   The defendants named herein were responsible for the contents and dissemination of the 2001 Registration Statement and the Prospectus.

234.   The 2001 Registration Statement and Prospectus contained the following untrue statements of material fact:

Third Quarter Financial Results. On January 18, 2001, we announced our financial results for the third quarter of fiscal year 2001. . . .  Gross profit increased from $170.1 million in the third quarter of fiscal 2000 to $236.7 million in the third quarter of fiscal 2001, and operating income increased from $83.6 million in the third quarter of fiscal 2000 to $115.2 million in the third quarter of fiscal 2001. Net income before amortization, merger related costs and other one-time charges increased from $58.5 million in the third quarter of fiscal 2000 to $122.7 million in the third quarter of fiscal 2001. Net income after amortization, merger related costs and other one-time charges increased from $47.8 million in the third quarter of fiscal 2000 to $67.8 million in the third quarter of fiscal 2001. As a result, our diluted earnings per share increased from $0.12 for the third quarter of fiscal 2000 to $0.14 for the third quarter of fiscal 2001.

*  *  *

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduces our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . .  In addition, because