many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross margins and operating income.

\* \* \*

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

. . . The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues would be harmed.

235.   However, the 2001 Registration Statement and Prospectus omitted to state the following material facts required to be stated therein or necessary to make the statements therein not misleading:

a.   <u>Excess high technology inventory was worthless because it was subject to rapid technological change and the Company did not have customers to purchase it</u>.  As many of Flextronics' agreements with its customers are not memorialized in writing, a significant number of the Company's customers terminated orders when the market downturn began.  However, because most of Flextronics' inventory is customer-specific, Flextronics was left with a tremendous amount of time-sensitive inventory that was rapidly becoming obsolete (including a massive amount of inventory at the Company's Silicon Valley manufacturing facilities in San Jose and Fremont, California).  Nonetheless, Flextronics avoided recording the impairments of such assets, thereby allowing the Company to overstate its financial performance during the Class Period.

b.   <u>Excess manufacturing capacity could not be profitably operated</u>. As a contract manufacturer, Flextronics is required to make significant capital investments in various facilities to manufacture unique products for its customers.  At the time of the 2001 Offering, Flextronics' customers began to cancel orders due to the massive decline in the demand for internet and telecommunications products and services.  Moreover, not only did

Flextronics' customers cancel existing contracts, but major customers also pressured the Company to accept return of product previously purchased from Flextronics that they could not sell. As a result of the significant reduction in demand for Flextronics' products, which resulted in order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets decreased significantly. Nonetheless, defendants caused Flextronics to improperly delay the recognition of impairment in the value of long-lived assets.

c.     Flextronics' forecasted business had actually declined, as reflected by individual reports from plant managers. Defendants ordered the destruction of internal sales forecasts that were dramatically lower than the forecasts being provided to investors. Specifically, Flextronics' Plant Controllers were required to submit 12-month rolling forecasts to the Corporate Finance Department each month. At the time of the 2001 Offering, however, Flextronics directed all of its Plant Controllers by email to destroy all hard and soft copies of these internal forecasts after they were sent to the Company's regional headquarters in San Jose, California. Defendants ordered that all copies of internal forecasts be destroyed because they were drastically different (i.e., lower) than the false and misleading forecasts that were being delivered to investors.

d.     Flextronics falsified financial statements at the time of the 2001 Offering by failing to write off worthless plant and equipment and inventory. When the technology market began declining, Flextronics was left with a substantial amount of excess manufacturing capacity and inventory. Such manufacturing facilities and unmarketable inventory were impaired under Generally Accepted Accounting Principles. Losses arising from such impairments were not timely recorded. Therefore, plaintiffs and Class members did not and could not appreciate that anticipated cash flows from these assets were not likely to materialize. In fact, at the time of the 2001 Offering, many of Flextronics' largest customers canceled their orders or lowered their budgeted production quantities. Thus, contrary to the Company's publicly stated policies, Flextronics was in fact failing to record

in its financial statements substantial amounts of impaired inventory and property and equipment in order to continue to appear to be profitable, whereas if it had accurately written off such inventory and plant and equipment it would not have been able to create the appearance of growth at the time of the 2001 Offering.

236.    At the times they purchased Flextronics shares, plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in paragraph 235 and could not have reasonably discovered those facts prior to the 2001 Offering.

237.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2001 Registration Statement and the Prospectus were true and without omissions of any material facts and were not materially misleading.

238.    Defendants are strictly liable to plaintiffs and the Class for the misstatements and omissions contained in the 2001 Registration Statement and Prospectus.

239.    This action has been brought within one year after the discovery of the untrue statements or the omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

240.    As a result of the foregoing, plaintiffs and the other members of the Class who purchased Flextronics common stock pursuant to or traceable to the 2001 Registration Statement and Prospectus have sustained damages.  The value of Flextronics shares has declined substantially subsequent to and due to defendants' violations of the federal securities laws.

## FIFTH CLAIM

### (Violation of Section 12(a)(2) of the Securities Act Against All Defendants In Regard To The 2001 Secondary Offering)

241.    This Claim is brought by plaintiffs against all defendants pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class members who purchased shares issued in

connection with, or traceable to, Flextronics' public offering of 27 million shares of common stock on or about February 1, 2001 at $37.9375 per share (2001 Offering).

242. Plaintiffs and the other members of the Class purchased Flextronics common stock pursuant to or traceable to the 2001 Registration Statement and Prospectus.

243. Flextronics is the registrant for the shares sold to plaintiffs and other members of the Class.

244. Defendants Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong signed the registration statement for the 2001 Offering, which was filed with the SEC pursuant to the Securities Act, and were thus soliciting the public to purchase Flextronics stock.

245. Defendants Banc of America Securities LLC, Goldman, Sachs & Co., Salomon Smith Barney, Thomas Weisel Partners LLC, Bear, Stearns & Co. Inc., Deutsche Bank (Alex Brown), Lehman Brothers, and FleetBoston Financial Corp. (as the successor-in-interest to Robertson Stephens) were at all relevant times integrated financial services institutions that acted as co-underwriters of Flextronics' 2001 Offering (collectively referred to as the Underwriter Defendants).

246. Defendants named herein were sellers, offerors and/or solicitors of sales of shares of Flextronics stock to plaintiffs and the members of the Class pursuant to the 2001 Registration Statement and Prospectus. The acts of solicitation by Flextronics and the Underwriter Defendants included participating in the preparation of the 2001 Registration Statement and Prospectus.

247. The 2001 Registration Statement and Prospectus contained the following untrue statements of material fact:

> Third Quarter Financial Results. On January 18, 2001, we announced our financial results for the third quarter of fiscal year 2001. . . . Gross profit increased from $170.1 million in the third quarter of fiscal 2000 to $236.7 million in the third quarter of fiscal 2001, and operating income increased from $83.6 million in the

third quarter of fiscal 2000 to $115.2 million in the third quarter of fiscal 2001. Net income before amortization, merger related costs and other one-time charges increased from $58.5 million in the third quarter of fiscal 2000 to $122.7 million in the third quarter of fiscal 2001. Net income after amortization, merger related costs and other one-time charges increased from $47.8 million in the third quarter of fiscal 2000 to $67.8 million in the third quarter of fiscal 2001. As a result, our diluted earnings per share increased from $0.12 for the third quarter of fiscal 2000 to $0.14 for the third quarter of fiscal 2001.

\* \* \*

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduces our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross margins and operating income.

\* \* \*

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

. . . The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues would be harmed.

248.    However, the 2001 Registration Statement and Prospectus omitted to state the following material facts required to be stated therein or necessary to make the statements therein not misleading:

a.  Excess high technology inventory was worthless because it was subject to rapid technological change and the Company did not have customers to purchase it. As many of Flextronics' agreements with its customers are not memorialized in writing, a significant number of the Company's customers terminated orders when the market downturn began. However, because most of Flextronics' inventory is customer-specific, Flextronics was left with a tremendous amount of time-sensitive inventory that was rapidly becoming obsolete (including a massive amount of inventory at the Company's Silicon Valley manufacturing facilities in San Jose and Fremont, California). Nonetheless, Flextronics avoided recording the impairments of such assets, thereby allowing the Company to overstate its financial performance during the Class Period.

b.  Excess manufacturing capacity could not be profitably operated. As a contract manufacturer, Flextronics is required to make significant capital investments in various facilities to manufacture unique products for its customers. At the time of the 2001 Offering, Flextronics' customers began to cancel orders due to the massive decline in the demand for internet and telecommunications products and services. Moreover, not only did Flextronics' customers cancel existing contracts, but major customers also pressured the Company to accept return of product previously purchased from Flextronics that they could not sell. As a result of the significant reduction in demand for Flextronics' products, which resulted in order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets decreased significantly. Nonetheless, defendants caused Flextronics to improperly delay the recognition of impairment in the value of long-lived assets.

c.  Flextronics' forecasted business had actually declined, as reflected by individual reports from plant managers. Defendants ordered the destruction of internal sales forecasts that were dramatically lower than the forecasts being provided to investors. Specifically, Flextronics' Plant Controllers were required to submit 12-month rolling forecasts to the Corporate Finance Department each month. At the time of the 2001

Offering, however, Flextronics directed all of its Plant Controllers by email to destroy all hard and soft copies of these internal forecasts after they were sent to the Company's regional headquarters in San Jose, California. Defendants ordered that all copies of internal forecasts be destroyed because they were drastically different (i.e., lower) than the false and misleading forecasts that were being delivered to investors.

       d.    <u>Flextronics falsified financial statements at the time of the 2001 Offering by failing to write off worthless plant and equipment and inventory</u>. When the technology market began declining, Flextronics was left with a substantial amount of excess manufacturing capacity and inventory. Such manufacturing facilities and unmarketable inventory were impaired under Generally Accepted Accounting Principles. Losses arising from such impairments were not timely recorded. Therefore, plaintiffs and Class members did not and could not appreciate that anticipated cash flows from these assets were not likely to materialize. In fact, at the time of the 2001 Offering, many of Flextronics' largest customers canceled their orders or lowered their budgeted production quantities. Thus, contrary to the Company's publicly stated policies, Flextronics was in fact failing to record in its financial statements substantial amounts of impaired inventory and property and equipment in order to continue to appear to be profitable, whereas if it had accurately written off such inventory and plant and equipment it would not have been able to create the appearance of growth at the time of the 2001 Offering.

249.    Defendants owed to the purchasers of Flextronics shares, including plaintiffs and other members of the Class who purchased Flextronics shares in connection with or traceable to the 2001 Offering, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the 2001 Registration Statement and Prospectus contained therein, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. C-03-2102-PJH

250.    Plaintiffs and those Class members did not know, or in the exercise of reasonable diligence could not have known, of the material untruths and omissions contained in the 2001 Registration Statement and Prospectus.

251.    By reason of the foregoing, plaintiffs and the members of the Class who purchased shares in or traceable to the 2001 Offering have been damaged.

252.    By reason of the conduct alleged herein, defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, plaintiffs and members of the Class who hold Flextronics shares purchased pursuant to the 2001 Registration Statement and Prospectus have the right to rescind and recover the consideration paid for their Flextronics shares and, hereby elect to rescind and tender their Flextronics shares to defendants. Plaintiffs and Class members who have sold the Flextronics shares they purchased pursuant to the 2001 Offering are entitled to rescissory damages.

253.    Plaintiffs, individually and representatively, hereby tender Flextronics shares to defendants that he and other Class members similarly situated continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

254.    This action has been brought within one year after the discovery of the untrue statements or the omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of the securities at issue.

## SIXTH CLAIM

### (Violation of Section 15 of the Securities Act
### In Regard to the 2001 Secondary Offering)

255.    Defendants Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong were controlling persons of Flextronics within the meaning of Section 15 of the Securities Act. By

virtue of their high-level positions and/or their ownership of the Company's stock and/or participation in the Company's operations, each of the defendants named herein had the power to influence and control, and did influence and control, the decision-making of the Company, including the content and dissemination of the 2001 Registration Statement and Prospectus. Each of the defendants named herein were provided with or had unlimited access to copies of the Company's 2001 Registration Statement and Prospectus prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

256.     By virtue of their positions as controlling persons, each of the defendants named herein are liable to plaintiffs and the members of the Class who purchased shares in or traceable to the 2001 Offering, pursuant to Section 15 of the Securities Act, for Flextronics' violations of Sections 11 and 12(a)(2) of the Securities Act, as alleged in the Fourth and Fifth Claims.

## SEVENTH CLAIM

**(Violation of Section 11 of the Securities Act Against Certain Defendants In Regard To The 2002 Secondary Offering)**

257.     This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against Flextronics, Banc of America Securities LLC, Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong, on behalf of plaintiffs and those Class members who purchased shares issued in connection with, or traceable to, Flextronics' public offering of 20 million shares of common stock on January 7, 2002 at $25.96 per share (2002 Offering).

258.     Plaintiffs and the other members of the Class purchased Flextronics common stock pursuant to or traceable to the 2002 Registration Statement and Prospectus.

259.     Flextronics is the registrant for the shares sold to plaintiffs and other members of the Class.

260.    Defendants Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong signed the registration statement for the 2002 Offering, which was filed with the SEC pursuant to the Securities Act, and were thus soliciting the public to purchase Flextronics stock.

261.    Defendant Banc of America Securities LLC was at all relevant times an integrated financial services institution that acted as sole underwriter of Flextronics' 2002 Offering.

262.    The defendants named herein were responsible for the contents and dissemination of the 2002 Registration Statement and the Prospectus.

263.    The 2002 Registration Statement and Prospectus contained the following untrue statements of material fact:

> We "incorporate by reference" in this prospectus information from other documents that we file with the SEC, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference . . . any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 prior to the sale of all the shares covered by this prospectus . . . .

Therefore, the 2002 Registration Statement and Prospectus incorporated defendants' statements contained in the Company's SEC filings as follows:

a.    ***Form 10-Q For The Third Quarter Of Fiscal Year 2001, The Period Ending December 31, 2000 (Dated February 9, 2001)***:  The Form 10-Q, which was signed by defendant Dykes, reported net inventories of $1.727 billion for the third quarter, $1.856 billion in property and equipment, and $6.600 billion in total assets.  The Form 10-Q also stated that gross profit was $236.7 million for the quarter, compared to $170.1 million for the same quarter the previous year. The Form 10-Q also reported net income of $67.78 million for the quarter, compared to $47.8 million in the same quarter the prior year.  Finally, the Form 10-Q stated that earnings per share (diluted) for the third quarter were $0.14, compared to $0.12 for the same quarter the prior year.

The Form 10-Q also reported the amount and composition of certain pre-tax charges for the third

quarter of fiscal 2001:

Unusual Charges

     We recognized unusual pre-tax charges of $587.8 million during the nine
months ended fiscal 2001. . . .

     The unusual pre-tax charges include $77.5 million for the write-down of
long-lived assets to fair value.  Of these charges, approximately $46.6 million, $14.4
million, and $16.5 million were written down in the first, second, and third quarters
of fiscal 2001, respectively. These amounts have been classified as a component of
Cost of Sales.  Included in the long-lived asset impairment are charges of $74.6
million, which relate to property, plant and equipment associated with the various
manufacturing and administrative facility closures which were written down to their
net realizable value based on their estimated sales price.  Certain facilities will
remain in service until their anticipated disposal dates pursuant to the exit plans.
Since the assets will remain in service from the date of the decision to dispose of
these assets to the anticipated disposal date, the assets will be depreciated over this
expected period.  The impaired long-lived assets consisted primarily of machinery
and equipment of $53.5 million and building and improvements of $21.1 million.
The long-lived asset impairment also includes the write-off of the remaining
goodwill and other intangibles related to certain closed facilities of $2.9 million.

     The unusual pre-tax charges also include approximately $49.6 million for
losses on inventory write-downs and other exit costs, which resulted from the
integration plans.  This amount has been classified as a component of Cost of Sales.
We have written off and disposed of approximately $11.9 million of inventory
related to the first quarter integration activities and approximately $10.6 million was
written off and disposed of related to the third quarter integration activities.  The
$27.1 million of other exit costs relate primarily to items such as lease termination
costs, incremental amounts of uncollectible accounts receivable, warranty-related
accruals, legal and other exit costs, incurred directly as a result of the various exit
plans.  We paid approximately $1.6 million, $4.2 million, and $2.6 million of other
exit costs during the first, second and third quarters of fiscal 2001.  Additionally,
approximately $3.1 million, $0.5 million and $3.5 million of other exit costs were
written off during the first, second and third quarters, respectively.  The remaining
$11.6 million is classified in accrued liabilities as of December 31, 2000 and is
expected to be substantially paid out by the end of fiscal 2001, except for certain
long-term contractual obligations.

The Form 10-Q for the third quarter of fiscal 2001 also identified several contingent risk factors

that, unknown to investors, were already having an adverse effect on the Company.  The Form 10-Q

stated:

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION
QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay
production for a number of reasons. Cancellations, reductions or delays by a

significant customer or by a group of customers would seriously harm our results of operations.

... The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross margins and operating income.

The Form 10-Q for the third quarter of fiscal 2001 also stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

... The identity of our principal customers has varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues would be harmed.

b.   ***Form 10-K For The 2001 Fiscal Year Ending March 31, 2001 (Dated June 29, 2001)***: The 2001 Form 10-K, which was signed by defendants Marks and Dykes, reported net inventories of $1.78 billion (compared to $1.14 billion in 2000), $1.828 billion in property, plant and equipment (compared to $1.323 billion in 2000), and total assets of $7.57 billion (compared to $5.13 billion in 2000).  The 2001 Form 10-K also reported $471.3 million in gross profit for fiscal 2001, a net loss of $446 million and earnings per share (diluted) of $(1.01).  The 2001 Form 10-K also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company.  The 2001 Form 10-K stated:

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.

... Customers may cancel their orders, change production quantities or delay production for a number of reasons. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

The 2001 Form 10-K also stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

\* \* \*

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

c.   ***Form 10-Q for the first quarter of fiscal year 2002, the period ending June 30, 2001 (dated August 14, 2001)***: The Form 10-Q, which was signed by defendant Dykes, reported net income of $88.328 million for the quarter (compared to a loss of $370.562 million for the same quarter in fiscal 2000.  The Form 10-Q also reported net inventories of $1.52 billion for the quarter, $2 billion in property, plant and equipment, and $7.71 in total assets.  The Form 10-Q also reported $231.8 million in gross profit, net income of $88.33 million, and earnings per share (diluted) of $0.17.  The Form 10-Q also reported the amount and composition of certain pre-tax charges for fiscal 2001:

The Company recognized unusual pre-tax charges of approximately $973.3 million during fiscal year 2001. . . .

The unusual pre-tax charges recorded in fiscal 2001, included $232.5 million for the write-down of long-lived assets to fair value. This amount has been classified as a component of Cost of Sales during fiscal 2001. Included in the long-lived asset impairment are charges of $229.1 million, which related to property, plant and equipment associated with the various manufacturing and administrative facility closures which were written down to their net realizable value based on their estimated sales price. Certain facilities will remain in service until their anticipated disposal dates pursuant to the exit plans. Since the assets will remain in service from

the date of the decision to dispose of these assets to the anticipated disposal date, the assets are being depreciated over this expected period. The impaired long-lived assets consisted primarily of machinery and equipment of $153.0 million and building and improvements of $76.1 million. The long-lived asset impairment also included the write-off of the remaining goodwill and other intangibles related to certain closed facilities of $3.4 million.

The unusual pre-tax charges recorded in fiscal 2001, also included approximately $219.4 million for other exit costs. Approximately $210.2 million of this amount has been classified as a component of Cost of Sales. The other exit costs recorded, primarily related to items such as building and equipment lease termination costs, warranty costs, current asset impairments and payments to suppliers and vendors to terminate agreements and were incurred directly as a result of the various exit plans. The Company paid approximately $17.2 million of other exit costs during the first quarter of fiscal 2002. Additionally, approximately $3.9 million of other exit costs were non-cash charges utilized during the first quarter of fiscal 2002. The remaining $74.2 million is classified in accrued liabilities as of June 30, 2001 and is expected to be substantially paid out within one year from the commitment dates of the respective exit plans, except for certain long-term contractual obligations.

The Form 10-Q also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company.  The Form 10-Q stated:

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . .  In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

The Form 10-Q also stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

* * *

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all.

Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

d.   ***Form 10-Q For The Second Quarter Of Fiscal Year 2002, The Period Ending September 30, 2001 (Dated November 14, 2001)***: The Form 10-Q, which was signed by defendant Dykes, reported a net loss of $329.9 million for the quarter. The Form 10-Q also reported $7.88 in total assets. The Form 10-Q also reported a gross loss of $230.7 million, and a loss per share (diluted) of $0.69. The Form 10-Q also stated that "[t]he Company recognized unusual pre-tax charges of approximately $516.1 million during the second quarter of fiscal 2002." The Form 10-Q also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company. The Form 10-Q stated:

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Many of our customers' industries are experiencing a significant decrease in demand for their products and services. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them, and placing purchase orders for lower volumes of products than previously anticipated. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations by reducing the volumes of products manufactured by us for the customers and delivered in that period, as well as causing a delay in the repayment of our expenditures for inventory in preparation for customer orders and lower asset utilization resulting in lower gross margins.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, increase capacity and incur other expenses to meet the anticipated demand of our customers, which may cause reductions in our gross margins if customer orders are delayed or canceled. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

The Form 10-Q also stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

* * *

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

264.    The 2002 Registration Statement and Prospectus also stated:

**Our customers may cancel their orders, change production quantities or delay production.**

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Many of our customers' industries are experiencing a significant decrease in demand for their products and services. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them, and placing purchase orders for lower volumes of products than previously anticipated. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations by reducing the volumes of products manufactured by us for the customers and delivered in that period, as well as causing a delay in the repayment of our expenditures for inventory in preparation for customer orders and lower asset utilization resulting in lower gross margins.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, increase capacity and incur other expenses to meet the anticipated demand of our customers, which may cause reductions in our gross margins if customer orders are delayed or canceled. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . .   In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

* * *

**The majority of our sales come from a small number of customers; if we lose any of these customers, our sales could decline significantly.**

* * *

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

265.    However, the 2002 Registration Statement and Prospectus omitted to state the following material facts required to be stated therein or necessary to make the statements therein not misleading:

a.    <u>Reserves were improperly released to meet predetermined earnings targets</u>. Flextronics manipulated accounting reserves to show more favorable financial metrics. Specifically, defendants improperly released accounting reserves (commencing no later than 3Q02), in order to meet certain predetermined earnings targets and to mask defendants' inability to prosper in the adverse tech market.  Defendants accomplished this by establishing at least two separate reserve accounts during the Class Period (the "memorial" and "dark period" accounts), which were commonly known within the Company (and treated) as "*slush fund*" accounts.

b.    <u>Excess high technology inventory was worthless because it was subject to rapid technological change and the Company did not have customers to purchase it</u>.  As many of Flextronics' agreements with its customers are not memorialized in writing, a significant number of the Company's customers terminated orders when the market downturn began.  However, because most of Flextronics' inventory is customer-specific, Flextronics was left with a tremendous amount of time-sensitive inventory that was rapidly becoming obsolete (including a massive amount of inventory at the Company's Silicon Valley manufacturing facilities in San Jose and Fremont, California).  Nonetheless, Flextronics avoided recording the impairments of such assets, thereby allowing the Company to overstate its financial performance at the time of the 2002 Offering.

c.    <u>Excess manufacturing capacity could not be profitably operated</u>. As a contract manufacturer, Flextronics is required to make significant capital investments in various facilities to manufacture unique products for its customers.  At the time of the 2002 Offering, Flextronics' customers began to cancel orders due to the massive decline in the demand for internet and telecommunications products and services.  Moreover, not only did Flextronics' customers cancel existing contracts, but major customers also pressured the

Company to accept return of product previously purchased from Flextronics that they could not sell. As a result of the significant reduction in demand for Flextronics' products, which resulted in order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets decreased significantly. Nonetheless, defendants caused Flextronics to improperly delay the recognition of impairment in the value of long-lived assets.

d.    Flextronics' forecasted business had actually declined, as reflected by individual reports from plant managers. Defendants ordered the destruction of internal sales forecasts that were dramatically lower than the forecasts being provided to investors. Specifically, Flextronics' Plant Controllers were required to submit 12-month rolling forecasts to the Corporate Finance Department each month. At the time of the 2002 Offering, however, Flextronics directed all of its Plant Controllers by email to destroy all hard and soft copies of these internal forecasts after they were sent to the Company's regional headquarters in San Jose, California. Defendants ordered that all copies of internal forecasts be destroyed because they were drastically different (i.e., lower) than the false and misleading forecasts that were being delivered to investors.

e.    Flextronics falsified financial statements at the time of the 2002 Offering by failing to write off worthless plant and equipment and inventory. When the technology market began declining, Flextronics was left with a substantial amount of excess manufacturing capacity and inventory. Such manufacturing facilities and unmarketable inventory were impaired under Generally Accepted Accounting Principles. Losses arising from such impairments were not timely recorded. Therefore, plaintiffs and Class members did not and could not appreciate that anticipated cash flows from these assets were not likely to materialize. In fact, at the time of the 2002 Offering, many of Flextronics' largest customers canceled their orders or lowered their budgeted production quantities. Thus, contrary to the Company's publicly stated policies, Flextronics was in fact failing to record in its financial statements substantial amounts of impaired inventory and property and

equipment in order to continue to appear to be profitable, whereas if it had accurately written off such inventory and plant and equipment it would not have been able to create the appearance of growth at the time of the 2002 Offering.

266.    At the times they purchased Flextronics shares, plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in paragraph 265 and could not have reasonably discovered those facts prior to the 2002 Offering.

267.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2002 Registration Statement and the Prospectus were true and without omissions of any material facts and were not materially misleading.

268.    The defendants named herein are strictly liable to plaintiffs and the Class for the misstatements and omissions contained in the 2002 Registration Statement and Prospectus.

269.    This action has been brought within one year after the discovery of the untrue statements or the omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

270.    As a result of the foregoing, plaintiffs and the other members of the Class who purchased Flextronics common stock pursuant to or traceable to the 2002 Registration Statement and Prospectus have sustained damages.  The value of Flextronics shares has declined substantially subsequent to and due to defendants' violations of the federal securities laws.

**EIGHTH CLAIM**

**(Violation of Section 12(a)(2) of the Securities Act Against Certain Defendants in Regard to the 2002 Secondary Offering)**

271.    This Claim is brought by plaintiffs against Flextronics, Banc of America Securities LLC, Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong, pursuant to

Section 12(a)(2) of the Securities Act on behalf of the Class members who purchased shares issued in connection with, or traceable to, Flextronics' public offering of 20 million shares of common stock on January 7, 2002 at $25.96 per share (2002 Offering).

272.    Plaintiffs and the other members of the Class purchased Flextronics common stock pursuant to or traceable to the 2002 Registration Statement and Prospectus.

273.    Flextronics is the registrant for the shares sold to plaintiffs and other members of the Class.

274.    Defendants Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong signed the registration statement for the 2002 Offering, which was filed with the SEC pursuant to the Securities Act, and were thus soliciting the public to purchase Flextronics stock.

275.    Defendant Banc of America Securities LLC was at all relevant times an integrated financial services institution that acted as sole underwriter of Flextronics' 2002 Offering.

276.    Defendants named herein were sellers, offerors and/or solicitors of sales of shares of Flextronics stock to plaintiffs and the members of the Class pursuant to the 2002 Registration Statement and Prospectus.  The acts of solicitation by Flextronics and Banc of American Securities LLC included participating in the preparation of the 2002 Registration Statement and Prospectus.

277.    The 2002 Registration Statement and Prospectus contained the following untrue statements of material fact:

> We "incorporate by reference" in this prospectus information from other documents that we file with the SEC, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference . . . any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 prior to the sale of all the shares covered by this prospectus . . . .

Therefore, the 2002 Registration Statement and Prospectus incorporated defendants' statements contained in the Company's SEC filings as follows:

e.   ***Form 10-Q For The Third Quarter Of Fiscal Year 2001, The Period Ending December 31, 2000 (Dated February 9, 2001)***:   The Form 10-Q, which was signed by defendant Dykes, reported net inventories of $1.727 billion for the third quarter, $1.856 billion in property and equipment, and $6.600 billion in total assets.  The Form 10-Q also stated that gross profit was $236.7 million for the quarter, compared to $170.1 million for the same quarter the previous year. The Form 10-Q also reported net income of $67.78 million for the quarter, compared to $47.8 million in the same quarter the prior year.  Finally, the Form 10-Q stated that earnings per share (diluted) for the third quarter were $0.14, compared to $0.12 for the same quarter the prior year. The Form 10-Q also reported the amount and composition of certain pre-tax charges for the third quarter of fiscal 2001:

Unusual Charges

   We recognized unusual pre-tax charges of $587.8 million during the nine months ended fiscal 2001. . . .

   The unusual pre-tax charges include $77.5 million for the write-down of long-lived assets to fair value.  Of these charges, approximately $46.6 million, $14.4 million, and $16.5 million were written down in the first, second, and third quarters of fiscal 2001, respectively. These amounts have been classified as a component of Cost of Sales.  Included in the long-lived asset impairment are charges of $74.6 million, which relate to property, plant and equipment associated with the various manufacturing and administrative facility closures which were written down to their net realizable value based on their estimated sales price.  Certain facilities will remain in service until their anticipated disposal dates pursuant to the exit plans. Since the assets will remain in service from the date of the decision to dispose of these assets to the anticipated disposal date, the assets will be depreciated over this expected period.  The impaired long-lived assets consisted primarily of machinery and equipment of $53.5 million and building and improvements of $21.1 million. The long-lived asset impairment also includes the write-off of the remaining goodwill and other intangibles related to certain closed facilities of $2.9 million.

   The unusual pre-tax charges also include approximately $49.6 million for losses on inventory write-downs and other exit costs, which resulted from the integration plans.  This amount has been classified as a component of Cost of Sales. We have written off and disposed of approximately $11.9 million of inventory related to the first quarter integration activities and approximately $10.6 million was written off and disposed of related to the third quarter integration activities.  The

$27.1 million of other exit costs relate primarily to items such as lease termination costs, incremental amounts of uncollectible accounts receivable, warranty-related accruals, legal and other exit costs, incurred directly as a result of the various exit plans. We paid approximately $1.6 million, $4.2 million, and $2.6 million of other exit costs during the first, second and third quarters of fiscal 2001. Additionally, approximately $3.1 million, $0.5 million and $3.5 million of other exit costs were written off during the first, second and third quarters, respectively. The remaining $11.6 million is classified in accrued liabilities as of December 31, 2000 and is expected to be substantially paid out by the end of fiscal 2001, except for certain long-term contractual obligations.

The Form 10-Q for the third quarter of fiscal 2001 also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company. The Form 10-Q stated:

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross margins and operating income.

The Form 10-Q for the third quarter of fiscal 2001 also stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

. . . The identity of our principal customers has varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues would be harmed.

f.    ***Form 10-K For The 2001 Fiscal Year Ending March 31, 2001 (Dated June 29, 2001)***: The 2001 Form 10-K, which was signed by defendants Marks and Dykes, reported net inventories of $1.78 billion (compared to $1.14 billion in 2000), $1.828 billion in property, plant

and equipment (compared to $1.323 billion in 2000), and total assets of $7.57 billion (compared to $5.13 billion in 2000). The 2001 Form 10-K also reported $471.3 million in gross profit for fiscal 2001, a net loss of $446 million and earnings per share (diluted) of $(1.01). The 2001 Form 10-K also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company. The 2001 Form 10-K stated:

> OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.
>
> . . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.
>
> . . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

The 2001 Form 10-K also stated:

> THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.
>
> * * *
>
> The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

g.   ***Form 10-Q for the first quarter of fiscal year 2002, the period ending June 30, 2001 (dated August 14, 2001)***: The Form 10-Q, which was signed by defendant Dykes, reported net income of $88.328 million for the quarter (compared to a loss of $370.562 million for the same quarter in fiscal 2000. The Form 10-Q also reported net inventories of $1.52 billion for the quarter,

$2 billion in property, plant and equipment, and $7.71 in total assets.  The Form 10-Q also reported

$231.8 million in gross profit, net income of $88.33 million, and earnings per share (diluted) of

$0.17.  The Form 10-Q also reported the amount and composition of certain pre-tax charges for

fiscal 2001:

> The Company recognized unusual pre-tax charges of approximately $973.3 million during fiscal year 2001. . . .
>
> The unusual pre-tax charges recorded in fiscal 2001, included $232.5 million for the write-down of long-lived assets to fair value. This amount has been classified as a component of Cost of Sales during fiscal 2001. Included in the long-lived asset impairment are charges of $229.1 million, which related to property, plant and equipment associated with the various manufacturing and administrative facility closures which were written down to their net realizable value based on their estimated sales price. Certain facilities will remain in service until their anticipated disposal dates pursuant to the exit plans. Since the assets will remain in service from the date of the decision to dispose of these assets to the anticipated disposal date, the assets are being depreciated over this expected period. The impaired long-lived assets consisted primarily of machinery and equipment of $153.0 million and building and improvements of $76.1 million. The long-lived asset impairment also included the write-off of the remaining goodwill and other intangibles related to certain closed facilities of $3.4 million.
>
> The unusual pre-tax charges recorded in fiscal 2001, also included approximately $219.4 million for other exit costs. Approximately $210.2 million of this amount has been classified as a component of Cost of Sales. The other exit costs recorded, primarily related to items such as building and equipment lease termination costs, warranty costs, current asset impairments and payments to suppliers and vendors to terminate agreements and were incurred directly as a result of the various exit plans. The Company paid approximately $17.2 million of other exit costs during the first quarter of fiscal 2002. Additionally, approximately $3.9 million of other exit costs were non-cash charges utilized during the first quarter of fiscal 2002. The remaining $74.2 million is classified in accrued liabilities as of June 30, 2001 and is expected to be substantially paid out within one year from the commitment dates of the respective exit plans, except for certain long-term contractual obligations.

The Form 10-Q also identified several contingent risk factors that, unknown to investors, were

already having an adverse effect on the Company.  The Form 10-Q stated:

> OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.
>
> . . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, purchase materials and incur other expenses to meet the anticipated demand of our customers. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

The Form 10-Q also stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

* * *

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

h. ***Form 10-Q For The Second Quarter Of Fiscal Year 2002, The Period Ending September 30, 2001 (Dated November 14, 2001)***: The Form 10-Q, which was signed by defendant Dykes, reported a net loss of $329.9 million for the quarter. The Form 10-Q also reported $7.88 in total assets. The Form 10-Q also reported a gross loss of $230.7 million, and a loss per share (diluted) of $0.69. The Form 10-Q also stated that "[t]he Company recognized unusual pre-tax charges of approximately $516.1 million during the second quarter of fiscal 2002." The Form 10-Q also identified several contingent risk factors that, unknown to investors, were already having an adverse effect on the Company. The Form 10-Q stated:

OUR CUSTOMERS MAY CANCEL THEIR ORDERS, CHANGE PRODUCTION QUANTITIES OR DELAY PRODUCTION.

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Many of our customers' industries are experiencing a significant decrease in demand for their products and services. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them, and placing purchase orders for lower volumes of products than previously anticipated. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations by reducing the volumes of products manufactured by us for the customers and delivered in that period, as well as causing

a delay in the repayment of our expenditures for inventory in preparation for customer orders and lower asset utilization resulting in lower gross margins.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, increase capacity and incur other expenses to meet the anticipated demand of our customers, which may cause reductions in our gross margins if customer orders are delayed or canceled. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

The Form 10-Q also stated:

THE MAJORITY OF OUR SALES COMES FROM A SMALL NUMBER OF CUSTOMERS; IF WE LOSE ANY OF THESE CUSTOMERS, OUR SALES COULD DECLINE SIGNIFICANTLY.

\* \* \*

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

278.    The 2002 Registration Statement and Prospectus also stated:

**Our customers may cancel their orders, change production quantities or delay production.**

. . . Customers may cancel their orders, change production quantities or delay production for a number of reasons. Many of our customers' industries are experiencing a significant decrease in demand for their products and services. The generally uncertain economic condition of several of the industries of our customers has resulted, and may continue to result, in some of our customers delaying the delivery of some of the products we manufacture for them, and placing purchase orders for lower volumes of products than previously anticipated. Cancellations, reductions or delays by a significant customer or by a group of customers would seriously harm our results of operations by reducing the volumes of products manufactured by us for the customers and delivered in that period, as well as causing a delay in the repayment of our expenditures for inventory in preparation for customer orders and lower asset utilization resulting in lower gross margins.

. . . The short-term nature of our customers' commitments and the possibility of rapid changes in demand for their products reduce our ability to estimate accurately future customer requirements. This makes it difficult to schedule production and maximize utilization of our manufacturing capacity. We often increase staffing, increase capacity and incur other expenses to meet the anticipated demand of our customers, which may cause reductions in our gross margins if customer orders are delayed or canceled. Anticipated orders may not materialize, and delivery schedules may be deferred as a result of changes in demand for our customers' products. . . . In

addition, because many of our costs and operating expenses are relatively fixed, a reduction in customer demand could harm our gross profit and operating income.

\* \* \*

**The majority of our sales come from a small number of customers; if we lose any of these customers, our sales could decline significantly.**

\* \* \*

The identity of our principal customers have [sic] varied from year to year, and our principal customers may not continue to purchase services from us at current levels, if at all. Significant reductions in sales to any of these customers, or the loss of major customers, would seriously harm our business. If we are not able to timely replace expired, canceled or reduced contracts with new business, our revenues could be harmed.

279.    However, the 2002 Registration Statement and Prospectus omitted to state the following material facts required to be stated therein or necessary to make the statements therein not misleading:

a.      Reserves were improperly released to meet predetermined earnings targets. Flextronics manipulated accounting reserves to show more favorable financial metrics. Specifically, defendants improperly released accounting reserves (commencing no later than 3Q02), in order to meet certain predetermined earnings targets and to mask defendants' inability to prosper in the adverse tech market.  Defendants accomplished this by establishing at least two separate reserve accounts during the Class Period (the "memorial" and "dark period" accounts), which were commonly known within the Company (and treated) as "*slush fund*" accounts.

b.      Excess high technology inventory was worthless because it was subject to rapid technological change and the Company did not have customers to purchase it.  As many of Flextronics' agreements with its customers are not memorialized in writing, a significant number of the Company's customers terminated orders when the market downturn began.  However, because most of Flextronics' inventory is customer-specific, Flextronics was left with a tremendous amount of time-sensitive inventory that was rapidly becoming obsolete (including a massive amount of inventory at the Company's Silicon

Valley manufacturing facilities in San Jose and Fremont, California). Nonetheless, Flextronics avoided recording the impairments of such assets, thereby allowing the Company to overstate its financial performance at the time of the 2002 Offering.

c.     Excess manufacturing capacity could not be profitably operated. As a contract manufacturer, Flextronics is required to make significant capital investments in various facilities to manufacture unique products for its customers. At the time of the 2002 Offering, Flextronics' customers began to cancel orders due to the massive decline in the demand for internet and telecommunications products and services. Moreover, not only did Flextronics' customers cancel existing contracts, but major customers also pressured the Company to accept return of product previously purchased from Flextronics that they could not sell. As a result of the significant reduction in demand for Flextronics' products, which resulted in order cancellations and product returns, the future net cash flows expected to be generated from the Company's long-lived, property and equipment assets decreased significantly. Nonetheless, defendants caused Flextronics to improperly delay the recognition of impairment in the value of long-lived assets.

d.     Flextronics' forecasted business had actually declined, as reflected by individual reports from plant managers. Defendants ordered the destruction of internal sales forecasts that were dramatically lower than the forecasts being provided to investors. Specifically, Flextronics' Plant Controllers were required to submit 12-month rolling forecasts to the Corporate Finance Department each month. At the time of the 2002 Offering, however, Flextronics directed all of its Plant Controllers by email to destroy all hard and soft copies of these internal forecasts after they were sent to the Company's regional headquarters in San Jose, California. Defendants ordered that all copies of internal forecasts be destroyed because they were drastically different (i.e., lower) than the false and misleading forecasts that were being delivered to investors.

e.     Flextronics falsified financial statements at the time of the 2002 Offering by failing to write off worthless plant and equipment and inventory. When the technology

market began declining, Flextronics was left with a substantial amount of excess manufacturing capacity and inventory. Such manufacturing facilities and unmarketable inventory were impaired under Generally Accepted Accounting Principles. Losses arising from such impairments were not timely recorded. Therefore, plaintiffs and Class members did not and could not appreciate that anticipated cash flows from these assets were not likely to materialize. In fact, at the time of the 2002 Offering, many of Flextronics' largest customers canceled their orders or lowered their budgeted production quantities. Thus, contrary to the Company's publicly stated policies, Flextronics was in fact failing to record in its financial statements substantial amounts of impaired inventory and property and equipment in order to continue to appear to be profitable, whereas if it had accurately written off such inventory and plant and equipment it would not have been able to create the appearance of growth at the time of the 2002 Offering.

280.    Each of the defendants named herein owed to the purchasers of Flextronics shares, including plaintiffs and other members of the Class who purchased Flextronics shares in connection with or traceable to the 2002 Offering, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the prospectuses contained therein, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

281.    Plaintiffs and those Class members did not know, or in the exercise of reasonable diligence could not have known, of the material untruths and omissions contained in the 2002 Registration Statement and Prospectus.

282.    By reason of the foregoing, plaintiffs and the members of the Class who purchased shares in or traceable to the 2002 Offering have been damaged.

283.    By reason of the foregoing, each of the defendants named herein violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, plaintiffs and

members of the Class who hold Flextronics shares purchased pursuant to the 2002 Registration Statement and Prospectus have the right to rescind and recover the consideration paid for their Flextronics shares and, hereby elect to rescind and tender their Flextronics shares to the defendants named herein. Plaintiffs and Class members who have sold the Flextronics shares they purchased pursuant to the 2002 Offering are entitled to rescissory damages.

284.   Plaintiffs, individually and representatively, hereby tender Flextronics shares to the defendants named herein that they and other Class members similarly situated continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

285.   This action has been brought within one year after the discovery of the untrue statements or the omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of the securities at issue.

## NINTH CLAIM

### (Violation of Section 15 of the Securities Act Against Certain Defendants In Regard to the 2002 Secondary Offering)

286.   Defendants Michael Marks, Robert Dykes, Michael McNamara, Thomas J. Smach, Tsui Sung Lam, Michael J. Moritz, Richard L. Sharp, Patrick Foley and Chuen Fah Alain Ahkong were controlling persons of Flextronics within the meaning of Section 15 of the Securities Act. By virtue of their high-level positions and/or their ownership of the Company's stock and/or participation in the Company's operations, each of the defendants named herein had the power to influence and control, and did influence and control, the decision-making of the Company, including the content and dissemination of the 2002 Registration Statement and Prospectus. Each of the defendants named herein were provided with or had unlimited access to copies of the Company's 2002 Registration Statement and Prospectus prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

287.     By virtue of their positions as controlling persons, each of the defendants named herein are liable to plaintiffs and the members of the Class who purchased shares in or traceable to the 2002 Offering, pursuant to Section 15 of the Securities Act, for Flextronics' violations of Sections 11 and 12(a)(2) of the Securities Act, as alleged in the Seventh and Eighth Claims.

## PRAYER

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding rescissory damages in favor of plaintiffs and the other class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest therein;

(d)     Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

(e)     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(f)     Such other and further relief as the Court may deem just and proper.

1
## JURY TRIAL DEMAND

2
      Plaintiffs demand a trial by jury.

3
Dated: January 28, 2004          MILBERG WEISS BERSHAD HYNES &
                                 LERACH LLP

4
                             RANDI D. BANDMAN (145212)
                             SYLVIA WAHBA (197612)

5
                             100 Pine Street, 26th Floor
                             San Francisco, CA 94111

6
                             (415) 288-4545

7
                             -and-

8

9
                             <u>/s/ Paul D. Young (e-filing signature)</u>
                             PAUL D. YOUNG (*admitted pro hac vice*)

10
                             BRIAN C. KERR (*admitted pro hac vice*)
                             One Pennsylvania Plaza

11
                             New York, NY 10119
                             (212) 594-5300

12
                             SCHIFFRIN & BARROWAY, LLP

13
                             JACOB A. GOLDBERG
                             Three Bala Plaza East, Suite 400

14
                             Bala Cynwyd, PA 19004
                             (610) 667-7706

15
                           STULL, STULL & BRODY

16
                             PATRICE BISHOP
                             10940 Wilshire Boulevard, Suite 2350

17
                             Los Angeles, CA 90024
                             (310) 209-2468

18
                             *Co-Lead Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28